1 | Francis T. Donohue III, Esq. (CSB# 106801)
email: ftd@vctlaw.com
2 | VOSS, COOK & THEL LLP
2301 Dupont Drive, Suite 500
3 | Irvine, California 92612-7504
Telephone  (949) 435-0225
4 | Fax  949 435-0226

5 | Attorneys for Plaintiffs
Angela Danciu and George Danciu
6 |

7 |

8 | **UNITED STATES BANKRUPTCY COURT**

9 | **CENTRAL DISTRICT OF CALIFORNIA**

10 | In re:

11 | LEWIS O'REILLY                          CASE NO.  8:21-bk-12426-MW

12 |                                         Chapter 7
          Debtor
13 |                                         Adv. Case No. _____

14 | _____

15 | Angela Danciu and George Danciu

16 |              Plaintiffs,                **Adversary Complaint Objecting to**
                                            **Discharge of Claim And For Finding**
17 |       vs.                              **Claim Nondischargable Pursuant to**
                                            **11 U.S.C. § 523**
18 | Lewis O'Reilly

19 |              Defendant.

20 | TO THE COURT AND ALL PARTIES IN INTEREST:

21 |       Plaintiffs and creditors Angela Danciu and George Danciu (collectively, "Danciu" or

22 | "plaintiffs")  hereby object to an entry of discharge of debtor Lewis O'Reilly as to the debt he

23 | owes to Danciu, and hereby request that Debtor's debt to Danciu be excepted from any discharge

24 | in the above-entitled bankruptcy case pursuant to 11 U.S.C. § 523(a)(2),  and allege as follows:

25 |                         **FIRST CAUSE OF ACTION**
                  For a Determination That Defendant's Debts to Plaintiffs Are
26 |            Not Dischargeable Because of Fraud Pursuant to 11 U.S.C. §523(a)(2)

27 |

28 |

**INTRODUCTION**

1.      This is an action to object to entry of discharge in the chapter 7 bankruptcy case of defendant Debtor Lewis R. O'Reilly, case number 8:21-bk-12426-MW pending in the above referenced U.S. Bankruptcy Court for the Central District of California; as to the debt Debtor owes to plaintiffs and to seek a determination that O'Reilly's debt to plaintiffs should be excepted from any discharge order issued in this bankruptcy pursuant to 11 U.S.C. §523(a)(2).

2.      Plaintiffs contend that the debt is not dischargeable because the debt was for property and services obtained by false pretenses, false representation and actual fraud which was perpetrated by O'Reilly on Danciu when he fraudulently forged his wife's signature on a Lease and a Lease Guaranty, represented the signature as his wife's, and plaintiffs relied on that forged signature when they agreed to lease property to O'Reilly's company subject to the forged Lease and forged Guaranty.

**JURISDICTION**

3.      On 10/05/2021 Debtor filed a voluntary petition (the "Petition") for relief under chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code") in the above captioned United States Bankruptcy Court for the Central District of California.

4.      The court set January 18, 2022 as the filing deadline to object to the discharge or to challenge whether certain debts are dischargeable.

5.      As of December 17, 2021 the Meeting of Creditors has been continued to January 12, 2022.

6.      This Court has jurisdiction of this adversary proceeding pursuant to 28 U.S.C. § 1334 and Bankruptcy Code 11 U.S.C. § 523(a)(2) and FRBP 7001(6).

7.      This case is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) and 157(b)(2)(J).

**VENUE**

8.      Venue is proper under 28 U.S.C. § 1409.

**PARTIES**

9.      Plaintiffs George Danciu and Angela Danciu (collectively "Danciu" and

-2-
**ADVERSARY COMPLAINT**

"plaintiffs") are listed creditors of Debtor and are residents of Orange County California who leased commercial property located in Costa Mesa, California to Debtor's company Kool Blast Gas, Inc. based on a false representation by Debtor O'Reilly that he and his wife had signed the Lease and the written Guaranty of Lease.

10.    Defendant and debtor Lewis R. O'Reilly ("O'Reilly) is a resident of the city of Irvine, Orange County, California.

## FACTUAL ALLEGATIONS

### A.  The Bankruptcy Action

11.    On 10/05/2021 Debtor filed a voluntary petition (the "Petition") for relief under chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code") in the above captioned United States Bankruptcy Court for the Central District of California.

12.    Debtor listed the plaintiffs Angela Danciu's and George Danciu's claim on his Voluntary Petition for Bankruptcy as claim no. 4.4.

### B.  Plaintiffs' Claim and the California Superior Court Action Against O'Reilly

13.    In or about November 7, 2017, Danciu entered into a written lease with Debtor's company Kool Blast Gas, Inc. ("Kool Blast") for the rental of a commercial building in Costa Mesa, California. As part of the consideration for Danciu to enter the lease and as a material inducement for Danciu to enter the lease, Debtor provided Danciu with a written Lease and a written Guaranty of Lease that was purportedly signed and entered by Debtor and his wife Maryellen O"Reilly M.D.

14.    Kool Blast fell behind in payments due under the lease and on May 28, 2020 Danciu brought an action in the Superior Court of California, Orange County for breach of contract on the Lease and for breach of contract on the Guaranty of Lease  against O'Reilly and Maryellen O'Reilly.  A true copy of the complaint, which includes the Lease as its Exhibit A, and the Lease Guaranty as its Exhibit B, is attached to this pleading as **Exhibit 1** and is incorporated herein by reference.

15.    Debtor O'Reilly filed an answer to the complaint in which Debtor stated "Maryellen O'Reilly did not sign this lease and has no knowledge of it. I signed it without her

**ADVERSARY COMPLAINT**

knowledge." O'Reilly attached a document he entitled "O'Reilly Affidavit" to his answer to the complaint.  In that Affidavit O'Reilly states: "I am providing this document to affirm that I signed my ex-wife's name (Maryellen O'Reilly) to the lease document for the rental property at 1351 Logan Avenue, Suite A, Costa Mesa California on November 13, 2017. … I took this action without Maryellen's knowledge or permission to expedite the completion of this short two year lease." A true copy of Debtor's Answer is attached as **Exhibit 2** to this pleading and is incorporated herein by reference.

16.    Danciu also received a document from Debtor's ex-wife Maryellen O'Reilly which also attested to the fact that the purported signature of Maryellen O'Reilly was not actually her signature.

17.    In response to Debtor's admission that he forged his ex-wife's signature, Danciu filed a First Amended Complaint that added a cause of action for fraud against Debtor O'Reilly for forging his ex-wife's signature on the Guaranty of Lease. A true copy of the First Amended Complaint is attached to this complaint as **Exhibit 3** and is incorporated herein by reference.

18.    Default was entered against Debtor O'Reilly on the First Amended Complaint on September 9, 2021.  A true copy of the Entry of Default is attached to this complaint as **Exhibit 4** and is incorporated herein by reference.

19.    Debtor filed his present Chapter 7 Bankruptcy action before judgment was entered on the default.

**The Allegations Of Fraud**

20.    Plaintiffs Angela Danciu and George Danciu entered into a written lease contract with defendant Kool Blast for the lease of real estate located at 1351 Logan Avenue, Suite A, Costa Mesa, CA. A true copy of the written Lease is attached to this complaint as **Exhibit A** to both **Exhibit 1** (the state Complaint) and **Exhibit 3** (the state First Amended Complaint) and is incorporated herein by reference. The contract is referred to as the "**Lease**" herein.  The Lease was signed by Kool Blast by its president Lewis O'Reilly and purportedly by Maryellen O'Reilly as Kool Blast's Corporate Secretary; additionally the Guaranty of Lease was signed and entered by Lewis O'Reilly in his individual capacity and purportedly signed and entered by Maryellen

**ADVERSARY COMPLAINT**

O'Reilly in her individual capacity. As noted elsewhere in this pleading, Debtor O'Reilly has since acknowledged that he forged Maryellen O'Reilly's signature on the lease documents.

21.    Under the terms of the Lease at paragraph 4.1 the "Rent" is defined as all monetary obligations of the Lessee to the Lessor under the terms of the Lease.  The Rent in this Lease consists of the Base Rent and also the Lessee's Share of the Company Area Operating Expenses, as provided in section 4.2 of the Lease.  The Lessee's share of the Operating Expenses is referred to as "CAM" charges in this complaint.

22.    Paragraph 1.5 of the Lease provides that the Rent to be paid under the Lease is due on the 1st day of each month and that the Base Rent was $7,461 per month from January 1, 2018 to December 14, 2019.

23.    Paragraph 54 of the Lease provides that if the Lease is renewed, the Base Rent for the Renewal Years shall be $7,915 per month for the period of December 15, 2019 to December 14, 2020 and $8,152 per month for the period December 15, 2020 to December 14, 2021.  The CAM charges are $1,580 per month.

24.    Kool Blast renewed the Lease for the term through December 14, 2020 and Kool Blast continues to occupy the premises.

25.    The Lease provides at paragraph 13.5 that any monetary payment due Lessor under the Lease, other than late charges, shall bear interest at 10% from the 31st day after it was due.

26.    The Lease provides at paragraph 31 that attorney fees shall be awarded to the prevailing party on any action or proceeding involving the leased premises.  The same paragraph allows for recovery of attorney fees incurred by Lessor in the preparation and service of notices of default and consultations in connection therewith.  Plaintiffs incurred attorney fees of $1,921 in preparing and service of the notice of default on defendant.  Plaintiffs have also now incurred and will continue to incur attorney fees and expenses associated with litigation in this lawsuit over the defendants' breach of lease and the related guaranty of lease.

27.    Defendant Kool Blast breached the lease by failing to timely pay the rent as it came due under the Lease, including failing to timely pay the base rent and the CAM charges.

-5-

As of April 10, 2020 defendant Kool Blast was delinquent in its Rent and was behind in payments, and had made no payment towards the February, March, or April rent for 2020.  As of April 10, 2020 Kool Blast owed $36,163 in back rent and late charges, not including the interest owed on the unpaid Rent balances.

28.    On April 10, 2020 plaintiffs sent written notice to Kool Blast and to defendants Lewis O'Reilly and Maryellen O'Reilly that Kool Blast was in breach of its Lease and of the amount owed.  The notice also informed the defendants that because Kool Blast had failed to timely pay rent for three consecutive months, Lessors were now demanding that rent be paid on a quarterly basis in advance as provided by paragraph 13.4 of the Lease.

29.    Subsequent to the April 10, 2020 notice, Kool Blast continued to breach the lease by not paying the rent then due on the Lease.

30.    Plaintiffs have been damaged by Kool Blast's breaches of the Lease in the amount of $89,143.10, plus the incurred attorney fees, plus interest on the late rent payments.  This amount includes all rent payments and late charges through April of 2021, and includes the all payments made through May 2021, with the last payment of $25,000 made on or about December 29, 2020.

31.    Plaintiffs have performed all material conditions, covenants, and promises on their part to be performed under the agreement, except as excused by defendant's breaches. Plaintiffs have given all notices and taken all actions necessary to sue for the damages requested in this lawsuit.

32.    The written Lease agreement also includes a provision for recovery of attorney fees and costs for the prevailing party in any action brought upon this agreement.  Plaintiffs have been required to hire an attorney to assist them in this lawsuit to enforce this agreement, and are thus entitled to recover those attorney fees and costs.

**Allegations On Why The Debt Should Not Be Discharged Because Of Fraud**

33.    A true copy of the written Guaranty of Lease that was provided by O'Reilly to plaintiffs to obtain the lease is attached to this complaint as **Exhibit B** to both **Exhibit 1** (the state Complaint) and **Exhibit 3** (the state First Amended Complaint) and is incorporated herein

by reference.

34.    Lewis O'Reilly, acting for himself and as an officer of Kool Blast and on behalf of Kool Blast, falsely and fraudulently forged the signature for Maryellen O'Reilly on the written Lease and on the written Guaranty of Lease.  O'Reilly has admitted the same in his answer to the original complaint in this lawsuit, as alleged above.

35.    Debtor presented the signed Lease and Guaranty to plaintiffs representing that the signatures on the documents were Lewis O'Reilly's and that of Maryellen O'Reilly when Lewis O'Reilly knew that his representations were false and that Lewis had forged Maryellen O'Reilly's signature on the documents without permission of Maryellen O'Reilly.

36.    Debtor knew that plaintiffs would rely on the representation that it was Maryellen O'Reilly's signature and plaintiffs would believe that the signature for Maryellen O'Reilly on the lease documents were hers and were valid.

37.    Plaintiffs reasonably relied upon the forged signatures of Maryellen O'Reilly and the representations that both Lewis O'Reilly and Maryellen O'Reilly had signed the Lease as officers of Kool Blast and that they guaranteed the lease obligations of Kool Blast when plaintiffs agreed to lease the subject property to Kool Blast.

38.    Plaintiffs were damaged by the fraud of defendant Debtor in that they leased the subject property to Kool Blast relying upon the false representations, and Kool Blast has defaulted on its duty to make rental payments, and as a result plaintiffs looked to the guaranty to recover the damages they have suffered by the breaches of the Lease Agreement.  But the purported guarantor Maryellen O'Reilly has stated that she is not a guarantor and will not agree to make payment for the losses plaintiffs will suffer because of the breaches of the Lease Agreement by Kool Blast.

39.    As a proximate result of this fraud and forgery, Plaintiffs were damaged in an amount of $89,143.10 plus interest for the unpaid rent and late charges, plus incurred attorney fees, and such additional funds plaintiffs will spend on attorney fees and costs trying to recover the unpaid funds under the Guaranty Agreement.

40.    The Bankruptcy Code at 11 U.S.C. § 523(a)(2) provides that "(a) A discharge

-7-
**ADVERSARY COMPLAINT**

under section 727, 1141, 1192 [1] 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt— (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by— (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."

WHEREFORE, Plaintiffs request judgment against Debtor/defendant O'Reilly as follows:

1.    That the court declare and rule that Plaintiffs' claim against O'Reilly shall not be discharged in this bankruptcy proceeding.

2.    For award of costs of suit.

3.    For award of attorney fees.

5.    For such other and further relief as the court deems just and proper.

DATED: January 10, 2021                    VOSS, COOK & THEL LLP


                                            By:      /s/ Francis T. Donohue III
                                                   Francis T. Donohue III, Esq.
                                                   for Plaintiffs Angela Danciu and George Danciu

**ADVERSARY COMPLAINT**

EXHIBIT 1

Electronically Filed by Superior Court of California, County of Orange, 05/28/2020 01:13:28 PM.
30-2020-01146632-CU-BC-CJC - ROA # 2 - DAVID H. YAMASAKI, Clerk of the Court By Valerie Hammer, Deputy Clerk.

Francis T. Donohue III, Esq. (CSB# 106801)
VOSS, COOK & THEL LLP
2301 Dupont Drive, Suite 500
Irvine, California 92612-7504
(949) 435-0225
email: ftd@vctlaw.com

Attorneys for Plaintiffs Angela Danciu and George Danciu

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## ORANGE COUNTY, CENTRAL JUSTICE CENTER

| | |
|---|---|
| Angela Danciu and George Danciu<br><br>Plaintiffs,<br><br>vs.<br><br>Kool Blast Gas, Inc, a California Corporation; Lewis O'Reilly and Maryellen O'Reilly and Does 1 through 60;<br><br>Defendants. | CASE NO.  30-2020-01146632-CU-BC-CJC<br><br>**Complaint for:**<br><br>**1. Breach of Contract (Lease)**<br>**2. Breach Contract (Guaranty)**<br><br>ASSIGNED FOR ALL PURPOSES TO:<br><br>Judge Derek W. Hunt |

Plaintiffs Angela Danciu and George Danciu ("Plaintiffs") allege as follows:

1.      Plaintiffs Angela Danciu and George Danciu are residents of California

2.      Defendant Kool Blast Gas, Inc. is a California Corporation with its

principal place of business located at 1351 Logan Avenue, Suite A, Costa Mesa.  This

defendant is referred to as "Kool Blast" herein.

3.      Lewis O'Reilly is an individual and a resident of California.

4.      Maryellen O'Reilly is an individual and resident of California.

5.      Plaintiffs do not currently know the identities of defendants named herein

as DOES 1 to 10.  DOES 1 to 10 are in some other way liable and responsible for the

damages suffered by Plaintiff as alleged herein.  Plaintiff reserves the right to amend

this pleading to insert the names of these persons at a later time when the name and

capacity of any such Doe becomes known to Plaintiff.

-1-
**COMPLAINT**

EXHIBIT  1  pg. 1

**FIRST CAUSE OF ACTION**

**For Breach of Contract (Lease)**

**By Plaintiffs Against Kool Blast Gas, Inc.**

6.     Plaintiffs repeat and reallege each and every allegation contained above, as though fully set forth herein.

7.     Plaintiffs Angela Danciu and George Danciu entered into a written lease contract with defendant Kool Blast for the lease of real estate located at 1351 Logan Avenue, Suite A, Costa Mesa, CA.  A true and correct copy of the contract is **Exhibit A** to this complaint and is incorporated herein by reference. The contract is referred to as the "**Lease**" herein.

8.     Under the terms of the Lease at paragraph 4.1 the "Rent" is defined as all monetary obligations of the Lessee to the Lessor under the terms of the Lease.  The Rent in this Lease consists of the Base Rent and also the Lessee's Share of the Company Area Operating Expenses, as provided in section 4.2 of the Lease.  The Lessee's share of the Operating Expenses is referred to as **"CAM"** charges in this complaint.

9.     Paragraph 1.5 of the Lease provides that the Rent to be paid under the Lease is due on the 1st day of each month and that the Base Rent was $7,461 per month from January 1, 2018 to December 14, 2019.

10.     Paragraph 54 of the Lease provides that if the Lease is renewed, the Base Rent for the Renewal Years shall be $7,915 per month for the period of December 15, 2019 to December 14, 2020 and $8,152 per month for the period December 15, 2020 to December 14, 2021.  The CAM charges are $1,580 per month.

11.     Kool Blast renewed the Lease for the term through December 14, 2020 and Kool Blast continues to occupy the premises.

12.     The Lease provides at paragraph 13.5 that any monetary payment due Lessor under the Lease, other than late charges, shall bear interest at 10% from the 31st day after it was due.

-2-
**COMPLAINT**

**EXHIBIT  1  pg. 2**

13.     The Lease provides at paragraph 31 that attorney fees shall be awarded to the prevailing party on any action or proceeding involving the leased premises.  The same paragraph allows for recovery of attorney fees incurred by Lessor in the preparation and service of notices of default and consultations in connection therewith. Plaintiffs incurred attorney fees of $1,921 in preparing and service of the notice of default on defendant.  Plaintiffs have also now incurred and will continue to incur attorney fees and expenses associated with litigation in this lawsuit over the defendants' breach of lease and the related guaranty of lease.

14.     Defendant Kool Blast has breached the lease by failing to timely pay the rent as it came due under the Lease, including failing to timely pay the base rent and the CAM charges.  As of April 10, 2020 defendant Kool Blast was delinquent in its Rent and was behind in payments, and had made no payment towards the February, March, or April rent for 2020.  As of April 10, 2020 Kool Blast owed $36,163 in back rent and late charges, not including the interest owed on the unpaid Rent balances.

15.     On April 10, 2020 plaintiffs sent written notice to Kool Blast and to defendants Lewis O'Reilly and Maryellen O'Reilly that Kool Blast was in breach of its Lease and of the amount owed.  The notice also informed the defendants that because Kool Blast had failed to timely pay rent for three consecutive months, Lessors were now demanding that rent be paid on a quarterly basis in advance as provided by paragraph 13.4 of the Lease.

16.     No rent payment has been made to Plaintiffs since a partial payment was last made in January 2020.

17.     Plaintiffs have been damaged by Kool Blast's breaches of the Lease in an in the amount of at least $108,324, plus late charges on payments due after May 10, 2020, plus the incurred attorney fees, and plus interest on the late rent payments.  This amount includes all rent payments and late charges through May of 2020, and includes the rent payments (Base Rent and CAMs) through the remainder of the Lease ending December 14, 2020.

-3-
**COMPLAINT**

**EXHIBIT  1  pg. 3**

18.     Plaintiffs have performed all material conditions, covenants, and promises on their part to be performed under the agreement, except as excused by defendant's breaches.  Plaintiffs have given all notices and taken all actions necessary to sue for the damages requested in this lawsuit.

19.     The written Lease agreement also includes a provision for recovery of attorney fees and costs for the prevailing party in any action brought upon this agreement.  Plaintiffs have been required to hire an attorney to assist them in this lawsuit to enforce this agreement, and are thus entitled to recover those attorney fees and costs.

## SECOND CAUSE OF ACTION

### For Breach of Contract (Guaranty)

### By All Plaintiffs against Defendants Lewis O'Reilly and Maryellen O'Reilly

20.     Plaintiffs repeat and reallege each and every allegation in paragraphs 1 through 19 above as though fully set forth herein.

21.     As part of the consideration for Plaintiffs to lease the premises to Kool Blast, both Lewis O'Reilly and Maryellen O'Reilly entered a written agreement with Plaintiffs in which Lewis O'Reilly and Maryellen O'Reilly agreed to guaranty the obligations of Kool Blast under the Lease.  Lewis O'Reilly and Maryellen O'Reilly are referred to as "Guarantors" herein.  A true copy of the written guaranty is attached to this pleading as **Exhibit B** and its terms are incorporated herein.

22.     Guarantors have breached the Guaranty Agreement because despite receiving notice of the breach by Kool Blast, Guarantors have failed to pay any or all of the rent and other payments owed by Kool Blast to plaintiffs under the Lease.

23.     Plaintiffs have been damaged by Guarantor's breaches of the Guaranty Agreement in an amount in the amount of at least  $108,324, plus late charges on payments due after May 10, 2020, and plus interest on the late rent payments.  This amount includes all rent payments and late charges through May of 2020, and includes

-4-

**COMPLAINT**

**EXHIBIT  1  pg. 4**

the rent payments (Base Rent and CAMs) through the remainder of the Lease ending December 14, 2020.

24.     Plaintiffs have performed all material conditions, covenants, and promises on their part to be performed under the agreement, except as excused by defendant's breaches.  Plaintiffs have given all notices and taken all actions necessary to sue for the damages requested in this lawsuit.

25.     The written Guaranty Agreement and the Lease both includes a provision for recovery of attorney fees and costs for the prevailing party in any action brought upon the Lease or Guaranty Agreement.  Plaintiffs have been required to hire an attorney to assist them in this lawsuit to enforce this agreement, and are thus entitled to recover those attorney fees and costs.

WHEREFORE, Plaintiffs request judgment against Defendants as follows:

1.     For monetary damages of $108,324 or such larger amount as proven at trial, plus pre-litigation attorney fees of $1,921, plus interest according to contract, plus such other damages that result from the failure of defendants to pay the additional rent as the rent comes due thereafter.

2.     For costs of suit.

3.     For attorney fees.

4.     For such other and further relief as the court deems just and proper.

DATED: May 26, 2020                    VOSS, COOK & THEL LLP


By:    _____
       Francis T. Donohue III, Esq.
       for Plaintiffs


-5-
**COMPLAINT**

**EXHIBIT  1  pg. 5**

**EXHIBIT A**

**EXHIBIT  1  pg. 6**

# AIRCRE

## STANDARD INDUSTRIAL/COMMERCIAL MULTI-TENANT LEASE - NET

**1.   Basic Provisions ("Basic Provisions").**

1.1  **Parties.** This Lease ("Lease"), dated for reference purposes only  November 7, 2017 , is made by and between  Angela Danciu and George Danciu  ("Lessor") and  Kool Blast Gas, Inc., a California corporation  ("Lessee"), (collectively the "Parties", or individually a "Party").

1.2(a)  **Premises:** That certain real property, including all improvements therein or to be provided by Lessor under the terms of this Lease, commonly known as (street address, unit/suite, city, state):  1351 Logan Avenue, Suite A, Costa Mesa, CA  ("Premises"). The Premises are located in the County of  Orange , and are generally described as (describe briefly the nature of the Premises and the "Project")  Approximately 8,778 square feet part of a larger industrial warehouse building . In addition to Lessee's rights to use and occupy the Premises as hereinafter specified, Lessee shall have non-exclusive rights to any utility raceways of the building containing the Premises ("Building") and to the Common Areas (as defined in Paragraph 2.7 below), but shall not have any rights to the roof, or exterior walls of the Building containing the Premises or to any other buildings in the Project. The Premises, the Building, the Common Areas, the land upon which they are located, along with all other buildings and improvements thereon, are herein collectively referred to as the "Project". (See also Paragraph 2)

1.2(b)  **Parking:**  18 outside of fenced yard and 2 stalls immediately inside the fenced gate  unreserved vehicle parking spaces. (See also Paragraph 2.6)

1.3  **Term:**  Two (2)  years and  zero (0)  months ("Original Term") commencing  December 15, 2017  ("Commencement Date") and ending  December 14, 2019  ("Expiration Date"). (See also Paragraph 3)

1.4  **Early Possession:** Lessee shall have non-exclusive access to the Premises for the purpose of cabling, futurization and storage of personal property beginning on November 15, 2017. The parties understand that Lessee's Early Occupancy shall be at Lessee's liability and risk as Lessor and its vendors will be accessing the Premises for the purposes of completing Lessor's Work prior to the Commencement Date. Additionally, Lessee shall not interfere with Lessor and Lessor's Vendors completing Lessor's Work during the Early Occupancy Period. If the Premises are available Lessee may have non-exclusive possession of the Premises commencing ("Early Possession Date"). (See also Paragraphs 3.2 and 3.3)

1.5  **Base Rent:**  $7,461.00  per month ("Base Rent"), payable on the  1st  day of each month commencing  January 1, 2018 . (See also Paragraph 4)

☑ If this box is checked, there are provisions in this Lease for the Base Rent to be adjusted. See Paragraph  54 .

1.6  **Lessee's Share of Common Area Operating Expenses:**  approx. forty-four  percent (  44  %) ("Lessee's Share"). In the event that the size of the Premises and/or the Project are modified during the term of this Lease, Lessor shall recalculate Lessee's Share to reflect such modification.

1.7  **Base Rent and Other Monies Paid Upon Execution:**
(a)  **Base Rent:**  $3,730.00  for the period  December 15-31, 2017 .
(b)  **Common Area Operating Expenses:**  $790.00  for the period  December 15-31, 2017 .
(c)  **Security Deposit:**  $7,685.00  ("Security Deposit"). (See also Paragraph 5)
(d)  **Other:**  for  .
(e)  **Total Due Upon Execution of this Lease:**  $12,205.00 .

1.8  **Agreed Use:**  Medical laser repair and distribution . (See also Paragraph 6)

1.9  **Insuring Party.** Lessor is the "Insuring Party". (See also Paragraph 8)

1.10  **Real Estate Brokers.** (See also Paragraph 15 and 25)
(a)  **Representation:** The following real estate brokers (the "Brokers") and brokerage relationships exist in this transaction (check applicable boxes):
☑  Voit Real Estate Services/Michael Cargile & John Viscounty  represents Lessor exclusively ("Lessor's Broker");
☑  Newmark Grubb Knight Frank/John Scruggs  represents Lessee exclusively ("Lessee's Broker"); or
☐  represents both Lessor and Lessee ("Dual Agency").
(b)  **Payment to Brokers.** Upon execution and delivery of this Lease by both Parties, Lessor shall pay to the Brokers the brokerage fee agreed to in a separate written agreement (or if there is no such agreement, the sum of  or  5.5  % of the total Base Rent) for the brokerage services rendered by the Brokers  to be split 3% to Newmark Grubb Knight Frank and 2.5% to Voit Real Estate Services.

1.11  **Guarantor.** The obligations of the Lessee under this Lease are to be guaranteed by  Lewis O'Reilly and Maryellen O'Reilly  ("Guarantor"). (See also Paragraph 37)

1.12  **Attachments.** Attached hereto are the following, all of which constitute a part of this Lease:
☑  an Addendum consisting of Paragraphs  50  through  54  ;
☑  a site floor plan depicting the Premises;
☐  a site plan depicting the Project;
☐  a current set of the Rules and Regulations for the Project;
☐  a current set of the Rules and Regulations adopted by the owners' association;
☐  a Work Letter;
☐  other (specify):  .

**2.   Premises.**

2.1  **Letting.** Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, the Premises, for the term, at the rental, and upon all of the terms, covenants and conditions set forth in this Lease. While the approximate square footage of the Premises may have been used in the marketing of the Premises for purposes of comparison, the Base Rent stated herein is NOT tied to square footage and is not subject to adjustment should the actual size be determined to be different. **NOTE: Lessee is advised to verify the actual size prior to executing this Lease.**

2.2  **Condition.** Lessor shall deliver that portion of the Premises contained within the Building ("Unit") to Lessee broom clean and free of debris on the Commencement Date or the Early Possession Date, whichever first occurs ("Start Date"), and, so long as the required service contracts described in Paragraph 7.1(b) below are obtained by Lessee and in effect within thirty days following the Start Date, warrants that the existing electrical, plumbing, fire sprinkler, lighting, heating, ventilating and air conditioning systems ("HVAC"), loading doors, sump pumps, if any, and all other such elements in the Unit, other than those constructed by Lessee, shall be in good operating condition on said date, that the structural elements of the roof, bearing walls and foundation of the Unit shall be free of material defects, and that the Unit does not contain hazardous levels of any mold or fungi defined as toxic under applicable state or federal law. If a non-compliance with such warranty exists as of the Start Date, or if one of such systems or elements should malfunction or fail within the appropriate warranty period, Lessor shall, as Lessor's sole obligation with respect to such matter, except as otherwise provided in this Lease, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, malfunction or failure, rectify same at Lessor's expense. The warranty periods shall be as follows: (i) 6 months as to the HVAC systems, and (ii) 30 days as to the remaining systems and other elements of the Unit. If Lessee does not give Lessor the required notice within the appropriate warranty period, correction of any such non-compliance, malfunction or failure shall be the obligation of Lessee at Lessee's sole cost and expense (except for the repairs to the fire sprinkler systems, roof, foundations, and/or bearing walls - see Paragraph 7). Lessor also warrants, that unless otherwise specified in writing, Lessor is unaware of (i) any recorded Notices of Default affecting the Premise; (ii) any delinquent amounts due under any loan secured by the Premises; and (iii) any bankruptcy proceeding affecting the Premises.

2.3  **Compliance.** Lessor warrants that to the best of its knowledge the improvements on the Premises comply with the building codes, applicable law

INITIALS

© 2017 AIR CRE. All Rights Reserved.

INITIALS

MTN-26.00, Revised 01-03-2017

**EXHIBIT A  pg. 1**
**EXHIBIT 1  pg. 7**

require during the term of this Lease the construction of an addition to or an alteration of the Unit, Premises and/or Building, the remediation of any Hazardous Substance, or the reinforcement or other physical modification of the Unit, Premises and/or Building ("**Capital Expenditure**"), Lessor and Lessee shall allocate the cost of such work as follows:

(a)  Subject to Paragraph 2.3(c) below, if such Capital Expenditures are required as a result of the specific and unique use of the Premises by Lessee as compared with uses by tenants in general, Lessee shall be fully responsible for the cost thereof, provided, however, that if such Capital Expenditure is required during the last 2 years of this Lease and the cost thereof exceeds 6 months' Base Rent, Lessee may instead terminate this Lease unless Lessor notifies Lessee, in writing, within 10 days after receipt of Lessee's termination notice that Lessor has elected to pay the difference between the actual cost thereof and the amount equal to 6 months' Base Rent. If Lessee elects termination, Lessee shall immediately cease the use of the Premises which requires such Capital Expenditure and deliver to Lessor written notice specifying a termination date at least 90 days thereafter. Such termination date shall, however, in no event be earlier than the last day that Lessee could legally utilize the Premises without commencing such Capital Expenditure.

(b)  If such Capital Expenditure is not the result of the specific and unique use of the Premises by Lessee (such as, governmentally mandated seismic modifications), then Lessor shall pay for such Capital Expenditure and Lessee shall only be obligated to pay, each month during the remainder of the term of this Lease or any extension thereof, on the date that on which the Base Rent is due, an amount equal to 1/144th of the portion of such costs reasonably attributable to the Premises. Lessee shall pay interest on the balance but may prepay its obligation at any time. If, however, such Capital Expenditure is required during the last 2 years of this Lease or if Lessor reasonably determines that it is not economically feasible to pay its share thereof, Lessor shall have the option to terminate this Lease upon 90 days prior written notice to Lessee unless Lessee notifies Lessor, in writing, within 10 days after receipt of Lessor's termination notice that Lessee will pay for such Capital Expenditure. If Lessor does not elect to terminate, and fails to tender its share of any such Capital Expenditure, Lessee may advance such funds and deduct same, with interest, from Rent until Lessor's share of such costs have been fully paid. If Lessee is unable to finance Lessor's share, or if the balance of the Rent due and payable for the remainder of this Lease is not sufficient to fully reimburse Lessee on an offset basis, Lessee shall have the right to terminate this Lease upon 30 days written notice to Lessor.

(c)  Notwithstanding the above, the provisions concerning Capital Expenditures are intended to apply only to non-voluntary, unexpected, and new Applicable Requirements. If the Capital Expenditures are instead triggered by Lessee as a result of an actual or proposed change in use, change in intensity of use, or modification to the Premises then, and in that event, Lessee shall either: (i) immediately cease such changed use or intensity of use and/or take such other steps as may be necessary to eliminate the requirement for such Capital Expenditure, or (ii) complete such Capital Expenditure at its own expense. Lessee shall not have any right to terminate this Lease.

2.4  **Acknowledgements**. Lessee acknowledges that: (a) it has been given an opportunity to inspect and measure the Premises, (b) it has been advised by Lessor and/or Brokers to satisfy itself with respect to the size and condition of the Premises (including but not limited to the electrical, HVAC and fire sprinkler systems, security, environmental aspects, and compliance with Applicable Requirements and the Americans with Disabilities Act), and their suitability for Lessee's intended use, (c) Lessee has made such investigation as it deems necessary with reference to such matters and assumes all responsibility therefor as the same relate to its occupancy of the Premises, (d) it is not relying on any representation as to the size of the Premises made by Brokers or Lessor, (e) the square footage of the Premises was not material to Lessee's decision to lease the Premises and pay the Rent stated herein, and (f) neither Lessor, Lessor's agents, nor Brokers have made any oral or written representations or warranties with respect to said matters other than as set forth in this Lease. In addition, Lessor acknowledges that: (i) Brokers have made no representations, promises or warranties concerning Lessee's ability to honor the Lease or suitability to occupy the Premises, and (ii) it is Lessor's sole responsibility to investigate the financial capability and/or suitability of all proposed tenants.

2.5  **Lessee as Prior Owner/Occupant.** The warranties made by Lessor in Paragraph 2 shall be of no force or effect if immediately prior to the Start Date Lessee was the owner or occupant of the Premises. In such event, Lessee shall be responsible for any necessary corrective work.

2.6  **Vehicle Parking.** Lessee shall be entitled to use the number of Parking Spaces specified in Paragraph 1.2(b) on those portions of the Common Areas designated from time to time by Lessor for parking. Lessee shall not use more parking spaces than said number. Said parking spaces shall be used for parking by vehicles no larger than full-size passenger automobiles or pick-up trucks, herein called "**Permitted Size Vehicles.**" Lessor may regulate the loading and unloading of vehicles by adopting Rules and Regulations as provided in Paragraph 2.9. No vehicles other than Permitted Size Vehicles may be parked in the Common Areas without the prior written permission of Lessor. In addition:

(a)  Lessee shall not permit or allow any vehicles that belong to or are controlled by Lessee or Lessee's employees, suppliers, shippers, customers, contractors or invitees to be loaded, unloaded, or parked in areas other than those designated by Lessor for such activities.

(b)  Lessee shall not service or store any vehicles in the Common Areas.

(c)  If Lessee permits or allows any of the prohibited activities described in this Paragraph 2.6, then Lessor shall have the right, without notice, in addition to such other rights and remedies that it may have, to remove or tow away the vehicle involved and charge the cost to Lessee, which cost shall be immediately payable upon demand by Lessor.

2.7  **Common Areas - Definition.** The term "**Common Areas**" is defined as all areas and facilities outside the Premises and within the exterior boundary line of the Project and interior utility raceways and installations within the Unit that are provided and designated by the Lessor from time to time for the general non-exclusive use of Lessor, Lessee and other tenants of the Project and their respective employees, suppliers, shippers, customers, contractors and invitees, including parking areas, loading and unloading areas, trash areas, roofs, roadways, walkways, driveways and landscaped areas.

2.8  **Common Areas - Lessee's Rights.** Lessor grants to Lessee, for the benefit of Lessee and its employees, suppliers, shippers, contractors, customers and invitees, during the term of this Lease, the non-exclusive right to use, in common with others entitled to such use, the Common Areas as they exist from time to time, subject to any rights, powers, and privileges reserved by Lessor under the terms hereof or under the terms of any rules and regulations or restrictions governing the use of the Project. Under no circumstances shall the right herein granted to use the Common Areas be deemed to include the right to store any property, temporarily or permanently, in the Common Areas. Any such storage shall be permitted only by the prior written consent of Lessor or Lessor's designated agent, which consent may be revoked at any time. In the event that any unauthorized storage shall occur, then Lessor shall have the right, without notice, in addition to such other rights and remedies that it may have, to remove the property and charge the cost to Lessee, which cost shall be immediately payable upon demand by Lessor.

2.9  **Common Areas - Rules and Regulations.** Lessor or such other person(s) as Lessor may appoint shall have the exclusive control and management of the Common Areas and shall have the right, from time to time, to establish, modify, amend and enforce reasonable rules and regulations ("**Rules and Regulations**") for the management, safety, care, and cleanliness of the grounds, the parking and unloading of vehicles and the preservation of good order, as well as for the convenience of other occupants or tenants of the Building and the Project and their invitees. Lessee agrees to abide by and conform to all such Rules and Regulations, and shall use its best efforts to cause its employees, suppliers, shippers, customers, contractors and invitees to so abide and conform. Lessor shall not be responsible to Lessee for the non-compliance with said Rules and Regulations by other tenants of the Project.

2.10  **Common Areas - Changes.** Lessor shall have the right, in Lessor's sole discretion, from time to time:

(a)  To make changes to the Common Areas, including, without limitation, changes in the location, size, shape and number of driveways, entrances, parking spaces, parking areas, loading and unloading areas, ingress, egress, direction of traffic, landscaped areas, walkways and utility raceways;

(b)  To close temporarily any of the Common Areas for maintenance purposes so long as reasonable access to the Premises remains available;

(c)  To designate other land outside the boundaries of the Project to be a part of the Common Areas;

(d)  To add additional buildings and improvements to the Common Areas;

(e)  To use the Common Areas while engaged in making additional improvements, repairs or alterations to the Project, or any portion thereof; and

(f)  To do and perform such other acts and make such other changes in, to or with respect to the Common Areas and Project as Lessor may, in the exercise of sound business judgment, deem to be appropriate.

3.  **Term.**

3.1  **Term.** The Commencement Date, Expiration Date and Original Term of this Lease are as specified in Paragraph 1.3.

3.2  **Early Possession.** Any provision herein granting Lessee Early Possession of the Premises is subject to and conditioned upon the Premises being available for such possession prior to the Commencement Date. Any grant of Early Possession only conveys a non-exclusive right to occupy the Premises. If Lessee totally or partially occupies the Premises prior to the Commencement Date, the obligation to pay Base Rent shall be abated for the period of such Early Possession. All other terms of this Lease (including but not limited to the obligations to pay Lessee's Share of Common Area Operating Expenses, Real Property Taxes and insurance premiums and to maintain the Premises) shall be in effect during such period. Any such Early Possession shall not affect the Expiration Date.

3.3  **Delay In Possession.** Lessor agrees to use its best commercially reasonable efforts to deliver possession of the Premises to Lessee by the Commencement Date. If, despite said efforts, Lessor is unable to deliver possession by such date, Lessor shall not be subject to any liability therefor, nor shall such failure affect the validity of this Lease or change the Expiration Date. Lessee shall not, however, be obligated to pay Rent or perform its other obligations until Lessor delivers possession of the Premises and any period of rent abatement that Lessee would otherwise have enjoyed shall run from the date of delivery of possession and continue for a period equal to what Lessee would otherwise have enjoyed under the terms hereof, but minus any days of delay caused by the acts or omissions of Lessee. If possession is not delivered within 60 days after the Commencement Date, as the same may be extended under the terms of any Work Letter executed by Parties, Lessee may, at its option, by notice in writing within 10 days after the end of such 60 day period, cancel this Lease, in which event the Parties shall be discharged from all obligations hereunder. If such written notice is not received by Lessor within said 10 day period, Lessee's right to cancel shall terminate. If possession of the Premises is not delivered within 120 days after the Commencement Date, this Lease shall terminate unless other agreements are reached between Lessor and Lessee, in writing.

© 2017 AIR CRE. All Rights Reserved.

MTN-26.00, Revised 01-03-2017

3.4  **Lessee Compliance.** Lessor shall not be required to tender possession of the Premises to Lessee until Lessee complies with its obligation to provide evidence of insurance (Paragraph 8.5). Pending delivery of such evidence, Lessee shall be required to perform all of its obligations under this Lease from and after the Start Date, including the payment of Rent, notwithstanding Lessor's election to withhold possession pending receipt of such evidence of insurance.  Further, if Lessee is required to perform any other conditions prior to or concurrent with the Start Date, the Start Date shall occur but Lessor may elect to withhold possession until such conditions are satisfied.

4.  **Rent.**

4.1  **Rent Defined.**  All monetary obligations of Lessee to Lessor under the terms of this Lease (except for the Security Deposit) are deemed to be rent (**"Rent"**).

4.2  **Common Area Operating Expenses.**  Lessee shall pay to Lessor during the term hereof, in addition to the Base Rent, Lessee's Share (as specified in Paragraph 1.6) of all Common Area Operating Expenses, as hereinafter defined, during each calendar year of the term of this Lease, in accordance with the following provisions:

(a)  **"Common Area Operating Expenses"** are defined, for purposes of this Lease, as all costs relating to the ownership and operation of the Project, including, but not limited to, the following:

(i)  The operation, repair and maintenance, in neat, clean, good order and condition, and if necessary the replacement, of the following:

(aa)  The Common Areas and Common Area improvements, including parking areas, loading and unloading areas, trash areas, roadways, parkways, walkways, driveways, landscaped areas, bumpers, irrigation systems, Common Area lighting facilities, fences and gates, elevators, roofs, exterior walls of the buildings, building systems and roof drainage systems.

(bb)  Exterior signs and any tenant directories.

(cc)  Any fire sprinkler systems.

(dd)  All other areas and improvements that are within the exterior boundaries of the Project but outside of the Premises and/or any other space occupied by a tenant.

(ii)  The cost of water, gas, electricity and telephone to service the Common Areas and any utilities not separately metered.

(iii)  The cost of trash disposal, pest control services, property management, security services, owners' association dues and fees, the cost to repaint the exterior of any structures and the cost of any environmental inspections.

(iv)  Reserves set aside for maintenance, repair and/or replacement of Common Area improvements and equipment.

(v)  Real Property Taxes (as defined in Paragraph 10).

(vi)  Any deductible portion of an insured loss concerning the Building or the Common Areas.

(vii)  Auditors', accountants' and attorneys' fees and costs related to the operation, maintenance, repair and replacement of the Project.

(viii)  The cost of any capital improvement to the Building or the Project not covered under the provisions of Paragraph 2.3 provided; however, that Lessor shall allocate the cost of any such capital improvement over a 12 year period and Lessee shall not be required to pay more than Lessee's Share of 1/144th of the cost of such capital improvement in any given month.

(x)  The cost of any other services to be provided by Lessor that are stated elsewhere in this Lease to be a Common Area Operating Expense.

(b)  Any Common Area Operating Expenses and Real Property Taxes that are specifically attributable to the Unit, Building or to any other building in the Project or to the operation, repair and maintenance thereof, shall be allocated entirely to such Unit, Building, or other building.  However, any Common Area Operating Expenses and Real Property Taxes that are not specifically attributable to the Building or to any other building or to the operation, repair and maintenance thereof, shall be equitably allocated by Lessor to all buildings in the Project.

(c)  The inclusion of the improvements, facilities and services set forth in Subparagraph 4.2(a) shall not be deemed to impose an obligation upon Lessor to either have said improvements or facilities or to provide those services unless the Project already has the same, Lessor already provides the services, or Lessor has agreed elsewhere in this Lease to provide the same or some of them.

(d)  Lessee's Share of Common Area Operating Expenses is payable monthly on the same day as the Base Rent is due hereunder.  The amount of such payments shall be based on Lessor's estimate of the annual Common Area Operating Expenses.  Within 60 days after written request (but not more than once each year) Lessor shall deliver to Lessee a reasonably detailed statement showing Lessee's Share of the actual Common Area Operating Expenses for the preceding year.  If Lessee's payments during such year exceed Lessee's Share, Lessor shall credit the amount of such over-payment against Lessee's future payments.  If Lessee's payments during such year were less than Lessee's Share, Lessee shall pay to Lessor the amount of the deficiency within 10 days after delivery by Lessor to Lessee of the statement.

(e)  Common Area Operating Expenses shall not include any expenses paid by any tenant directly to third parties, or as to which Lessor is otherwise reimbursed by any third party, other tenant, or insurance proceeds.

4.3  **Payment.**  Lessee shall cause payment of Rent to be received by Lessor in lawful money of the United States, without offset or deduction (except as specifically permitted in this Lease), on or before the day on which it is due.  All monetary amounts shall be rounded to the nearest whole dollar.  In the event that any invoice prepared by Lessor is inaccurate such inaccuracy shall not constitute a waiver and Lessee shall be obligated to pay the amount set forth in this Lease.  Rent for any period during the term hereof which is for less than one full calendar month shall be prorated based upon the actual number of days of said month.  Payment of Rent shall be made to Lessor at its address stated herein or to such other persons or place as Lessor may from time to time designate in writing.  Acceptance of a payment which is less than the amount then due shall not be a waiver of Lessor's rights to the balance of such Rent, regardless of Lessor's endorsement of any check so stating.  In the event that any check, draft, or other instrument of payment given by Lessee to Lessor is dishonored for any reason, Lessee agrees to pay to Lessor the sum of $25 in addition to any Late Charge and Lessor, at its option, may require all future Rent be paid by cashier's check.  Payments will be applied first to accrued late charges and attorney's fees, second to accrued interest, then to Base Rent and Common Area Operating Expenses, and any remaining amount to any other outstanding charges or costs.

5.  **Security Deposit.**  Lessee shall deposit with Lessor upon execution hereof the Security Deposit as security for Lessee's faithful performance of its obligations under this Lease.  If Lessee fails to pay Rent, or otherwise Defaults under this Lease, Lessor may use, apply or retain all or any portion of said Security Deposit for the payment of any amount already due Lessor, for Rents which will be due in the future, and/ or to reimburse or compensate Lessor for any liability, expense, loss or damage which Lessor may suffer or incur by reason thereof.  If Lessor uses or applies all or any portion of the Security Deposit, Lessee shall within 10 days after written request therefor deposit monies with Lessor sufficient to restore said Security Deposit to the full amount required by this Lease.  If the Base Rent increases during the term of this Lease, Lessee shall, upon written request from Lessor, deposit additional monies with Lessor so that the total amount of the Security Deposit shall at all times bear the same proportion to the increased Base Rent as the initial Security Deposit bore to the initial Base Rent.  Should the Agreed Use be amended to accommodate a material change in the business of Lessee or to accommodate a sublessee or assignee, Lessor shall have the right to increase the Security Deposit to the extent necessary, in Lessor's reasonable judgment, to account for any increased wear and tear that the Premises may suffer as a result thereof.  If a change in control of Lessee occurs during this Lease and following such change the financial condition of Lessee is, in Lessor's reasonable judgment, significantly reduced, Lessee shall deposit such additional monies with Lessor as shall be sufficient to cause the Security Deposit to be at a commercially reasonable level based on such change in financial condition.  Lessor shall not be required to keep the Security Deposit separate from its general accounts.  Within 90 days after the expiration or termination of this Lease, Lessor shall return that portion of the Security Deposit not used or applied by Lessor.  Lessor shall upon written request provide Lessee with an accounting showing how that portion of the Security Deposit that was not returned was applied.  No part of the Security Deposit shall be considered to be held in trust, to bear interest or to be prepayment for any monies to be paid by Lessee under this Lease.  THE SECURITY DEPOSIT SHALL NOT BE USED BY LESSEE IN LIEU OF PAYMENT OF THE LAST MONTH'S RENT.

6.  **Use.**

6.1  **Use.**  Lessee shall use and occupy the Premises only for the Agreed Use, or any other legal use which is reasonably comparable thereto, and for no other purpose.  Lessee shall not use or permit the use of the Premises in a manner that is unlawful, creates damage, waste or a nuisance, or that disturbs occupants of or causes damage to neighboring premises or properties.  Other than guide, signal and seeing eye dogs, Lessee shall not keep or allow in the Premises any pets, animals, birds, fish, or reptiles.  Lessor shall not unreasonably withhold or delay its consent to any written request for a modification of the Agreed Use, so long as the same will not impair the structural integrity of the Building or the mechanical or electrical systems therein, and/or is not significantly more burdensome to the Project.  If Lessor elects to withhold consent, Lessor shall within 7 days after such request give written notification of same, which notice shall include an explanation of Lessor's objections to the change in the Agreed Use.

6.2  **Hazardous Substances.**

(a)  **Reportable Uses Require Consent.**  The term **"Hazardous Substance"** as used in this Lease shall mean any product, substance, or waste whose presence, use, manufacture, disposal, transportation, or release, either by itself or in combination with other materials expected to be on the Premises, is either: (i) potentially injurious to the public health, safety or welfare, the environment or the Premises, (ii) regulated or monitored by any governmental authority, or (iii) a basis for potential liability of Lessor to any governmental agency or third party under any applicable statute or common law theory.  Hazardous Substances shall include, but not be limited to, hydrocarbons, petroleum, gasoline, and/or crude oil or any products, by-products or fractions thereof.  Lessee shall not engage in any activity in or on the Premises which constitutes a Reportable Use of Hazardous Substances without the express prior written consent of Lessor and timely compliance (at Lessee's expense) with all Applicable Requirements.  **"Reportable Use"** shall mean (i) the installation or use of any above or below ground storage tank, (ii) the gene[...]

© 2017 AIR CRE.  All Rights Reserved.

MTN-26.00, Revised 01-03-2017

possession, storage, use, transportation, or disposal of a Hazardous Substance that requires a permit from, or with respect to which a report, notice, registration or business plan is required to be filed with, any governmental authority, and/or (iii) the presence at the Premises of a Hazardous Substance with respect to which any Applicable Requirements requires that a notice be given to persons entering or occupying the Premises or neighboring properties.  Notwithstanding the foregoing, Lessee may use any ordinary and customary materials reasonably required to be used in the normal course of the Agreed Use, ordinary office supplies (copier toner, liquid paper, glue, etc.) and common household cleaning materials, so long as such use is in compliance with all Applicable Requirements, is not a Reportable Use, and does not expose the Premises or neighboring property to any meaningful risk of contamination or damage or expose Lessor to any liability therefor.  In addition, Lessor may condition its consent to any Reportable Use upon receiving such additional assurances as Lessor reasonably deems necessary to protect itself, the public, the Premises and/or the environment against damage, contamination, injury and/or liability, including, but not limited to, the installation (and removal on or before Lease expiration or termination) of protective modifications (such as concrete encasements) and/or increasing the Security Deposit.

(b)    **Duty to Inform Lessor.**  If Lessee knows, or has reasonable cause to believe, that a Hazardous Substance has come to be located in, on, under or about the Premises, other than as previously consented to by Lessor, Lessee shall immediately give written notice of such fact to Lessor, and provide Lessor with a copy of any report, notice, claim or other documentation which it has concerning the presence of such Hazardous Substance.

(c)    **Lessee Remediation.**  Lessee shall not cause or permit any Hazardous Substance to be spilled or released in, on, under, or about the Premises (including through the plumbing or sanitary sewer system) and shall promptly, at Lessee's expense, comply with all Applicable Requirements and take all investigatory and/or remedial action reasonably recommended, whether or not formally ordered or required, for the cleanup of any contamination of, and for the maintenance, security and/or monitoring of the Premises or neighboring properties, that was caused or materially contributed to by Lessee, or pertaining to or involving any Hazardous Substance brought onto the Premises during the term of this Lease, by or for Lessee, or any third party.

(d)    **Lessee Indemnification.**  Lessee shall indemnify, defend and hold Lessor, its agents, employees, lenders and ground lessor, if any, harmless from and against any and all loss of rents and/or damages, liabilities, judgments, claims, expenses, penalties, and attorneys' and consultants' fees arising out of or involving any Hazardous Substance brought onto the Premises by or for Lessee, or any third party (provided, however, that Lessee shall have no liability under this Lease with respect to underground migration of any Hazardous Substance under the Premises from areas outside of the Project not caused or contributed to by Lessee).  Lessee's obligations shall include, but not be limited to, the effects of any contamination or injury to person, property or the environment created or suffered by Lessee, and the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease.  No termination, cancellation or release agreement entered into by Lessor and Lessee shall release Lessee from its obligations under this Lease with respect to Hazardous Substances, unless specifically so agreed by Lessor in writing at the time of such agreement.

(e)    **Lessor Indemnification.**  Except as otherwise provided in paragraph 8.7, Lessor and its successors and assigns shall indemnify, defend, reimburse and hold Lessee, its employees and lenders, harmless from and against any and all environmental damages, including the cost of remediation, which are suffered as a direct result of Hazardous Substances on the Premises prior to Lessee taking possession or which are caused by the gross negligence or willful misconduct of Lessor, its agents or employees.  Lessor's obligations, as and when required by the Applicable Requirements, shall include, but not be limited to, the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease.

(f)    **Investigations and Remediations.**  Lessor shall retain the responsibility and pay for any investigations or remediation measures required by governmental entities having jurisdiction with respect to the existence of Hazardous Substances on the Premises prior to the Lessee taking possession, unless such remediation measure is required as a result of Lessee's use (including "Alterations", as defined in paragraph 7.3(a) below) of the Premises, in which event Lessee shall be responsible for such payment.  Lessee shall cooperate fully in any such activities at the request of Lessor, including allowing Lessor and Lessor's agents to have reasonable access to the Premises at reasonable times in order to carry out Lessor's investigative and remedial responsibilities.

(g)    **Lessor Termination Option.**  If a Hazardous Substance Condition (see Paragraph 9.1(e)) occurs during the term of this Lease, unless Lessee is legally responsible therefor (in which case Lessee shall make the investigation and remediation thereof required by the Applicable Requirements and this Lease shall continue in full force and effect, but subject to Lessor's rights under Paragraph 6.2(d) and Paragraph 13), Lessor may, at Lessor's option, either (i) investigate and remediate such Hazardous Substance Condition, if required, as soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) if the estimated cost to remediate such condition exceeds 12 times the then monthly Base Rent or $100,000, whichever is greater, give written notice to Lessee, within 30 days after receipt by Lessor of knowledge of the occurrence of such Hazardous Substance Condition, of Lessor's desire to terminate this Lease as of the date 60 days following the date of such notice.  In the event Lessor elects to give a termination notice, Lessee may, within 10 days thereafter, give written notice to Lessor of Lessee's commitment to pay the amount by which the cost of the remediation of such Hazardous Substance Condition exceeds an amount equal to 12 times the then monthly Base Rent or $100,000, whichever is greater.  Lessee shall provide Lessor with said funds or satisfactory assurance thereof within 30 days following such commitment.  In such event, this Lease shall continue in full force and effect, and Lessor shall proceed to make such remediation as soon as reasonably possible after the required funds are available.  If Lessee does not give such notice and provide the required funds or assurance thereof within the time provided, this Lease shall terminate as of the date specified in Lessor's notice of termination.

6.3    **Lessee's Compliance with Applicable Requirements.**  Except as otherwise provided in this Lease, Lessee shall, at Lessee's sole expense, fully, diligently and in a timely manner, materially comply with all Applicable Requirements, the requirements of any applicable fire insurance underwriter or rating bureau, and the recommendations of Lessor's engineers and/or consultants which relate in any manner to the Premises, without regard to whether said Applicable Requirements are now in effect or become effective after the Start Date.  Lessee shall, within 10 days after receipt of Lessor's written request, provide Lessor with copies of all permits and other documents, and other information evidencing Lessee's compliance with any Applicable Requirements specified by Lessor, and shall immediately upon receipt, notify Lessor in writing (with copies of any documents involved) of any threatened or actual claim, notice, citation, warning, complaint or report pertaining to or involving the failure of Lessee or the Premises to comply with any Applicable Requirements.  Likewise, Lessee shall immediately give written notice to Lessor of: (i) any water damage to the Premises and any suspected seepage, pooling, dampness or other condition conducive to the production of mold; or (ii) any mustiness or other odors that might indicate the presence of mold in the Premises.

6.4    **Inspection; Compliance.**  Lessor and Lessor's "Lender" (as defined in Paragraph 30) and consultants authorized by Lessor shall have the right to enter into Premises at any time, in the case of an emergency, and otherwise at reasonable times after reasonable notice, for the purpose of inspecting and/or testing the condition of the Premises and/or for verifying compliance by Lessee with this Lease.  The cost of any such inspections shall be paid by Lessor, unless a violation of Applicable Requirements, or a Hazardous Substance Condition (see Paragraph 9.1) is found to exist or be imminent, or the inspection is requested or ordered by a governmental authority.  In such case, Lessee shall upon request reimburse Lessor for the cost of such inspection, so long as such inspection is reasonably related to the violation or contamination.  In addition, Lessee shall provide copies of all relevant material safety data sheets (MSDS) to Lessor within 10 days of the receipt of written request therefor.  Lessee acknowledges that any failure on its part to allow such inspections or testing will expose Lessor to risks and potentially cause Lessor to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain.  Accordingly, should the Lessee fail to allow such inspections and/or testing in a timely fashion the Base Rent shall be automatically increased, without any requirement for notice to Lessee, by an amount equal to 10% of the then existing Base Rent or $100, whichever is greater for the remainder to the Lease.  The Parties agree that such increase in Base Rent represents fair and reasonable compensation for the additional risk/costs that Lessor will incur by reason of Lessee's failure to allow such inspection and/or testing.  Such increase in Base Rent shall in no event constitute a waiver of Lessee's Default or Breach with respect to such failure nor prevent the exercise of any of the other rights and remedies granted hereunder.

7.    **Maintenance; Repairs; Utility Installations; Trade Fixtures and Alterations.**

7.1    **Lessee's Obligations.**

(a)    **In General.**  Subject to the provisions of Paragraph 2.2 (Condition), 2.3 (Compliance), 6.3 (Lessee's Compliance with Applicable Requirements), 7.2 (Lessor's Obligations), 9 (Damage or Destruction), and 14 (Condemnation), Lessee shall, at Lessee's sole expense, keep the Premises, Utility Installations (intended for Lessee's exclusive use, no matter where located), and Alterations in good order, condition and repair (whether or not the portion of the Premises requiring repairs, or the means of repairing the same, are reasonably or readily accessible to Lessee, and whether or not the need for such repairs occurs as a result of Lessee's use, any prior use, the elements or the age of such portion of the Premises), including, but not limited to, all equipment or facilities, such as plumbing, HVAC equipment, electrical, lighting facilities, boilers, pressure vessels, fixtures, interior walls, interior surfaces of exterior walls, ceilings, floors, windows, doors, plate glass, and skylights but excluding any items which are the responsibility of Lessor pursuant to Paragraph 7.2.  Lessee, in keeping the Premises in good order, condition and repair, shall exercise and perform good maintenance practices, specifically including the procurement and maintenance of the service contracts required by Paragraph 7.1(b) below.  Lessee's obligations shall include restorations, replacements or renewals when necessary to keep the Premises and all improvements thereon or a part thereof in good order, condition and state of repair.

(b)    **Service Contracts.**  Lessee shall, at Lessee's sole expense, procure and maintain contracts, with copies to Lessor, in customary form and substance for, and with contractors specializing and experienced in the maintenance of the following equipment and improvements, if any, if and when installed on the Premises:  (i) HVAC equipment, (ii) boiler and pressure vessels, and (iii) clarifiers.  However, Lessor reserves the right, upon notice to Lessee, to procure and maintain any or all of such service contracts, and Lessee shall reimburse Lessor, upon demand, for the cost thereof.

(c)    **Failure to Perform.**  If Lessee fails to perform Lessee's obligations under this Paragraph 7.1, Lessor may enter upon the Premises after 10 days' prior written notice to Lessee (except in the case of an emergency, in which case no notice shall be required), perform such obligations on Lessee's behalf, and put the Premises in good order, condition and repair, and Lessee shall promptly pay to Lessor a sum equal to 115% of the cost thereof.

(d)    **Replacement.**  Subject to Lessee's indemnification of Lessor as set forth in Paragraph 8.7 below, and without relieving Lessee of liability resulting from Lessee's failure to exercise and perform good maintenance practices, if an item described in Paragraph 7.1(b) cannot be repaired other than at a cost which is in excess

INITIALS

© 2017 AIR CRE.  All Rights Reserved.

Page 4 of 13
Last Edited: 11/8/2017 12:02 PM

INITIALS

MTN-26.00, Revised 01-03-2017

of 50% of the cost of replacing such item, then such Item shall be replaced by Lessor, and the cost thereof shall be prorated between the Parties and Lessee shall only be obligated to pay, each month during the remainder of the term of this Lease, on the date on which Base Rent is due, an amount equal to the product of multiplying the cost of such replacement by a fraction, the numerator of which is one, and the denominator of which is 144 (ie. 1/144th of the cost per month). Lessee shall pay Interest on the unamortized balance but may prepay its obligation at any time.

7.2  **Lessor's Obligations.** Subject to the provisions of Paragraphs 2.2 (Condition), 2.3 (Compliance), 4.2 (Common Area Operating Expenses), 6 (Use), 7.1 (Lessee's Obligations), 9 (Damage or Destruction) and 14 (Condemnation), Lessor, subject to reimbursement pursuant to Paragraph 4.2, shall keep in good order, condition and repair the foundations, exterior walls, structural condition of interior bearing walls, exterior roof, fire sprinkler system, Common Area fire alarm and/or smoke detection systems, fire hydrants, parking lots, walkways, parkways, driveways, landscaping, fences, signs and utility systems serving the Common Areas and all parts thereof, as well as providing the services for which there is a Common Area Operating Expense pursuant to Paragraph 4.2. Lessor shall not be obligated to paint the exterior or interior surfaces of exterior walls nor shall Lessor be obligated to maintain, repair or replace windows, doors or plate glass of the Premises.

7.3  **Utility Installations; Trade Fixtures; Alterations.**

(a)  **Definitions.** The term "Utility Installations" refers to all floor and window coverings, air and/or vacuum lines, power panels, electrical distribution, security and fire protection systems, communication cabling, lighting fixtures, HVAC equipment, plumbing, and fencing in or on the Premises. The term "**Trade Fixtures**" shall mean Lessee's machinery and equipment that can be removed without doing material damage to the Premises. The term "Alterations" shall mean any modification of the improvements, other than Utility Installations or Trade Fixtures, whether by addition or deletion. "**Lessee Owned Alterations and/or Utility Installations**" are defined as Alterations and/or Utility Installations made by Lessee that are not yet owned by Lessor pursuant to Paragraph 7.4(a).

(b)  **Consent.** Lessee shall not make any Alterations or Utility Installations to the Premises without Lessor's prior written consent. Lessee may, however, make non-structural Alterations or Utility Installations to the interior of the Premises (excluding the roof) without such consent but upon notice to Lessor, as long as they are not visible from the outside, do not involve puncturing, relocating or removing the roof or any existing walls, will not affect the electrical, plumbing, HVAC, and/or life safety systems, do not trigger the requirement for additional modifications and/or improvements to the Premises resulting from Applicable Requirements, such as compliance with Title 24, and/or life safety systems, and the cumulative cost thereof during this Lease as extended does not exceed a sum equal to 3 month's Base Rent in the aggregate or a sum equal to one month's Base Rent in any one year. Notwithstanding the foregoing, Lessee shall not make or permit any roof penetrations and/or install anything on the roof without the prior written approval of Lessor. Lessor may, as a precondition to granting such approval, require Lessee to utilize a contractor chosen and/or approved by Lessor. Any Alterations or Utility Installations that Lessee shall desire to make and which require the consent of the Lessor shall be presented to Lessor in written form with detailed plans. Consent shall be deemed conditioned upon Lessee's: (i) acquiring all applicable governmental permits, (ii) furnishing Lessor with copies of both the permits and the plans and specifications prior to commencement of the work, and (iii) compliance with all conditions of said permits and other Applicable Requirements in a prompt and expeditious manner. Any Alterations or Utility Installations shall be performed in a workmanlike manner with good and sufficient materials. Lessee shall promptly upon completion furnish Lessor with as-built plans and specifications. For work which costs an amount in excess of one month's Base Rent, Lessor may condition its consent upon Lessee providing a lien and completion bond in an amount equal to 150% of the estimated cost of such Alteration or Utility Installation and/or upon Lessee's posting an additional Security Deposit with Lessor.

(c)  **Liens; Bonds.** Lessee shall pay, when due, all claims for labor or materials furnished or alleged to have been furnished to or for Lessee at or for use on the Premises, which claims are or may be secured by any mechanic's or materialmen's lien against the Premises or any interest therein. Lessee shall give Lessor not less than 10 days notice prior to the commencement of any work in, on or about the Premises, and Lessor shall have the right to post notices of non-responsibility. If Lessee shall contest the validity of any such lien, claim or demand, then Lessee shall, at its sole expense defend and protect itself, Lessor and the Premises against the same and shall pay and satisfy any such adverse judgment that may be rendered thereon before the enforcement thereof. If Lessor shall require, Lessee shall furnish a surety bond in an amount equal to 150% of the amount of such contested lien, claim or demand, indemnifying Lessor against liability for the same. If Lessor elects to participate in any such action, Lessee shall pay Lessor's attorneys' fees and costs.

7.4  **Ownership; Removal; Surrender; and Restoration.**

(a)  **Ownership.** Subject to Lessor's right to require removal or elect ownership as hereinafter provided, all Alterations and Utility Installations made by Lessee shall be the property of Lessee, but considered a part of the Premises. Lessor may, at any time, elect in writing to be the owner of all or any specified part of the Lessee Owned Alterations and Utility Installations. Unless otherwise instructed per paragraph 7.4(b) hereof, all Lessee Owned Alterations and Utility Installations shall, at the expiration or termination of this Lease, become the property of Lessor and be surrendered by Lessee with the Premises.

(b)  **Removal.** By delivery to Lessee of written notice from Lessor not earlier than 90 and not later than 30 days prior to the end of the term of this Lease, Lessor may require that any or all Lessee Owned Alterations or Utility Installations be removed by the expiration or termination of this Lease. Lessor may require the removal at any time of all or any part of any Lessee Owned Alterations or Utility Installations made without the required consent.

(c)  **Surrender; Restoration.** Lessee shall surrender the Premises by the Expiration Date or any earlier termination date, with all of the improvements, parts and surfaces thereof broom clean and free of debris, and in good operating order, condition and state of repair, ordinary wear and tear excepted. "Ordinary wear and tear" shall not include any damage or deterioration that would have been prevented by good maintenance practice. Notwithstanding the foregoing, if the Lessee occupies the Premises for 12 months or less, then Lessee shall surrender the Premises in the same condition as delivered to Lessee on the Start Date with NO allowance for ordinary wear and tear. Lessee shall repair any damage occasioned by the installation, maintenance or removal of Trade Fixtures, Lessee owned Alterations and/or Utility Installations, furnishings, and equipment as well as the removal of any storage tank installed by or for Lessee. Lessee shall also remove from the Premises any and all Hazardous Substances brought onto the Premises by or for Lessee, or any third party (except Hazardous Substances which were disposed of via underground migration from areas outside of the Project) to the level specified in Applicable Requirements. Trade Fixtures shall remain the property of Lessee and shall be removed by Lessee. Any personal property of Lessee not removed on or before the Expiration Date or any earlier termination date shall be deemed to have been abandoned by Lessee and may be disposed of or retained by Lessor as Lessor may desire. The failure by Lessee to timely vacate the Premises pursuant to this Paragraph 7.4(c) without the express written consent of Lessor shall constitute a holdover under the provisions of Paragraph 26 below.

8.  **Insurance; Indemnity.**

8.1  **Payment of Premiums.** The cost of the premiums for the insurance policies required to be carried by Lessor, pursuant to Paragraphs 8.2(b), 8.3(a) and 8.3(b), shall be a Common Area Operating Expense. Premiums for policy periods commencing prior to, or extending beyond, the term of this Lease shall be prorated to coincide with the corresponding Start Date or Expiration Date.

8.2  **Liability Insurance.**

(a)  **Carried by Lessee.** Lessee shall obtain and keep in force a Commercial General Liability policy of insurance protecting Lessee and Lessor as an additional insured against claims for bodily injury, personal injury and property damage based upon or arising out of the ownership, use, occupancy or maintenance of the Premises and all areas appurtenant thereto. Such insurance shall be on an occurrence basis providing single limit coverage in an amount not less than $1,000,000 per occurrence with an annual aggregate of not less than $2,000,000. Lessee shall add Lessor as an additional insured by means of an endorsement at least as broad as the Insurance Service Organization's "Additional Insured-Managers or Lessors of Premises" Endorsement. The policy shall not contain any intra-insured exclusions as between insured persons or organizations, but shall include coverage for liability assumed under this Lease as an "Insured contract" for the performance of Lessee's indemnity obligations under this Lease. The limits of said insurance shall not, however, limit the liability of Lessee nor relieve Lessee of any obligation hereunder. Lessee shall provide an endorsement on its liability policy(ies) which provides that its insurance shall be primary to and not contributory with any similar insurance carried by Lessor, whose insurance shall be considered excess insurance only.

(b)  **Carried by Lessor.** Lessor shall maintain liability insurance as described in Paragraph 8.2(a), in addition to, and not in lieu of, the insurance required to be maintained by Lessee. Lessee shall not be named as an additional insured therein.

8.3  **Property insurance - Building, Improvements and Rental Value.**

(a)  **Building and Improvements.** Lessor shall obtain and keep in force a policy or policies of insurance in the name of Lessor, with loss payable to Lessor, any ground-lessor, and to any Lender insuring loss or damage to the Premises. The amount of such insurance shall be equal to the full insurable replacement cost of the Premises, as the same shall exist from time to time, or the amount required by any Lender, but in no event more than the commercially reasonable and available insurable value thereof. Lessee Owned Alterations and Utility Installations, Trade Fixtures, and Lessee's personal property shall be insured by Lessee not by Lessor. If the coverage is available and commercially appropriate, such policy or policies shall insure against all risks of direct physical loss or damage (except the perils of flood and/or earthquake unless required by a Lender), including coverage for debris removal and the enforcement of any Applicable Requirements requiring the upgrading, demolition, reconstruction or replacement of any portion of the Premises as the result of a covered loss. Said policy or policies shall also contain an agreed valuation provision in lieu of any coinsurance clause, waiver of subrogation, and inflation guard protection causing an increase in the annual property insurance coverage amount by a factor of not less than the adjusted U.S. Department of Labor Consumer Price Index for All Urban Consumers for the city nearest to where the Premises are located. If such insurance coverage has a deductible clause, the deductible amount shall not exceed $5,000 per occurrence.

(b)  **Rental Value.** Lessor shall also obtain and keep in force a policy or policies in the name of Lessor with loss payable to Lessor and any Lender, insuring the loss of the full Rent for one year with an extended period of indemnity for an additional 180 days ("Rental Value insurance"). Said insurance shall contain an agreed valuation provision in lieu of any coinsurance clause, and the amount of coverage shall be adjusted annually to reflect the projected Rent otherwise payable by Lessee, for the next 12 month period.

(c)  **Adjacent Premises.** Lessee shall pay for any increase in the premiums for the property insurance of the Building and for the Common Areas or other buildings in the Project if said increase is caused by Lessee's acts, omissions, use or occupancy of the Premises.

(d)  **Lessee's Improvements.** Since Lessor is the Insuring Party, Lessor shall not be required to insure Lessee Owned Alterations and Utility Installations.

INITIALS

© 2017 AIR CRE. All Rights Reserved.

INITIALS

MTN-26.00, Revised 01-03-2017

**EXHIBIT  A  pg. 5**
**EXHIBIT  1  pg. 11**

unless the item in question has become the property of Lessor under the terms of this Lease.

8.4   **Lessee's Property; Business Interruption Insurance; Worker's Compensation Insurance.**
(a)   **Property Damage.** Lessee shall obtain and maintain insurance coverage on all of Lessee's personal property, Trade Fixtures, and Lessee Owned Alterations and Utility Installations. Such insurance shall be full replacement cost coverage with a deductible of not to exceed $1,000 per occurrence. The proceeds from any such insurance shall be used by Lessee for the replacement of personal property, Trade Fixtures and Lessee Owned Alterations and Utility Installations.
(b)   **Business Interruption.** Lessee shall obtain and maintain loss of income and extra expense insurance in amounts as will reimburse Lessee for direct or indirect loss of earnings attributable to all perils commonly insured against by prudent lessees in the business of Lessee or attributable to prevention of access to the Premises as a result of such perils.
(c)   **Worker's Compensation Insurance.** Lessee shall obtain and maintain Worker's Compensation Insurance in such amount as may be required by Applicable Requirements. Such policy shall include a 'Waiver of Subrogation' endorsement. Lessee shall provide Lessor with a copy of such endorsement along with the certificate of insurance or copy of the policy required by paragraph 8.5.
(d)   **No Representation of Adequate Coverage.** Lessor makes no representation that the limits or forms of coverage of insurance specified herein are adequate to cover Lessee's property, business operations or obligations under this Lease.

8.5   **Insurance Policies.** Insurance required herein shall be by companies maintaining during the policy term a "General Policyholders Rating" of at least A-, VII, as set forth in the most current issue of "Best's Insurance Guide", or such other rating as may be required by a Lender. Lessee shall not do or permit to be done anything which invalidates the required insurance policies. Lessee shall, prior to the Start Date, deliver to Lessor certified copies of policies of such insurance or certificates with copies of the required endorsements evidencing the existence and amounts of the required insurance. No such policy shall be cancelable or subject to modification except after 30 days prior written notice to Lessor. Lessee shall, at least 10 days prior to the expiration of such policies, furnish Lessor with evidence of renewals or "insurance binders" evidencing renewal thereof, or Lessor may increase his liability insurance coverage and charge the cost thereof to Lessee, which amount shall be payable by Lessee to Lessor upon demand. Such policies shall be for a term of at least one year, or the length of the remaining term of this Lease, whichever is less. If either Party shall fail to procure and maintain the insurance required to be carried by it, the other Party may, but shall not be required to, procure and maintain the same.

8.6   **Waiver of Subrogation.** Without affecting any other rights or remedies, Lessee and Lessor each hereby release and relieve the other, and waive their entire right to recover damages against the other, for loss of or damage to its property arising out of or incident to the perils required to be insured against herein. The effect of such releases and waivers is not limited by the amount of insurance carried or required, or by any deductibles applicable hereto. The Parties agree to have their respective property damage insurance carriers waive any right to subrogation that such companies may have against Lessor or Lessee, as the case may be, so long as the insurance is not invalidated thereby.

8.7   **Indemnity.** Except for Lessor's gross negligence or willful misconduct, Lessee shall indemnify, protect, defend and hold harmless the Premises, Lessor and its agents, Lessor's master or ground lessor, partners and Lenders, from and against any and all claims, loss of rents and/or damages, liens, judgments, penalties, attorneys' and consultants' fees, expenses and/or liabilities arising out of, involving, or in connection with, the use and/or occupancy of the Premises by Lessee. If any action or proceeding is brought against Lessor by reason of any of the foregoing matters, Lessee shall upon notice defend the same at Lessee's expense by counsel reasonably satisfactory to Lessor and Lessee shall cooperate with Lessee in such defense. Lessor need not have first paid any such claim in order to be defended or indemnified.

8.8   **Exemption of Lessor and its Agents from Liability.** Notwithstanding the negligence or breach of this Lease by Lessor or its agents, neither Lessor nor its agents shall be liable under any circumstances for: (i) injury or damage to the person or goods, wares, merchandise or other property of Lessee, Lessee's employees, contractors, invitees, customers, or any other person in or about the Premises, whether such damage or injury is caused by or results from fire, steam, electricity, gas, water or rain, indoor air quality, the presence of mold or from the breakage, leakage, obstruction or other defects of pipes, fire sprinklers, wires, appliances, plumbing, HVAC or lighting fixtures, or from any other cause, whether the said injury or damage results from conditions arising upon the Premises or upon other portions of the Building, or from other sources or places, (ii) any damages arising from any act or neglect of any other tenant of Lessor or from the failure of Lessor or its agents to enforce the provisions of any other lease in the Project, or (iii) injury to Lessee's business or for any loss of income or profit therefrom. Instead, it is intended that Lessee's sole recourse in the event of such damages or injury be to file a claim on the insurance policy(ies) that Lessee is required to maintain pursuant to the provisions of paragraph 8.

8.9   **Failure to Provide Insurance.** Lessee acknowledges that any failure on its part to obtain or maintain the insurance required herein will expose Lessor to risks and potentially cause Lessor to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain. Accordingly, for any month or portion thereof that Lessee does not maintain the required insurance and/or does not provide Lessor with the required binders or certificates evidencing the existence of the required insurance, the Base Rent shall be automatically increased, without any requirement for notice to Lessee, by an amount equal to 10% of the then existing Base Rent or $100, whichever is greater. The parties agree that such increase in Base Rent represents fair and reasonable compensation for the additional risk/costs that Lessor will incur by reason of Lessee's failure to maintain the required insurance. Such increase in Base Rent shall in no event constitute a waiver of Lessee's Default or Breach with respect to the failure to maintain such insurance, prevent the exercise of any of the other rights and remedies granted hereunder, nor relieve Lessee of its obligation to maintain the insurance specified in this Lease.

9.   **Damage or Destruction.**
9.1   **Definitions.**
(a)   **"Premises Partial Damage"** shall mean damage or destruction to the Improvements on the Premises, other than Lessee Owned Alterations and Utility Installations, which can reasonably be repaired in 3 months or less from the date of the damage or destruction, and the cost thereof does not exceed a sum equal to 6 month's Base Rent. Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not the damage is Partial or Total.
(b)   **"Premises Total Destruction"** shall mean damage or destruction to the Improvements on the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which cannot reasonably be repaired in 3 months or less from the date of the damage or destruction and/or the cost thereof exceeds a sum equal to 6 month's Base Rent. Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not the damage is Partial or Total.
(c)   **"Insured Loss"** shall mean damage or destruction to Improvements on the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which was caused by an event required to be covered by the insurance described in Paragraph 8.3(a), irrespective of any deductible amounts or coverage limits involved.
(d)   **"Replacement Cost"** shall mean the cost to repair or rebuild the improvements owned by Lessor at the time of the occurrence to their condition existing immediately prior thereto, including demolition, debris removal and upgrading required by the operation of Applicable Requirements, and without deduction for depreciation.
(e)   **"Hazardous Substance Condition"** shall mean the occurrence or discovery of a condition involving the presence of, or a contamination by, a Hazardous Substance, in, on, or under the Premises which requires restoration.

9.2   **Partial Damage - Insured Loss.** If a Premises Partial Damage that is an Insured Loss occurs, then Lessor shall, at Lessor's expense, repair such damage (but not Lessee's Trade Fixtures or Lessee Owned Alterations and Utility Installations) as soon as reasonably possible and this Lease shall continue in full force and effect; provided, however, that Lessee shall, at Lessor's election, make the repair of any damage or destruction the total cost to repair of which is $10,000 or less, and, in such event, Lessor shall make any applicable insurance proceeds available to Lessee on a reasonable basis for that purpose. Notwithstanding the foregoing, if the required insurance was not in force or the insurance proceeds are not sufficient to effect such repair, the insuring Party shall promptly contribute the shortage in proceeds as and when required to complete said repairs. In the event, however, such shortage was due to the fact that, by reason of the unique nature of the improvements, full replacement cost insurance coverage was not commercially reasonable and available, Lessor shall have no obligation to pay for the shortage in insurance proceeds or to fully restore the unique aspects of the Premises unless Lessee provides Lessor with the funds to cover same, or adequate assurance thereof, within 10 days following receipt of written notice of such shortage and request therefor. If Lessor receives said funds or adequate assurance thereof within said 10 day period, the party responsible for making the repairs shall complete them as soon as reasonably possible and this Lease shall remain in full force and effect. If such funds or assurance are not received, Lessor may nevertheless elect by written notice to Lessee within 10 days thereafter to: (i) make such restoration and repair as is commercially reasonable with Lessor paying any shortage in proceeds, in which case this Lease shall remain in full force and effect, or (ii) have this Lease terminate 30 days thereafter. Lessee shall not be entitled to reimbursement of any funds contributed by Lessee to repair any such damage or destruction. Premises Partial Damage due to flood or earthquake shall be subject to Paragraph 9.3, notwithstanding that there may be some insurance coverage, but the net proceeds of any such insurance shall be made available for the repairs if made by either Party.

9.3   **Partial Damage - Uninsured Loss.** If a Premises Partial Damage that is not an Insured Loss occurs, unless caused by a negligent or willful act of Lessee (in which event Lessee shall make the repairs at Lessee's expense), Lessor may either: (i) repair such damage as soon as reasonably possible at Lessor's expense (subject to reimbursement pursuant to Paragraph 4.2), in which event this Lease shall continue in full force and effect, or (ii) terminate this Lease by giving written notice to Lessee within 30 days after receipt by Lessor of knowledge of the occurrence of such damage. Such termination shall be effective 60 days following the date of such notice. In the event Lessor elects to terminate this Lease, Lessee shall have the right within 10 days after receipt of the termination notice to give written notice to Lessor of Lessee's commitment to pay for the repair of such damage without reimbursement from Lessor. Lessee shall provide Lessor with said funds or satisfactory assurance thereof within 30 days after making such commitment. In such event this Lease shall continue in full force and effect, and Lessor shall proceed to make such repairs as soon as reasonably possible after the required funds are available. If Lessee does not make the required commitment, this Lease shall terminate as of

INITIALS
© 2017 AIR CRE. All Rights Reserved.
Page 6 of 13
Last Edited: 11/8/2017 12:02 PM
INITIALS
MTN-26.00, Revised 01-03-2017

the date specified in the termination notice.

9.4   **Total Destruction.** Notwithstanding any other provision hereof, if a Premises Total Destruction occurs, this Lease shall terminate 60 days following such Destruction. If the damage or destruction was caused by the gross negligence or willful misconduct of Lessee, Lessor shall have the right to recover Lessor's damages from Lessee, except as provided in Paragraph 8.6.

9.5   **Damage Near End of Term.** If at any time during the last 6 months of this Lease there is damage for which the cost to repair exceeds one month's Base Rent, whether or not an Insured Loss, Lessor may terminate this Lease effective 60 days following the date of occurrence of such damage by giving a written termination notice to Lessee within 30 days after the date of occurrence of such damage. Notwithstanding the foregoing, if Lessee at that time has an exercisable option to extend this Lease or to purchase the Premises, then Lessee may preserve this Lease by, (a) exercising such option and (b) providing Lessor with any shortage in insurance proceeds (or adequate assurance thereof) needed to make the repairs on or before the earlier of (i) the date which is 10 days after Lessee's receipt of Lessor's written notice purporting to terminate this Lease, or (ii) the day prior to the date upon which such option expires. If Lessee duly exercises such option during such period and provides Lessor with funds (or adequate assurance thereof) to cover any shortage in insurance proceeds, Lessor shall, at Lessee's commercially reasonable expense, repair such damage as soon as reasonably possible and this Lease shall continue in full force and effect. If Lessee fails to exercise such option and provide such funds or assurance during such period, then this Lease shall terminate on the date specified in the termination notice and Lessee's option shall be extinguished.

9.6   **Abatement of Rent; Lessee's Remedies.**

(a)   **Abatement.** In the event of Premises Partial Damage or Premises Total Destruction or a Hazardous Substance Condition for which Lessee is not responsible under this Lease, the Rent payable by Lessee for the period required for the repair, remediation or restoration of such damage shall be abated in proportion to the degree to which Lessee's use of the Premises is impaired, but not to exceed the proceeds received from the Rental Value insurance. All other obligations of Lessee hereunder shall be performed by Lessee, and Lessor shall have no liability for any such damage, destruction, remediation, repair or restoration except as provided herein.

(b)   **Remedies.** If Lessor is obligated to repair or restore the Premises and does not commence, in a substantial and meaningful way, such repair or restoration within 90 days after such obligation shall accrue, Lessee may, at any time prior to the commencement of such repair or restoration, give written notice to Lessor and to any Lenders of which Lessee has actual notice, of Lessee's election to terminate this Lease on a date not less than 30 days following the giving of such notice. If Lessee gives such notice and such repair or restoration is not commenced within 30 days thereafter, this Lease shall terminate as of the date specified in said notice. If the repair or restoration is commenced within such 30 days, this Lease shall continue in full force and effect. "Commence" shall mean either the unconditional authorization of the preparation of the required plans, or the beginning of the actual work on the Premises, whichever first occurs.

9.7   **Termination; Advance Payments.** Upon termination of this Lease pursuant to Paragraph 6.2(g) or Paragraph 9, an equitable adjustment shall be made concerning advance Base Rent and any other advance payments made by Lessee to Lessor. Lessor shall, in addition, return to Lessee so much of Lessee's Security Deposit as has not been, or is not then required to be, used by Lessor.

**10.   Real Property Taxes.**

10.1   **Definition.** As used herein, the term **"Real Property Taxes"** shall include any form of assessment; real estate, general, special, ordinary or extraordinary, or rental levy or tax (other than inheritance, personal income or estate taxes); improvement bond; and/or license fee imposed upon or levied against any legal or equitable interest of Lessor in the Project, Lessor's right to other income therefrom, and/or Lessor's business of leasing, by any authority having the direct or indirect power to tax and where the funds are generated with reference to the Project address. The term "Real Property Taxes" shall also include any tax, fee, levy, assessment or charge, or any increase therein: (i) imposed by reason of events occurring during the term of this Lease, including but not limited to, a change in the ownership of the Project, (ii) a change in the improvements thereon, and/or (iii) levied or assessed on machinery or equipment provided by Lessor to Lessee pursuant to this Lease. In calculating Real Property Taxes for any calendar year, the Real Property Taxes for any real estate tax year shall be included in the calculation of Real Property Taxes for such calendar year based upon the number of days which such calendar year and tax year have in common.

10.2   **Payment of Taxes.** Except as otherwise provided in Paragraph 10.3, Lessor shall pay the Real Property Taxes applicable to the Project, and said payments shall be included in the calculation of Common Area Operating Expenses in accordance with the provisions of Paragraph 4.2.

10.3   **Additional Improvements.** Common Area Operating Expenses shall not include Real Property Taxes specified in the tax assessor's records and work sheets as being caused by additional improvements placed upon the Project by other lessees or by Lessor for the exclusive enjoyment of such other lessees. Notwithstanding Paragraph 10.2 hereof, Lessee shall, however, pay to Lessor at the time Common Area Operating Expenses are payable under Paragraph 4.2, the entirety of any increase in Real Property Taxes if assessed solely by reason of Alterations, Trade Fixtures or Utility Installations placed upon the Premises by Lessee or at Lessee's request or by reason of any alterations or improvements to the Premises made by Lessor subsequent to the execution of this Lease by the Parties.

10.4   **Joint Assessment.** If the Building is not separately assessed, Real Property Taxes allocated to the Building shall be an equitable proportion of the Real Property Taxes for all of the land and improvements included within the tax parcel assessed, such proportion to be determined by Lessor from the respective valuations assigned in the assessor's work sheets or such other information as may be reasonably available. Lessor's reasonable determination thereof, in good faith, shall be conclusive.

10.5   **Personal Property Taxes.** Lessee shall pay prior to delinquency all taxes assessed against and levied upon Lessee Owned Alterations and Utility Installations, Trade Fixtures, furnishings, equipment and all personal property of Lessee contained in the Premises. When possible, Lessee shall cause its Lessee Owned Alterations and Utility Installations, Trade Fixtures, furnishings, equipment and all other personal property to be assessed and billed separately from the real property of Lessor. If any of Lessee's said property shall be assessed with Lessor's real property, Lessee shall pay Lessor the taxes attributable to Lessee's property within 10 days after receipt of a written statement setting forth the taxes applicable to Lessee's property.

**11.   Utilities and Services.** Lessee shall pay for all water, gas, heat, light, power, telephone, trash disposal and other utilities and services supplied to the Premises, together with any taxes thereon. Notwithstanding the provisions of Paragraph 4.2, if at any time in Lessor's sole judgment, Lessor determines that Lessee is using a disproportionate amount of water, electricity or other commonly metered utilities, or that Lessee is generating such a large volume of trash as to require an increase in the size of the trash receptacle and/or an increase in the number of times per month that it is emptied, then Lessor may increase Lessee's Base Rent by an amount equal to such increased costs. There shall be no abatement of Rent and Lessor shall not be liable in any respect whatsoever for the inadequacy, stoppage, interruption or discontinuance of any utility or service due to riot, strike, labor dispute, breakdown, accident, repair or other cause beyond Lessor's reasonable control or in cooperation with governmental request or directions.

**12.   Assignment and Subletting.**

12.1   **Lessor's Consent Required.**

(a)   Lessee shall not voluntarily or by operation of law assign, transfer, mortgage or encumber (collectively, **"assign or assignment"**) or sublet all or any part of Lessee's interest in this Lease or in the Premises without Lessor's prior written consent.

(b)   Unless Lessee is a corporation and its stock is publicly traded on a national stock exchange, a change in the control of Lessee shall constitute an assignment requiring consent. The transfer, on a cumulative basis, of 25% or more of the voting control of Lessee shall constitute a change in control for this purpose.

(c)   The involvement of Lessee or its assets in any transaction, or series of transactions (by way of merger, sale, acquisition, financing, transfer, leveraged buy-out or otherwise), whether or not a formal assignment or hypothecation of this Lease or Lessee's assets occurs, which results or will result in a reduction of the Net Worth of Lessee by an amount greater than 25% of such Net Worth as it was represented at the time of the execution of this Lease or at the time of the most recent assignment to which Lessor has consented, or as it exists immediately prior to said transaction or transactions constituting such reduction, whichever was or is greater, shall be considered an assignment of this Lease to which Lessor may withhold its consent. **"Net Worth of Lessee"** shall mean the net worth of Lessee (excluding any guarantors) established under generally accepted accounting principles.

(d)   An assignment or subletting without consent shall, at Lessor's option, be a Default curable after notice per Paragraph 13.1(d), or a noncurable Breach without the necessity of any notice and grace period. If Lessor elects to treat such unapproved assignment or subletting as a noncurable Breach, Lessor may either: (i) terminate this Lease, or (ii) upon 30 days written notice, increase the monthly Base Rent to 110% of the Base Rent then in effect. Further, in the event of such Breach and rental adjustment, (i) the purchase price of any option to purchase the Premises held by Lessee shall be subject to similar adjustment to 110% of the price previously in effect, and (ii) all fixed and non-fixed rental adjustments scheduled during the remainder of the Lease term shall be increased to 110% of the scheduled adjusted rent.

(e)   Lessee's remedy for any breach of Paragraph 12.1 by Lessor shall be limited to compensatory damages and/or injunctive relief.

(f)   Lessor may reasonably withhold consent to a proposed assignment or subletting if Lessee is in Default at the time consent is requested.

(g)   Notwithstanding the foregoing, allowing a de minimis portion of the Premises, ie. 20 square feet or less, to be used by a third party vendor in connection with the installation of a vending machine or payphone shall not constitute a subletting.

12.2   **Terms and Conditions Applicable to Assignment and Subletting.**

(a)   Regardless of Lessor's consent, no assignment or subletting shall : (i) be effective without the express written assumption by such assignee or sublessee of the obligations of Lessee under this Lease, (ii) release Lessee of any obligations hereunder, or (iii) alter the primary liability of Lessee for the payment of Rent or for the performance of any other obligations to be performed by Lessee.

(b)   Lessor may accept Rent or performance of Lessee's obligations from any person other than Lessee pending approval or disapproval of an assignment. Neither a delay in the approval or disapproval of such assignment nor the acceptance of Rent or performance shall constitute a waiver or estoppel of Lessor's right to

INITIALS

Page 7 of 13
Last Edited: 11/8/2017 12:02 PM

© 2017 AIR CRE. All Rights Reserved.                                      MTN-26.00, Revised 01-03-2017

**EXHIBIT  A  pg. 7**
**EXHIBIT  1  pg. 13**

exercise its remedies for Lessee's Default or Breach.

(c) Lessor's consent to any assignment or subletting shall not constitute a consent to any subsequent assignment or subletting.

(d) In the event of any Default or Breach by Lessee, Lessor may proceed directly against Lessee, any Guarantors or anyone else responsible for the performance of Lessee's obligations under this Lease, including any assignee or sublessee, without first exhausting Lessor's remedies against any other person or entity responsible therefor to Lessor, or any security held by Lessor.

(e) Each request for consent to an assignment or subletting shall be in writing, accompanied by information relevant to Lessor's determination as to the financial and operational responsibility and appropriateness of the proposed assignee or sublessee, including but not limited to the intended use and/or required modification of the Premises, if any, together with a fee of $500 as consideration for Lessor's considering and processing said request.  Lessee agrees to provide Lessor with such other or additional information and/or documentation as may be reasonably requested. (See also Paragraph 36)

(f) Any assignee of, or sublessee under, this Lease shall, by reason of accepting such assignment, entering into such sublease, or entering into possession of the Premises or any portion thereof, be deemed to have assumed and agreed to conform and comply with each and every term, covenant, condition and obligation herein to be observed or performed by Lessee during the term of said assignment or sublease, other than such obligations as are contrary to or inconsistent with provisions of an assignment or sublease to which Lessor has specifically consented to in writing.

(g) Lessor's consent to any assignment or subletting shall not transfer to the assignee or sublessee any Option granted to the original Lessee by this Lease unless such transfer is specifically consented to by Lessor in writing. (See Paragraph 39.2)

12.3  **Additional Terms and Conditions Applicable to Subletting.**  The following terms and conditions shall apply to any subletting by Lessee of all or any part of the Premises and shall be deemed included in all subleases under this Lease whether or not expressly incorporated therein.

(a) Lessee hereby assigns and transfers to Lessor all of Lessee's interest in all Rent payable on any sublease, and Lessor may collect such Rent and apply same toward Lessee's obligations under this Lease; provided, however, that until a Breach shall occur in the performance of Lessee's obligations, Lessee may collect said Rent.  In the event that the amount collected by Lessor exceeds Lessee's then outstanding obligations any such excess shall be refunded to Lessee.  Lessor shall not, by reason of the foregoing or any assignment of such sublease, nor by reason of the collection of Rent, be deemed liable to the sublessee for any failure of Lessee to perform and comply with any of Lessee's obligations to such sublessee.  Lessee hereby irrevocably authorizes and directs any such sublessee, upon receipt of a written notice from Lessor stating that a Breach exists in the performance of Lessee's obligations under this Lease, to pay to Lessor all Rent due and to become due under the sublease.  Sublessee shall rely upon any such notice from Lessor and shall pay all Rents to Lessor without any obligation or right to inquire as to whether such Breach exists, notwithstanding any claim from Lessee to the contrary.

(b) In the event of a Breach by Lessee, Lessor may, at its option, require sublessee to attorn to Lessor, in which event Lessor shall undertake the obligations of the sublessor under such sublease from the time of the exercise of said option to the expiration of such sublease; provided, however, Lessor shall not be liable for any prepaid rents or security deposit paid by such sublessee to such sublessor or for any prior Defaults or Breaches of such sublessor.

(c) Any matter requiring the consent of the sublessor under a sublease shall also require the consent of Lessor.

(d) No sublessee shall further assign or sublet all or any part of the Premises without Lessor's prior written consent.

(e) Lessor shall deliver a copy of any notice of Default or Breach by Lessee to the sublessee, who shall have the right to cure the Default of Lessee within the grace period, if any, specified in such notice.  The sublessee shall have a right of reimbursement and offset from and against Lessee for any such Defaults cured by the sublessee.

**13.  Default; Breach; Remedies.**

13.1  **Default; Breach.**  A "**Default**" is defined as a failure by the Lessee to comply with or perform any of the terms, covenants, conditions or Rules and Regulations under this Lease. A "**Breach**" is defined as the occurrence of one or more of the following Defaults, and the failure of Lessee to cure such Default within any applicable grace period:

(a) The abandonment of the Premises; or the vacating of the Premises without providing a commercially reasonable level of security, or where the coverage of the property insurance described in Paragraph 8.3 is jeopardized as a result thereof, or without providing reasonable assurances to minimize potential vandalism.

(b) The failure of Lessee to make any payment of Rent or any Security Deposit required to be made by Lessee hereunder, whether to Lessor or to a third party, when due, to provide reasonable evidence of insurance or surety bond, or to fulfill any obligation under this Lease which endangers or threatens life or property, where such failure continues for a period of 3 business days following written notice to Lessee.  THE ACCEPTANCE BY LESSOR OF A PARTIAL PAYMENT OF RENT OR SECURITY DEPOSIT SHALL NOT CONSTITUTE A WAIVER OF ANY OF LESSOR'S RIGHTS, INCLUDING LESSOR'S RIGHT TO RECOVER POSSESSION OF THE PREMISES.

(c) The failure of Lessee to allow Lessor and/or its agents access to the Premises or the commission of waste, act or acts constituting public or private nuisance, and/or an illegal activity on the Premises by Lessee, where such actions continue for a period of 3 business days following written notice to Lessee.  In the event that Lessee commits waste, a nuisance or an illegal activity a second time then, the Lessor may elect to treat such conduct as a non-curable Breach rather than a Default.

(d) The failure by Lessee to provide (i) reasonable written evidence of compliance with Applicable Requirements, (ii) the service contracts, (iii) the rescission of an unauthorized assignment or subletting, (iv) an Estoppel Certificate or financial statements, (v) a requested subordination, (vi) evidence concerning any guaranty and/or Guarantor, (vii) any document requested under Paragraph 41, (viii) material safety data sheets (MSDS), or (ix) any other documentation or information which Lessor may reasonably require of Lessee under the terms of this Lease, where any such failure continues for a period of 10 days following written notice to Lessee.

(e) A Default by Lessee as to the terms, covenants, conditions or provisions of this Lease, or of the rules adopted under Paragraph 2.9 hereof, other than those described in subparagraphs 13.1(a), (b), (c) or (d), above, where such Default continues for a period of 30 days after written notice; provided, however, that if the nature of Lessee's Default is such that more than 30 days are reasonably required for its cure, then it shall not be deemed to be a Breach if Lessee commences such cure within said 30 day period and thereafter diligently prosecutes such cure to completion.

(f) The occurrence of any of the following events: (i) the making of any general arrangement or assignment for the benefit of creditors; (ii) becoming a "debtor" as defined in 11 U.S.C. § 101 or any successor statute thereto (unless, in the case of a petition filed against Lessee, the same is dismissed within 60 days); (iii) the appointment of a trustee or receiver to take possession of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where possession is not restored to Lessee within 30 days; or (iv) the attachment, execution or other judicial seizure of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where such seizure is not discharged within 30 days; provided, however, in the event that any provision of this subparagraph is contrary to any applicable law, such provision shall be of no force or effect, and not affect the validity of the remaining provisions.

(g) The discovery that any financial statement of Lessee or of any Guarantor given to Lessor was materially false.

(h) If the performance of Lessee's obligations under this Lease is guaranteed: (i) the death of a Guarantor, (ii) the termination of a Guarantor's liability with respect to this Lease other than in accordance with the terms of such guaranty, (iii) a Guarantor's becoming insolvent or the subject of a bankruptcy filing, (iv) a Guarantor's refusal to honor the guaranty, or (v) a Guarantor's breach of its guaranty obligation on an anticipatory basis, and Lessee's failure, within 60 days following written notice of any such event, to provide written alternative assurance or security, which, when coupled with the then existing resources of Lessee, equals or exceeds the combined financial resources of Lessee and the Guarantors that existed at the time of execution of this Lease.

13.2  **Remedies.**  If Lessee fails to perform any of its affirmative duties or obligations, within 10 days after written notice (or in case of an emergency, without notice), Lessor may, at its option, perform such duty or obligation on Lessee's behalf, including but not limited to the obtaining of reasonably required bonds, insurance policies, or governmental licenses, permits or approvals.  Lessee shall pay to Lessor an amount equal to 115% of the costs and expenses incurred by Lessor in such performance upon receipt of an invoice therefor.  In the event of a Breach, Lessor may, with or without further notice or demand, and without limiting Lessor in the exercise of any right or remedy which Lessor may have by reason of such Breach:

(a) Terminate Lessee's right to possession of the Premises by any lawful means, in which case this Lease shall terminate and Lessee shall immediately surrender possession to Lessor.  In such event Lessor shall be entitled to recover from Lessee: (i) the unpaid Rent which had been earned at the time of termination; (ii) the worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that the Lessee proves could have been reasonably avoided; (iii) the worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that the Lessee proves could be reasonably avoided; and (iv) any other amount necessary to compensate Lessor for all the detriment proximately caused by the Lessee's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, including but not limited to the cost of recovering possession of the Premises, expenses of reletting, including necessary renovation and alteration of the Premises, reasonable attorneys' fees, and that portion of any leasing commission paid by Lessor in connection with this Lease applicable to the unexpired term of this Lease.  The worth at the time of award of the amount referred to in provision (iii) of the immediately preceding sentence shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of the District within which the Premises are located at the time of award plus one percent.  Efforts by Lessor to mitigate damages caused by Lessee's Breach of this Lease shall not waive Lessor's right to recover any damages to which Lessor is otherwise entitled.  If termination of this Lease is obtained through the provisional remedy of unlawful detainer, Lessor shall have the right to recover in such proceeding any unpaid Rent and damages as are recoverable therein, or Lessor may reserve the right to recover all or any part thereof in a separate suit.  If a notice and grace period required under Paragraph 13.1 was not previously given, a notice to pay rent or quit, or to perform or quit given to Lessee under the unlawful detainer statute shall also constitute the notice required by Paragraph 13.1. In such case, the applicable grace period required by Paragraph 13.1 and the un

INITIALS

INITIALS

© 2017 AIR CRE.  All Rights Reserved.

MTN-26.00, Revised 01-03-2017

detainer statute shall run concurrently, and the failure of Lessee to cure the Default within the greater of the two such grace periods shall constitute both an unlawful detainer and a Breach of this Lease entitling Lessor to the remedies provided for in this Lease and/or by said statute.

(b)   Continue the Lease and Lessee's right to possession and recover the Rent as it becomes due, in which event Lessee may sublet or assign, subject only to reasonable limitations. Acts of maintenance, efforts to relet, and/or the appointment of a receiver to protect the Lessor's interests, shall not constitute a termination of the Lessee's right to possession.

(c)   Pursue any other remedy now or hereafter available under the laws or judicial decisions of the state wherein the Premises are located. The expiration or termination of this Lease and/or the termination of Lessee's right to possession shall not relieve Lessee from liability under any Indemnity provisions of this Lease as to matters occurring or accruing during the term thereof or by reason of Lessee's occupancy of the Premises.

13.3  **Inducement Recapture.** Any agreement for free or abated rent or other charges, the cost of tenant improvements for Lessee paid for or performed by Lessor, or for the giving or paying by Lessor to or for Lessee of any cash or other bonus, inducement or consideration for Lessee's entering into this Lease, all of which concessions are hereinafter referred to as "**Inducement Provisions**," shall be deemed conditioned upon Lessee's full and faithful performance of all of the terms, covenants and conditions of this Lease. Upon Breach of this Lease by Lessee, any such Inducement Provision shall automatically be deemed deleted from this Lease and of no further force or effect, and any rent, other charge, bonus, inducement or consideration theretofore abated, given or paid by Lessor under such an Inducement Provision shall be immediately due and payable by Lessee to Lessor, notwithstanding any subsequent cure of said Breach by Lessee. The acceptance by Lessor of rent or the cure of the Breach which initiated the operation of this paragraph shall not be deemed a waiver by Lessor of the provisions of this paragraph unless specifically so stated in writing by Lessor at the time of such acceptance.

13.4  **Late Charges.** Lessee hereby acknowledges that late payment by Lessee of Rent will cause Lessor to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed upon Lessor by any Lender. Accordingly, if any Rent shall not be received by Lessor within 5 days after such amount shall be due, then, without any requirement for notice to Lessee, Lessee shall immediately pay to Lessor a one-time late charge equal to 10% of each such overdue amount or $100, whichever is greater. The parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Lessor will incur by reason of such late payment. Acceptance of such late charge by Lessor shall in no event constitute a waiver of Lessee's Default or Breach with respect to such overdue amount, nor prevent the exercise of any of the other rights and remedies granted hereunder. In the event that a late charge is payable hereunder, whether or not collected, for 3 consecutive installments of Base Rent, then notwithstanding any provision of this Lease to the contrary, Base Rent shall, at Lessor's option, become due and payable quarterly in advance.

13.5  **Interest.** Any monetary payment due Lessor hereunder, other than late charges, not received by Lessor, when due shall bear interest from the 31st day after it was due. The interest ("**Interest**") charged shall be computed at the rate of 10% per annum but shall not exceed the maximum rate allowed by law. Interest is payable in addition to the potential late charge provided for in Paragraph 13.4.

13.6  **Breach by Lessor.**

(a)   **Notice of Breach.** Lessor shall not be deemed in breach of this Lease unless Lessor fails within a reasonable time to perform an obligation required to be performed by Lessor. For purposes of this Paragraph, a reasonable time shall in no event be less than 30 days after receipt by Lessor, and any Lender whose name and address shall have been furnished to Lessee in writing for such purpose, of written notice specifying wherein such obligation of Lessor has not been performed; provided, however, that if the nature of Lessor's obligation is such that more than 30 days are reasonably required for its performance, then Lessor shall not be in breach if performance is commenced within such 30 day period and thereafter diligently pursued to completion.

(b)   **Performance by Lessee on Behalf of Lessor.** In the event that neither Lessor nor Lender cures said breach within 30 days after receipt of said notice, or if having commenced said cure they do not diligently pursue it to completion, then Lessee may elect to cure said breach at Lessee's expense and offset from Rent the actual and reasonable cost to perform such cure, provided however, that such offset shall not exceed an amount equal to the greater of one month's Base Rent or the Security Deposit, reserving Lessee's right to reimbursement from Lessor for any such expense in excess of such offset. Lessee shall document the cost of said cure and supply said documentation to Lessor.

**14.  Condemnation.** If the Premises or any portion thereof are taken under the power of eminent domain or sold under the threat of the exercise of said power (collectively "**Condemnation**"), this Lease shall terminate as to the part taken as of the date the condemning authority takes title or possession, whichever first occurs. If more than 10% of the floor area of the Unit, or more than 25% of the parking spaces is taken by Condemnation, Lessee may, at Lessee's option, to be exercised in writing within 10 days after Lessor shall have given Lessee written notice of such taking (or in the absence of such notice, within 10 days after the condemning authority shall have taken possession) terminate this Lease as of the date the condemning authority takes such possession. If Lessee does not terminate this Lease in accordance with the foregoing, this Lease shall remain in full force and effect as to the portion of the Premises remaining, except that the Base Rent shall be reduced in proportion to the reduction in utility of the Premises caused by such Condemnation. Condemnation awards and/or payments shall be the property of Lessor, whether such award shall be made as compensation for diminution in value of the leasehold, the value of the part taken, or for severance damages; provided, however, that Lessee shall be entitled to any compensation paid by the condemnor for Lessee's relocation expenses, loss of business goodwill and/or Trade Fixtures, without regard to whether or not this Lease is terminated pursuant to the provisions of this Paragraph. All Alterations and Utility Installations made to the Premises by Lessee, for purposes of Condemnation only, shall be considered the property of the Lessee and Lessee shall be entitled to any and all compensation which is payable therefor. In the event that this Lease is not terminated by reason of the Condemnation, Lessor shall repair any damage to the Premises caused by such Condemnation.

**15.  Brokerage Fees.**

~~15.1   Additional Commission.   In addition to the payments owed pursuant to Paragraph 1.10 above, Lessor agrees that: (a) if Lessee exercises any Option, (b) if Lessee or anyone affiliated with Lessee acquires from Lessor any rights to the Premises or other premises owned by Lessor and located within the Project, (c) if Lessee remains in possession of the Premises, with the consent of Lessor, after the expiration of this Lease, or (d) if Base Rent is increased, whether by an agreement or operation of an escalation clause herein, then, Lessor shall pay Brokers a fee in accordance with the fee schedule of the Brokers in effect at the time the Lease was executed.~~

15.2  **Assumption of Obligations.** Any buyer or transferee of Lessor's interest in this Lease shall be deemed to have assumed Lessor's obligation hereunder. Brokers shall be third party beneficiaries of the provisions of Paragraphs 1.10, 15, 22 and 31. If Lessor fails to pay to Brokers any amounts due as and for brokerage fees pertaining to this Lease when due, then such amounts shall accrue Interest. In addition, if Lessor fails to pay any amounts to Lessee's Broker when due, Lessee's Broker may send written notice to Lessor and Lessee of such failure and if Lessor fails to pay such amounts within 10 days after said notice, Lessee shall pay said monies to its Broker and offset such amounts against Rent. In addition, Lessee's Broker shall be deemed to be a third party beneficiary of any commission agreement entered into by and/or between Lessor and Lessor's Broker for the limited purpose of collecting any brokerage fee owed.

15.3  **Representations and Indemnities of Broker Relationships.** Lessee and Lessor each represent and warrant to the other that it has had no dealings with any person, firm, broker or finder (other than the Brokers, if any) in connection with this Lease, and that no one other than said named Brokers is entitled to any commission or finder's fee in connection herewith. Lessee and Lessor do each hereby agree to indemnify, protect, defend and hold the other harmless from and against liability for compensation or charges which may be claimed by any such unnamed broker, finder or other similar party by reason of any dealings or actions of the indemnifying Party, including any costs, expenses, attorneys' fees reasonably incurred with respect thereto.

**16.  Estoppel Certificates.**

(a)   Each Party (as "**Responding Party**") shall within 10 days after written notice from the other Party (the "**Requesting Party**") execute, acknowledge and deliver to the Requesting Party a statement in writing in form similar to the then most current "**Estoppel Certificate**" form published BY AIR CRE, plus such additional information, confirmation and/or statements as may be reasonably requested by the Requesting Party.

(b)   If the Responding Party shall fail to execute or deliver the Estoppel Certificate within such 10 day period, the Requesting Party may execute an Estoppel Certificate stating that: (i) the Lease is in full force and effect without modification except as may be represented by the Requesting Party, (ii) there are no uncured defaults in the Requesting Party's performance, and (iii) if Lessor is the Requesting Party, not more than one month's rent has been paid in advance. Prospective purchasers and encumbrancers may rely upon the Requesting Party's Estoppel Certificate, and the Responding Party shall be estopped from denying the truth of the facts contained in said Certificate. In addition, Lessee acknowledges that any failure on its part to provide such an Estoppel Certificate will expose Lessor to risks and potentially cause Lessor to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain. Accordingly, should the Lessee fail to execute and/or deliver a requested Estoppel Certificate in a timely fashion the monthly Base Rent shall be automatically increased, without any requirement for notice to Lessee, by an amount equal to 10% of the then existing Base Rent or $100, whichever is greater for remainder of the Lease. The Parties agree that such increase in Base Rent represents fair and reasonable compensation for the additional risk/costs that Lessor will incur by reason of Lessee's failure to provide the Estoppel Certificate. Such increase in Base Rent shall in no event constitute a waiver of Lessee's Default or Breach with respect to the failure to provide the Estoppel Certificate nor prevent the exercise of any of the other rights and remedies granted hereunder.

(c)   If Lessor desires to finance, refinance, or sell the Premises, or any part thereof, Lessee and all Guarantors shall within 10 days after written notice from Lessor deliver to any potential lender or purchaser designated by Lessor such financial statements as may be reasonably required by such lender or purchaser, including but not limited to Lessee's financial statements for the past 3 years. All such financial statements shall be received by Lessor and such lender or purchaser in confidence and shall be used only for the purposes herein set forth.

© 2017 AIR CRE.  All Rights Reserved.

INITIALS

MTN-26.00, Revised 01-03-2017

**17.   Definition of Lessor.**  The term "**Lessor**" as used herein shall mean the owner or owners at the time in question of the fee title to the Premises, or, if this is a sublease, of the Lessee's interest in the prior lease.  In the event of a transfer of Lessor's title or interest in the Premises or this Lease, Lessor shall deliver to the transferee or assignee (in cash or by credit) any unused Security Deposit held by Lessor.  Upon such transfer or assignment and delivery of the Security Deposit, as aforesaid, the prior Lessor shall be relieved of all liability with respect to the obligations and/or covenants under this Lease thereafter to be performed by the Lessor. Subject to the foregoing, the obligations and/or covenants in this Lease to be performed by the Lessor shall be binding only upon the Lessor as hereinabove defined.

**18.   Severability.**  The invalidity of any provision of this Lease, as determined by a court of competent jurisdiction, shall in no way affect the validity of any other provision hereof.

**19.   Days.**  Unless otherwise specifically indicated to the contrary, the word "**days**" as used in this Lease shall mean and refer to calendar days.

**20.   Limitation on Liability.**  The obligations of Lessor under this Lease shall not constitute personal obligations of Lessor, or its partners, members, directors, officers or shareholders, and Lessee shall look to the Premises, and to no other assets of Lessor, for the satisfaction of any liability of Lessor with respect to this Lease, and shall not seek recourse against Lessor's partners, members, directors, officers or shareholders, or any of their personal assets for such satisfaction.

**21.   Time of Essence.**  Time is of the essence with respect to the performance of all obligations to be performed or observed by the Parties under this Lease.

**22.   No Prior or Other Agreements; Broker Disclaimer.**  This Lease contains all agreements between the Parties with respect to any matter mentioned herein, and no other prior or contemporaneous agreement or understanding shall be effective.  Lessor and Lessee each represents and warrants to the Brokers that it has made, and is relying solely upon, its own investigation as to the nature, quality, character and financial responsibility of the other Party to this Lease and as to the use, nature, quality and character of the Premises.  Brokers have no responsibility with respect thereto or with respect to any default or breach hereof by either Party.

**23.   Notices.**

23.1  **Notice Requirements.**  All notices required or permitted by this Lease or applicable law shall be in writing and may be delivered in person (by hand or by courier) or may be sent by regular, certified or registered mail or U.S. Postal Service Express Mail, with postage prepaid, or by facsimile transmission, or by email, and shall be deemed sufficiently given if served in a manner specified in this Paragraph 23.  The addresses noted adjacent to a Party's signature on this Lease shall be that Party's address for delivery or mailing of notices.  Either Party may by written notice to the other specify a different address for notice, except that upon Lessee's taking possession of the Premises, the Premises shall constitute Lessee's address for notice.  A copy of all notices to Lessor shall be concurrently transmitted to such party or parties at such addresses as Lessor may from time to time hereafter designate in writing.

23.2  **Date of Notice.**  Any notice sent by registered or certified mail, return receipt requested, shall be deemed given on the date of delivery shown on the receipt card, or if no delivery date is shown, the postmark thereon.  If sent by regular mail the notice shall be deemed given 72 hours after the same is addressed as required herein and mailed with postage prepaid.  Notices delivered by United States Express Mail or overnight courier that guarantees next day delivery shall be deemed given 24 hours after delivery of the same to the Postal Service or courier.  Notices delivered by hand, or transmitted by facsimile transmission or by email shall be deemed delivered upon actual receipt.  If notice is received on a Saturday, Sunday or legal holiday, it shall be deemed received on the next business day.

**24.   Waivers.**

(a)   No waiver by Lessor of the Default or Breach of any term, covenant or condition hereof by Lessee, shall be deemed a waiver of any other term, covenant or condition hereof, or of any subsequent Default or Breach by Lessee of the same or of any other term, covenant or condition hereof.  Lessor's consent to, or approval of, any act shall not be deemed to render unnecessary the obtaining of Lessor's consent to, or approval of, any subsequent or similar act by Lessee, or be construed as the basis of an estoppel to enforce the provision or provisions of this Lease requiring such consent.

(b)   The acceptance of Rent by Lessor shall not be a waiver of any Default or Breach by Lessee.  Any payment by Lessee may be accepted by Lessor on account of monies or damages due Lessor, notwithstanding any qualifying statements or conditions made by Lessee in connection therewith, which such statements and/or conditions shall be of no force or effect whatsoever unless specifically agreed to in writing by Lessor at or before the time of deposit of such payment.

(c)   THE PARTIES AGREE THAT THE TERMS OF THIS LEASE SHALL GOVERN WITH REGARD TO ALL MATTERS RELATED THERETO AND HEREBY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE TO THE EXTENT THAT SUCH STATUTE IS INCONSISTENT WITH THIS LEASE.

**25.   Disclosures Regarding The Nature of a Real Estate Agency Relationship.**

(a)   When entering into a discussion with a real estate agent regarding a real estate transaction, a Lessor or Lessee should from the outset understand what type of agency relationship or representation it has with the agent or agents in the transaction. Lessor and Lessee acknowledge being advised by the Brokers in this transaction, as follows:

(i)   *Lessor's Agent.*  A Lessor's agent under a listing agreement with the Lessor acts as the agent for the Lessor only.  A Lessor's agent or subagent has the following affirmative obligations: *To the Lessor:*  A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Lessor. *To the Lessee and the Lessor:*  (a) Diligent exercise of reasonable skills and care in performance of the agent's duties. (b) A duty of honest and fair dealing and good faith. (c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties.  An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

(ii)   *Lessee's Agent.*  An agent can agree to act as agent for the Lessee only.  In these situations, the agent is not the Lessor's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Lessor.  An agent acting only for a Lessee has the following affirmative obligations. *To the Lessee:*  A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Lessee. *To the Lessee and the Lessor:* (a) Diligent exercise of reasonable skills and care in performance of the agent's duties. (b) A duty of honest and fair dealing and good faith. (c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties. An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

(iii)   *Agent Representing Both Lessor and Lessee.*  A real estate agent, either acting directly or through one or more associate licenses, can legally be the agent of both the Lessor and the Lessee in a transaction, but only with the knowledge and consent of both the Lessor and the Lessee.  In a dual agency situation, the agent has the following affirmative obligations to both the Lessor and the Lessee: (a) A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either Lessor or the Lessee.  (b) Other duties to the Lessor and the Lessee as stated above in subparagraphs (i) or (ii).  In representing both Lessor and Lessee, the agent may not without the express permission of the respective Party, disclose to the other Party that the Lessor will accept rent in an amount less than that indicated in the listing or that the Lessee is willing to pay a higher rent than that offered.  The above duties of the agent in a real estate transaction do not relieve a Lessor or Lessee from the responsibility to protect their own interests.  Lessor and Lessee should carefully read all agreements to assure that they adequately express their understanding of the transaction.  A real estate agent is a person qualified to advise about real estate.  If legal or tax advice is desired, consult a competent professional.

(b)   Brokers have no responsibility with respect to any default or breach hereof by either Party.  The Parties agree that no lawsuit or other legal proceeding involving any breach of duty, error or omission relating to this Lease may be brought against Broker more than one year after the Start Date and that the liability (including court costs and attorneys' fees), of any Broker with respect to any such lawsuit and/or legal proceeding shall not exceed the fee received by such Broker pursuant to this Lease; provided, however, that the foregoing limitation on each Broker's liability shall not be applicable to any gross negligence or willful misconduct of such Broker.

(c)   Lessor and Lessee agree to identify to Brokers as "Confidential" any communication or information given Brokers that is considered by such Party to be confidential.

**26.   No Right To Holdover.**  Lessee has no right to retain possession of the Premises or any part thereof beyond the expiration or termination of this Lease.  In the event that Lessee holds over, then the Base Rent shall be increased to 150% of the Base Rent applicable immediately preceding the expiration or termination. Holdover Base Rent shall be calculated on monthly basis.  Nothing contained herein shall be construed as consent by Lessor to any holding over by Lessee.

**27.   Cumulative Remedies.**  No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity.

**28.   Covenants and Conditions; Construction of Agreement.**  All provisions of this Lease to be observed or performed by Lessee are both covenants and conditions. In construing this Lease, all headings and titles are for the convenience of the Parties only and shall not be considered a part of this Lease.  Whenever required by the context, the singular shall include the plural and vice versa.  This Lease shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if both Parties had prepared it.

**29.   Binding Effect; Choice of Law.**  This Lease shall be binding upon the parties, their personal representatives, successors and assigns and be governed by the laws of the State in which the Premises are located.  Any litigation between the Parties hereto concerning this Lease shall be initiated in the county in which the Premises are located.

---

INITIALS

© 2017 AIR CRE.  All Rights Reserved.

Page 10 of 13
Last Edited: 11/8/2017 12:02 PM

INITIALS

MTN-26.00, Revised 01-03-2017

**EXHIBIT  A  pg. 10**
**EXHIBIT  1  pg. 16**

**30.   Subordination; Attornment; Non-Disturbance.**

30.1   **Subordination.**  This Lease and any Option granted hereby shall be subject and subordinate to any ground lease, mortgage, deed of trust, or other hypothecation or security device (collectively, "**Security Device**"), now or hereafter placed upon the Premises, to any and all advances made on the security thereof, and to all renewals, modifications, and extensions thereof. Lessee agrees that the holders of any such Security Devices (in this Lease together referred to as "**Lender**") shall have no liability or obligation to perform any of the obligations of Lessor under this Lease. Any Lender may elect to have this Lease and/or any Option granted hereby superior to the lien of its Security Device by giving written notice thereof to Lessee, whereupon this Lease and such Options shall be deemed prior to such Security Device, notwithstanding the relative dates of the documentation or recordation thereof.

30.2   **Attornment.**  In the event that Lessor transfers title to the Premises, or the Premises are acquired by another upon the foreclosure or termination of a Security Device to which this Lease is subordinated (i) Lessee shall, subject to the non-disturbance provisions of Paragraph 30.3, attorn to such new owner, and upon request, enter into a new lease, containing all of the terms and provisions of this Lease, with such new owner for the remainder of the term hereof, or, at the election of the new owner, this Lease will automatically become a new lease between Lessee and such new owner, and (ii) Lessor shall thereafter be relieved of any further obligations hereunder and such new owner shall assume all of Lessor's obligations, except that such new owner shall not: (a) be liable for any act or omission of any prior lessor or with respect to events occurring prior to acquisition of ownership; (b) be subject to any offsets or defenses which Lessee might have against any prior lessor, (c) be bound by prepayment of more than one month's rent, or (d) be liable for the return of any security deposit paid to any prior lessor which was not paid or credited to such new  owner.

30.3   **Non-Disturbance.**  With respect to Security Devices entered into by Lessor after the execution of this Lease, Lessee's subordination of this Lease shall be subject to receiving a commercially reasonable non-disturbance agreement (a "**Non-Disturbance Agreement**") from the Lender which Non-Disturbance Agreement provides that Lessee's possession of the Premises, and this Lease, including any options to extend the term hereof, will not be disturbed so long as Lessee is not in Breach hereof and attorns to the record owner of the Premises. Further, within 60 days after the execution of this Lease, Lessor shall, if requested by Lessee, use its commercially reasonable efforts to obtain a Non-Disturbance Agreement from the holder of any pre-existing Security Device which is secured by the Premises. In the event that Lessor is unable to provide the Non-Disturbance Agreement within said 60 days, then Lessee may, at Lessee's option, directly contact Lender and attempt to negotiate for the execution and delivery of a Non-Disturbance Agreement.

30.4   **Self-Executing.**  The agreements contained in this Paragraph 30 shall be effective without the execution of any further documents; provided, however, that, upon written request from Lessor or a Lender in connection with a sale, financing or refinancing of the Premises, Lessee and Lessor shall execute such further writings as may be reasonably required to separately document any subordination, attornment and/or Non-Disturbance Agreement provided for herein.

**31.   Attorneys' Fees.**  If any Party or Broker brings an action or proceeding involving the Premises whether founded in tort, contract or equity, or to declare rights hereunder, the Prevailing Party (as hereafter defined) in any such proceeding, action, or appeal thereon, shall be entitled to reasonable attorneys' fees. Such fees may be awarded in the same suit or recovered in a separate suit, whether or not such action or proceeding is pursued to decision or judgment. The term, "**Prevailing Party**" shall include, without limitation, a Party or Broker who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other Party or Broker of its claim or defense. The attorneys' fees award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees reasonably incurred. In addition, Lessor shall be entitled to attorneys' fees, costs and expenses incurred in the preparation and service of notices of Default and consultations in connection therewith, whether or not a legal action is subsequently commenced in connection with such Default or resulting Breach ($200 is a reasonable minimum per occurrence for such services and consultation).

**32.   Lessor's Access; Showing Premises; Repairs.**  Lessor and Lessor's agents shall have the right to enter the Premises at any time, in the case of an emergency, and otherwise at reasonable times after reasonable prior notice for the purpose of showing the same to prospective purchasers, lenders, or tenants, and making such alterations, repairs, improvements or additions to the Premises as Lessor may deem necessary or desirable and the erecting, using and maintaining of utilities, services, pipes and conduits through the Premises and/or other premises as long as there is no material adverse effect on Lessee's use of the Premises. All such activities shall be without abatement of rent or liability to Lessee.

**33.   Auctions.**  Lessee shall not conduct, nor permit to be conducted, any auction upon the Premises without Lessor's prior written consent. Lessor shall not be obligated to exercise any standard of reasonableness in determining whether to permit an auction.

**34.   Signs.**  Lessor may place on the Premises ordinary "For Sale" signs at any time and ordinary "For Lease" signs during the last 6 months of the term hereof. Except for ordinary "For Sublease" signs which may be placed only on the Premises, Lessee shall not place any sign upon the Project without Lessor's prior written consent. All signs must comply with all Applicable Requirements.

**35.   Termination; Merger.**  Unless specifically stated otherwise in writing by Lessor, the voluntary or other surrender of this Lease by Lessee, the mutual termination or cancellation hereof, or a termination hereof by Lessor for Breach by Lessee, shall automatically terminate any sublease or lesser estate in the Premises; provided, however, that Lessor may elect to continue any one or all existing subtenancies. Lessor's failure within 10 days following any such event to elect to the contrary by written notice to the holder of any such lesser interest, shall constitute Lessor's election to have such event constitute the termination of such interest.

**36.   Consents.**  All requests for consent shall be in writing. Except as otherwise provided herein, wherever in this Lease the consent of a Party is required to an act by or for the other Party, such consent shall not be unreasonably withheld or delayed. Lessor's actual reasonable costs and expenses (including but not limited to architects', attorneys', engineers' and other consultants' fees) incurred in the consideration of, or response to, a request by Lessee for any Lessor consent, including but not limited to consents to an assignment, a subletting or the presence or use of a Hazardous Substance, shall be paid by Lessee upon receipt of an invoice and supporting documentation therefor. Lessor's consent to any act, assignment or subletting shall not constitute an acknowledgment that no Default or Breach by Lessee of this Lease exists, nor shall such consent be deemed a waiver of any then existing Default or Breach, except as may be otherwise specifically stated in writing by Lessor at the time of such consent. The failure to specify herein any particular condition to Lessor's consent shall not preclude the imposition by Lessor at the time of consent of such further or other conditions as are then reasonable with reference to the particular matter for which consent is being given. In the event that either Party disagrees with any determination made by the other hereunder and reasonably requests the reasons for such determination, the determining party shall furnish its reasons in writing and in reasonable detail within 10 business days following such request.

**37.   Guarantor.**

37.1   **Execution.**  The Guarantors, if any, shall each execute a guaranty in the form most recently published BY AIR CRE.

37.2   **Default.**  It shall constitute a Default of the Lessee if any Guarantor fails or refuses, upon request to provide:  (a) evidence of the execution of the guaranty, including the authority of the party signing on Guarantor's behalf to obligate Guarantor, and in the case of a corporate Guarantor, a certified copy of a resolution of its board of directors authorizing the making of such guaranty, (b) current financial statements, (c) an Estoppel Certificate, or (d) written confirmation that the guaranty is still in effect.

**38.   Quiet Possession.**  Subject to payment by Lessee of the Rent and performance of all of the covenants, conditions and provisions on Lessee's part to be observed and performed under this Lease, Lessee shall have quiet possession and quiet enjoyment of the Premises during the term hereof.

**39.   Options.**  If Lessee is granted any option, as defined below, then the following provisions shall apply.

39.1   **Definition.**  "Option" shall mean:  (a) the right to extend or reduce the term of or renew this Lease that Lessee has on other property of Lessor; (b) the right of first refusal or first offer to lease either the Premises or other property of Lessor; (c) the right to purchase, the right of first offer to purchase or the right of first refusal to purchase the Premises or other property of Lessor.

39.2   **Options Personal To Original Lessee.**  Any Option granted to Lessee in this Lease is personal to the original Lessee, and cannot be assigned or exercised by anyone other than said original Lessee and only while the original Lessee is in full possession of the Premises and, if requested by Lessor, with Lessee certifying that Lessee has no intention of thereafter assigning or subletting.

39.3   **Multiple Options.**  In the event that Lessee has any multiple Options to extend or renew this Lease, a later Option cannot be exercised unless the prior Options have been validly exercised.

39.4   **Effect of Default on Options.**

(a)   Lessee shall have no right to exercise an Option: (i) during the period commencing with the giving of any notice of Default and continuing until said Default is cured, (ii) during the period of time any Rent is unpaid (without regard to whether notice thereof is given Lessee), (iii) during the time Lessee is in Breach of this Lease, or (iv) in the event that Lessee has been given 3 or more notices of separate Default, whether or not the Defaults are cured, during the 12 month period immediately preceding the exercise of the Option.

(b)   The period of time within which an Option may be exercised shall not be extended or enlarged by reason of Lessee's inability to exercise an Option because of the provisions of Paragraph 39.4(a).

(c)   An Option shall terminate and be of no further force or effect, notwithstanding Lessee's due and timely exercise of the Option, if, after such exercise and prior to the commencement of the extended term or completion of the purchase, (i) Lessee fails to pay Rent for a period of 30 days after such Rent becomes due (without any necessity of Lessor to give notice thereof), or (ii) if Lessee commits a Breach of this Lease.

© 2017 AIR CRE.  All Rights Reserved.

MTN-26.00, Revised 01-03-2017

**40. Security Measures.** Lessee hereby acknowledges that the Rent payable to Lessor hereunder does not include the cost of guard service or other security measures, and that Lessor shall have no obligation whatsoever to provide same. Lessee assumes all responsibility for the protection of the Premises, Lessee, its agents and invitees and their property from the acts of third parties.

**41. Reservations.** Lessor reserves the right: (i) to grant, without the consent or joinder of Lessee, such easements, rights and dedications that Lessor deems necessary, (ii) to cause the recordation of parcel maps and restrictions, and (iii) to create and/or install new utility raceways, so long as such easements, rights, dedications, maps, restrictions, and utility raceways do not unreasonably interfere with the use of the Premises by Lessee. Lessee agrees to sign any documents reasonably requested by Lessor to effectuate such rights.

**42. Performance Under Protest.** If at any time a dispute shall arise as to any amount or sum of money to be paid by one Party to the other under the provisions hereof, the Party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest" and such payment shall not be regarded as a voluntary payment and there shall survive the right on the part of said Party to institute suit for recovery of such sum. If it shall be adjudged that there was no legal obligation on the part of said Party to pay such sum or any part thereof, said Party shall be entitled to recover such sum or so much thereof as it was not legally required to pay. A Party who does not initiate suit for the recovery of sums paid "under protest" within 6 months shall be deemed to have waived its right to protest such payment.

**43. Authority; Multiple Parties; Execution.**

(a) If either Party hereto is a corporation, trust, limited liability company, partnership, or similar entity, each individual executing this Lease on behalf of such entity represents and warrants that he or she is duly authorized to execute and deliver this Lease on its behalf. Each Party shall, within 30 days after request, deliver to the other Party satisfactory evidence of such authority.

(b) If this Lease is executed by more than one person or entity as "Lessee", each such person or entity shall be jointly and severally liable hereunder. It is agreed that any one of the named Lessees shall be empowered to execute any amendment to this Lease, or other document ancillary thereto and bind all of the named Lessees, and Lessor may rely on the same as if all of the named Lessees had executed such document.

(c) This Lease may be executed by the Parties in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

**44. Conflict.** Any conflict between the printed provisions of this Lease and the typewritten or handwritten provisions shall be controlled by the typewritten or handwritten provisions.

**45. Offer.** Preparation of this Lease by either party or their agent and submission of same to the other Party shall not be deemed an offer to lease to the other Party. This Lease is not intended to be binding until executed and delivered by all Parties hereto.

**46. Amendments.** This Lease may be modified only in writing, signed by the Parties in interest at the time of the modification. As long as they do not materially change Lessee's obligations hereunder, Lessee agrees to make such reasonable non-monetary modifications to this Lease as may be reasonably required by a Lender in connection with the obtaining of normal financing or refinancing of the Premises.

**47. Waiver of Jury Trial.** THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING INVOLVING THE PROPERTY OR ARISING OUT OF THIS AGREEMENT.

**48. Arbitration of Disputes.** An Addendum requiring the Arbitration of all disputes between the Parties and/or Brokers arising out of this Lease ☐ is ☑ is not attached to this Lease.

**49. Accessibility; Americans with Disabilities Act.**

(a) The Premises:

☑ have not undergone an inspection by a Certified Access Specialist (CASp). Note: A Certified Access Specialist (CASp) can inspect the subject premises and determine whether the subject premises comply with all of the applicable construction-related accessibility standards under state law. Although state law does not require a CASp inspection of the subject premises, the commercial property owner or lessor may not prohibit the lessee or tenant from obtaining a CASp inspection of the subject premises for the occupancy or potential occupancy of the lessee or tenant, if requested by the lessee or tenant. The parties shall mutually agree on the arrangements for the time and manner of the CASp inspection, the payment of the fee for the CASp inspection, and the cost of making any repairs necessary to correct violations of construction-related accessibility standards within the premises.

☐ have undergone an inspection by a Certified Access Specialist (CASp) and it was determined that the Premises met all applicable construction-related accessibility standards pursuant to California Civil Code §55.51 et seq. Lessee acknowledges that it received a copy of the inspection report at least 48 hours prior to executing this Lease and agrees to keep such report confidential.

☐ have undergone an inspection by a Certified Access Specialist (CASp) and it was determined that the Premises did not meet all applicable construction-related accessibility standards pursuant to California Civil Code §55.51 et seq. Lessee acknowledges that it received a copy of the Inspection report at least 48 hours prior to executing this Lease and agrees to keep such report confidential except as necessary to complete repairs and corrections of violations of construction related accessibility standards.

In the event that the Premises have been issued an inspection report by a CASp the Lessor shall provide a copy of the disability access inspection certificate to Lessee within 7 days of the execution of this Lease.

(b) Since compliance with the Americans with Disabilities Act (ADA) and other state and local accessibility statutes are dependent upon Lessee's specific use of the Premises, Lessor makes no warranty or representation as to whether or not the Premises comply with ADA or any similar legislation. In the event that Lessee's use of the Premises requires modifications or additions to the Premises in order to be in compliance with ADA or other accessibility statutes, Lessee agrees to make any such necessary modifications and/or additions at Lessee's expense.

LESSOR AND LESSEE HAVE CAREFULLY READ AND REVIEWED THIS LEASE AND EACH TERM AND PROVISION CONTAINED HEREIN, AND BY THE EXECUTION OF THIS LEASE SHOW THEIR INFORMED AND VOLUNTARY CONSENT THERETO. THE PARTIES HEREBY AGREE THAT, AT THE TIME THIS LEASE IS EXECUTED, THE TERMS OF THIS LEASE ARE COMMERCIALLY REASONABLE AND EFFECTUATE THE INTENT AND PURPOSE OF LESSOR AND LESSEE WITH RESPECT TO THE PREMISES.

ATTENTION: NO REPRESENTATION OR RECOMMENDATION IS MADE BY AIR CRE OR BY ANY BROKER AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS LEASE OR THE TRANSACTION TO WHICH IT RELATES. THE PARTIES ARE URGED TO:
1.    SEEK ADVICE OF COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS LEASE.
2.    RETAIN APPROPRIATE CONSULTANTS TO REVIEW AND INVESTIGATE THE CONDITION OF THE PREMISES. SAID INVESTIGATION SHOULD INCLUDE BUT NOT BE LIMITED TO: THE POSSIBLE PRESENCE OF HAZARDOUS SUBSTANCES, THE ZONING OF THE PREMISES, THE STRUCTURAL INTEGRITY, THE CONDITION OF THE ROOF AND OPERATING SYSTEMS, COMPLIANCE WITH THE AMERICANS WITH DISABILITIES ACT AND THE SUITABILITY OF THE PREMISES FOR LESSEE'S INTENDED USE.

WARNING: IF THE PREMISES ARE LOCATED IN A STATE OTHER THAN CALIFORNIA, CERTAIN PROVISIONS OF THE LEASE MAY NEED TO BE REVISED TO COMPLY WITH THE LAWS OF THE STATE IN WHICH THE PREMISES ARE LOCATED.

The parties hereto have executed this Lease at the place and on the dates specified above their respective signatures.

| | |
|---|---|
| Executed at: ____<br>On: ____ | Executed at: _Irvine_<br>On: _Nov 13, 2017_ |
| By LESSOR:<br>_Angela Danciu and George Danciu_ | By LESSEE:<br>_Kool Blast Gas, Inc., a California corporation_ |
| By: _____<br>Name Printed: _Angela Danciu_<br>Title: ____<br>Phone: ____<br>Fax: ____ | By: _(signature)_<br>Name Printed: _Lewis O'Reilly_<br>Title: _Pres_<br>Phone: _949 292-8868_<br>Fax: ____ |

Page 12 of 13
Last Edited: 11/8/2017 12:02 PM

INITIALS

© 2017 AIR CRE. All Rights Reserved.                MTN-26.00, Revised 01-03-2017

INITIALS

**EXHIBIT  A  pg. 12**
**EXHIBIT  1  pg. 18**

Email: ___

By: _____

Name Printed:  George Danciu

Title: ___

Phone: ___

Fax: ___

Email: ___

Address: ___

Federal ID No.: ___

**BROKER**

Voit Real Estate Services

Attn:  Michael Cargile/John Viscounty

Title:  Sr. Vice President/Associate

Address:  2020 Main Street, Suite 100, Irvine, CA  92614

Phone:  (949) 851-5100

Fax:  (949) 261-9092

Email:  mcargile@voitco.com, jviscounty@voitco.com

Federal ID No.: ___

Broker/Agent BRE License #:  00491668 / 02028915

Email:  lew@kcglblastgas.com

By:  *Maryellen O'Reilly M. D.*

Name Printed:  Maryellen O'Reilly

Title:  Sec

Phone:  949 421-7883

Fax: ___

Email:  medusdoc@gmail.com                 SJC. 92675

Address: ___

Federal ID No.:

**BROKER**

Newmark Grubb Knight Frank

Attn:  John Scruggs

Title:  Managing Director

Address:  4675 MacArthur Court, Suite 1600, Newport Beach, CA  92660

Phone:  (949) 608-2102

Fax: ___

Email:  jscruggs@nguf.com

Federal ID No.: ___

Broker/Agent BRE License #:  01796826

AIR CRE. 500 North Brand Blvd, Suite 900, Glendale, CA 91203, Tel 213-687-8777, Email contracts@aircre.com
NOTICE:  No part of these works may be reproduced in any form without permission in writing.

INITIALS
© 2017 AIR CRE.  All Rights Reserved.

Page 13 of 13
Last Edited: 11/8/2017 12:02 PM

INITIALS
MTN-26.00, Revised 01-03-2017

**EXHIBIT  A  pg. 13**

**EXHIBIT  1  pg. 19**

40.    Security Measures. Lessee hereby acknowledges that the Rent payable to Lessor hereunder does not include the cost of guard service or other security measures, and that Lessor shall have no obligation whatsoever to provide same. Lessee assumes all responsibility for the protection of the Premises, Lessee, its agents and invitees and their property from the acts of third parties.

41.    Reservations. Lessor reserves the right: (i) to grant, without the consent or joinder of Lessee, such easements, rights and dedications that Lessor deems necessary, (ii) to cause the recordation of parcel maps and restrictions, and (iii) to create and/or install new utility raceways, so long as such easements, rights, dedications, maps, restrictions, and utility raceways do not unreasonably interfere with the use of the Premises by Lessee. Lessee agrees to sign any documents reasonably requested by Lessor to effectuate such rights.

42.    Performance Under Protest. If at any time a dispute shall arise as to any amount or sum of money to be paid by one Party to the other under the provisions hereof, the Party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest" and such payment shall not be regarded as a voluntary payment and there shall survive the right on the part of said Party to institute suit for recovery of such sum. If it shall be adjudged that there was no legal obligation on the part of said Party to pay such sum or any part thereof, said Party shall be entitled to recover such sum or so much thereof as it was not legally required to pay. A Party who does not initiate suit for the recovery of sums paid "under protest" within 6 months shall be deemed to have waived its right to protest such payment.

43.    Authority; Multiple Parties; Execution.
        (a)    If either Party hereto is a corporation, trust, limited liability company, partnership, or similar entity, each individual executing this Lease on behalf of such entity represents and warrants that he or she is duly authorized to execute and deliver this Lease on its behalf. Each Party shall, within 30 days after request, deliver to the other Party satisfactory evidence of such authority.
        (b)    If this Lease is executed by more than one person or entity as "Lessee", each such person or entity shall be jointly and severally liable hereunder. It is agreed that any one of the named Lessees shall be empowered to execute any amendment to this Lease, or other document ancillary thereto and bind all of the named Lessees, and Lessor may rely on the same as if all of the named Lessees had executed such document.
        (c)    This Lease may be executed by the Parties in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

44.    Conflict. Any conflict between the printed provisions of this Lease and the typewritten or handwritten provisions shall be controlled by the typewritten or handwritten provisions.

45.    Offer. Preparation of this Lease by either party or their agent and submission of same to the other Party shall not be deemed an offer to lease to the other Party. This Lease is not intended to be binding until executed and delivered by all Parties hereto.

46.    Amendments. This Lease may be modified only in writing, signed by the Parties in interest at the time of the modification. As long as they do not materially change Lessee's obligations hereunder, Lessee agrees to make such reasonable non-monetary modifications to this Lease as may be reasonably required by a Lender in connection with the obtaining of normal financing or refinancing of the Premises.

47.    Waiver of Jury Trial. THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING INVOLVING THE PROPERTY OR ARISING OUT OF THIS AGREEMENT.

48.    Arbitration of Disputes. An Addendum requiring the Arbitration of all disputes between the Parties and/or Brokers arising out of this Lease ☑ is ☐ is not attached to this Lease.

49.    Accessibility; Americans with Disabilities Act.
        (a)    The Premises:
☑ have not undergone an inspection by a Certified Access Specialist (CASp). Note: A Certified Access Specialist (CASp) can inspect the subject premises and determine whether the subject premises comply with all of the applicable construction-related accessibility standards under state law. Although state law does not require a CASp inspection of the subject premises, the commercial property owner or lessor may not prohibit the lessee or tenant from obtaining a CASp inspection of the subject premises for the occupancy or potential occupancy of the lessee or tenant, if requested by the lessee or tenant. The parties shall mutually agree on the arrangements for the time and manner of the CASp inspection, the payment of the fee for the CASp inspection, and the cost of making any repairs necessary to correct violations of construction-related accessibility standards within the premises.

☐ have undergone an inspection by a Certified Access Specialist (CASp) and it was determined that the Premises met all applicable construction-related accessibility standards pursuant to California Civil Code §55.51 et seq. Lessee acknowledges that it received a copy of the inspection report at least 48 hours prior to executing this Lease and agrees to keep such report confidential.

☐ have undergone an inspection by a Certified Access Specialist (CASp) and it was determined that the Premises did not meet all applicable construction-related accessibility standards pursuant to California Civil Code §55.51 et seq. Lessee acknowledges that it received a copy of the inspection report at least 48 hours prior to executing this Lease and agrees to keep such report confidential except as necessary to complete repairs and corrections of violations of construction related accessibility standards.

In the event that the Premises have been issued an inspection report by a CASp the Lessor shall provide a copy of the disability access inspection certificate to Lessee within 7 days of the execution of this Lease.

        (b)    Since compliance with the Americans with Disabilities Act (ADA) and other state and local accessibility statutes are dependent upon Lessee's specific use of the Premises, Lessor makes no warranty or representation as to whether or not the Premises comply with ADA or any similar legislation. In the event that Lessee's use of the Premises requires modifications or additions to the Premises in order to be in compliance with ADA or other accessibility statutes, Lessee agrees to make any such necessary modifications and/or additions at Lessee's expense.

LESSOR AND LESSEE HAVE CAREFULLY READ AND REVIEWED THIS LEASE AND EACH TERM AND PROVISION CONTAINED HEREIN, AND BY THE EXECUTION OF THIS LEASE SHOW THEIR INFORMED AND VOLUNTARY CONSENT THERETO. THE PARTIES HEREBY AGREE THAT, AT THE TIME THIS LEASE IS EXECUTED, THE TERMS OF THIS LEASE ARE COMMERCIALLY REASONABLE AND EFFECTUATE THE INTENT AND PURPOSE OF LESSOR AND LESSEE WITH RESPECT TO THE PREMISES.

ATTENTION: NO REPRESENTATION OR RECOMMENDATION IS MADE BY AIR CRE OR BY ANY BROKER AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS LEASE OR THE TRANSACTION TO WHICH IT RELATES. THE PARTIES ARE URGED TO:
1.    SEEK ADVICE OF COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS LEASE.
2.    RETAIN APPROPRIATE CONSULTANTS TO REVIEW AND INVESTIGATE THE CONDITION OF THE PREMISES. SAID INVESTIGATION SHOULD INCLUDE BUT NOT BE LIMITED TO: THE POSSIBLE PRESENCE OF HAZARDOUS SUBSTANCES, THE ZONING OF THE PREMISES, THE STRUCTURAL INTEGRITY, THE CONDITION OF THE ROOF AND OPERATING SYSTEMS, COMPLIANCE WITH THE AMERICANS WITH DISABILITIES ACT AND THE SUITABILITY OF THE PREMISES FOR LESSEE'S INTENDED USE.

WARNING: IF THE PREMISES ARE LOCATED IN A STATE OTHER THAN CALIFORNIA, CERTAIN PROVISIONS OF THE LEASE MAY NEED TO BE REVISED TO COMPLY WITH THE LAWS OF THE STATE IN WHICH THE PREMISES ARE LOCATED.

The parties hereto have executed this Lease at the place and on the dates specified above their respective signatures.

| | |
|---|---|
| Executed at: ____ | Executed at: Irvine |
| On: ____ | On: Nov 13, 2017 |
| By LESSOR: | By LESSEE: |
| Angela Danciu and George Danciu | Kool Blast Gas, Inc., a California corporation |
| By: ____ | By: _(signature)_ |
| Name Printed: Angela Danciu | Name Printed: Lewis O'Reilly |
| Title: ____ | Title: Pres |
| Phone: ____ | Phone: 949 292-8868 |
| Fax: ____ | Fax: ____ |

INITIALS                          INITIALS

Page 12 of 13
Last Edited: 11/8/2017 12:02 PM

© 2017 AIR CRE.  All Rights Reserved.                          MTN-26.00, Revised 01-03-2017

EXHIBIT  A  pg. 14
EXHIBIT  1  pg. 20

Email: _____

By: _____
Name Printed: George Danciu
Title: _____
Phone: _____
Fax: _____
Email: _____

Address: _____
Federal ID No.: _____

Email: lewe.koalblastgas.com

By: _____
Name Printed: Maryellen O'Reilly
Title: Sec
Phone: 949 421-7983
Fax: _____
Email: medwsdoc@gmail.com       SJC. 92675

Address: _____
Federal ID No.:

BROKER

Voit Real Estate Services

Attn: Michael Cargile/John Viscounty
Title: Sr. Vice President/Associate

Address: 2020 Main Street, Suite 100, Irvine, CA 92614
Phone: (949) 851-5100
Fax: (949) 261-9092
Email: mcargile@voitco.com, jviscounty@voitco.com
Federal ID No.: _____
Broker/Agent BRE License #: 00491668 / 02028915

BROKER

Newmark Grubb Knight Frank

Attn: John Scruggs
Title: Managing Director

Address: 4675 MacArthur Court, Suite 1600, Newport
Beach, CA 92660
Phone: (949) 608-2102
Fax: _____
Email: jscruggs@nguf.com
Federal ID No.: _____
Broker/Agent BRE License #: 01796826

AIR CRE. 500 North Brand Blvd, Suite 900, Glendale, CA 91203, Tel 213-687-8777, Email contracts@aircre.com
NOTICE: No part of these works may be reproduced in any form without permission in writing.

INITIALS
© 2017 AIR CRE. All Rights Reserved.

Page 13 of 13
Last Edited: 11/8/2017 12:02 PM

INITIALS
MTN-26.00, Revised 01-03-2017



$ a^{26s}$

**ADDENDUM**

Date:        November 7, 2017
By and Between
Lessor:      Angela Danciu and George Danciu
Lessee:      Kool Blast Gas, Inc., a California corporation
Property Address:    1351 Logan Avenue, Suite A, Costa Mesa, CA
                     (street address, city, state, zip)

Paragraph:   50-53

In the event of any conflict between the provisions of this Addendum and the printed provisions of the Lease, this Addendum shall control.

50.   Base Monthly Rent Schedule:

    December 15, 2017 - December 14, 2018:    $7,461.00 plus Cams/Nets

    December 15, 2018 - December 14, 2019:    $7,685.00 plus Cams/Nets

51.   Operating Expense, Taxes and Insurance: Base year - $1,580.00 per month not to increase greater than 5% for the second year of the lease term. No cap applicable in the option term if exercised.

52.   Landlord Improvements: Landlord shall deliver the Premises in broom clean condition including the following improvements:

    a) New carpet and paint throughout office areas / 1st floor entrance and private offices will have ceramic faux wood tile.

    b) Broken, stained or missing ceiling tiles replaced.

    c) Storefront elevations and windows cleaned.

    d) Loose warehouse ceiling insulation sheets re-attached.

53.   ADA Compliance: Tenant does not intend to make permit-required improvements to the Premises. However, Landlord, at its cost shall be responsible for maintaining the Building in compliance with applicable codes including the ADA throughout the term and extensions of the Lease, should upgrades be required by the City of Costa Mesa, unless such upgrades are a result of Landlord approved tenant improvements that require ADA compliance.

AIR CRE. 500 North Brand Blvd, Suite 900, Glendale, CA 91203, Tel 213-687-8777, Email contracts@aircre.com
NOTICE: No part of these works may be reproduced in any form without permission in writing.

_____
INITIALS
© 2017 AIR CRE. All Rights Reserved.

Page 1 of 1
Last Edited: 11/9/2017 11:28 AM

INITIALS

ADD-1.00, Revised 01-03-2017

**EXHIBIT  A  pg. 16**
**EXHIBIT  1  pg. 22**

# AIRCRE

## OPTION(S) TO EXTEND
### STANDARD LEASE ADDENDUM

Dated:    November 7, 2017
By and Between
Lessor:    Angela Danciu and George Danciu
Lessee:    Kool Blast Gas, Inc., a California corporation
Property Address:    1351 Logan Avenue, Suite A, Costa Mesa, CA
(street address, city, state, zip)

Paragraph: 54

**A.    OPTION(S) TO EXTEND:**

Lessor hereby grants to Lessee the option to extend the term of this Lease for  2  additional  12  month period(s) commencing when the prior term expires upon each and all of the following terms and conditions:

(i)    In order to exercise an option to extend, Lessee must give written notice of such election to Lessor and Lessor must receive the same at least  6  but not more than  12  months prior to the date that the option period would commence, time being of the essence. If proper notification of the exercise of an option is not given and/or received, such option shall automatically expire. Options (if there are more than one) may only be exercised consecutively.

(ii)    The provisions of paragraph 39, including those relating to Lessee's Default set forth in paragraph 39.4 of this Lease, are conditions of this Option.

(iii)    Except for the provisions of this Lease granting an option or options to extend the term, all of the terms and conditions of this Lease except where specifically modified by this option shall apply.

(iv)    This Option is personal to the original Lessee, and cannot be assigned or exercised by anyone other than said original Lessee and only while the original Lessee is in full possession of the Premises and without the intention of thereafter assigning or subletting.

(v)    The monthly rent for each month of the option period shall be calculated as follows, using the method(s) indicated below:

(Check Method(s) to be Used and Fill in Appropriately)

☐ I.    **Cost of Living Adjustment(s) (COLA)**
a.    On (Fill in COLA Dates):  ___  the Base Rent shall be adjusted by the change, if any, from the Base Rent specified below, in the Consumer Price Index of the Bureau of Labor Statistics of the U.S. Department of Labor for (select one): ☐ CPI W (Urban Wage Earners and Clerical Workers) or ☐ CPI U (All Urban Consumers), for (Fill in Urban Area):  ___ . All items (1982-1984 = 100), herein referred to as "CPI".

b.    The monthly Base Rent payable in accordance with paragraph A.I.a. of this Addendum shall be calculated as follows: the Base Rent set forth in paragraph 1.5 of the attached Lease, shall be multiplied by a fraction the numerator of which shall be the CPI of the calendar month 2 months prior to the month(s) specified in paragraph A.I.a. above during which the adjustment is to take effect, and the denominator of which shall be the CPI of the calendar month which is 2 months prior to (select one): ☐ the first month of the term of this Lease as set forth in paragraph 1.3 ("Base Month") or ☐ (Fill in Other "Base Month"):  ___ . The sum so calculated shall constitute the new monthly Base Rent hereunder, but in no event, shall any such new monthly Base Rent be less than the Base Rent payable for the month immediately preceding the rent adjustment.

c.    In the event the compilation and/or publication of the CPI shall be transferred to any other governmental department or bureau or agency or shall be discontinued, then the index most nearly the same as the CPI shall be used to make such calculation. In the event that the Parties cannot agree on such alternative index, then the matter shall be submitted for decision to the American Arbitration Association in accordance with the then rules of said Association and the decision of the arbitrators shall be binding upon the parties. The cost of said Arbitration shall be paid equally by the Parties.

☐ II.    **Market Rental Value Adjustment(s) (MRV)**
a.    On (Fill in MRV Adjustment Date(s))  ___  the Base Rent shall be adjusted to the "Market Rental Value" of the property as follows:

1)    Four months prior to each Market Rental Value Adjustment Date described above, the Parties shall attempt to agree upon what the new MRV will be on the adjustment date. If agreement cannot be reached, within thirty days, then:

(a)    Lessor and Lessee shall immediately appoint a mutually acceptable appraiser or broker to establish the new MRV within the next 30 days. Any associated costs will be split equally between the Parties, or

(b)    Both Lessor and Lessee shall each immediately make a reasonable determination of the MRV and submit such determination, in writing, to arbitration in accordance with the following provisions:

(i)    Within 15 days thereafter, Lessor and Lessee shall each select an independent third party ☐ appraiser or ☐ broker ("Consultant" - check one) of their choice to act as an arbitrator (Note: the parties may not select either of the Brokers that was involved in negotiating the Lease). The two arbitrators so appointed shall immediately select a third mutually acceptable Consultant to act as a third arbitrator.

(ii)    The 3 arbitrators shall within 30 days of the appointment of the third arbitrator reach a decision as to what the actual MRV for the Premises is, and whether Lessor's or Lessee's submitted MRV is the closest thereto. The decision of a majority of the arbitrators shall be binding on the Parties. The submitted MRV which is determined to be the closest to the actual MRV shall thereafter be used by the Parties.

(iii)    If either of the Parties fails to appoint an arbitrator within the specified 15 days, the arbitrator timely appointed by one of them shall reach a decision on his or her own, and said decision shall be binding on the Parties.

(iv)    The entire cost of such arbitration shall be paid by the party whose submitted MRV is not selected, ie. the one that is NOT the closest to the actual MRV.

2)    When determining MRV, the Lessor, Lessee and Consultants shall consider the terms of comparable market transactions which shall include, but not limited to, rent, rental adjustments, abated rent, lease term and financial condition of tenants.

3)    Notwithstanding the foregoing, the new Base Rent shall not be less than the rent payable for the month immediately preceding the rent adjustment.

b.    Upon the establishment of each New Market Rental Value:

1)    the new MRV will become the new "Base Rent" for the purpose of calculating any further Adjustments, and

2)    the first month of each Market Rental Value term shall become the new "Base Month" for the purpose of calculating any further Adjustments.

☑ III.    **Fixed Rental Adjustment(s) (FRA)**

The Base Rent shall be increased to the following amounts on the dates set forth below:

___
INITIALS

INITIALS

© 2017 AIR CRE. All Rights Reserved.

OE-6.00, Revised 01-03-2017

**EXHIBIT  A  pg. 17**
**EXHIBIT  1  pg. 23**

| On (Fill in FRA Adjustment Date(s)): | The New Base Rent shall be: |
|---|---|
| December 15, 2019 - December 14, 2020 | $7,915.00 |
| December 15, 2020 - December 14, 2021 | $8,152.00 |
| — | — |
| — | — |
| — | — |
| — | — |
| — | — |
| — | — |

☐ **IV.   Initial Term Adjustments**
The formula used to calculate adjustments to the Base Rate during the original Term of the Lease shall continue to be used during the extended term.

**B.   NOTICE:**
Unless specified otherwise herein, notice of any rental adjustments, other than Fixed Rental Adjustments, shall be made as specified in paragraph 23 of the Lease.

C.   BROKER'S FEE:
The Brokers shall be paid a Brokerage Fee for each adjustment specified above in accordance with paragraph 15 of the Lease or if applicable, paragraph 9 of the Sublease.

AIR CRE. 500 North Brand Blvd, Suite 900, Glendale, CA 91203, Tel 213-687-8777, Email contracts@aircre.com
NOTICE:  No part of these works may be reproduced in any form without permission in writing.

————
INITIALS
© 2017 AIR CRE.  All Rights Reserved.

INITIALS
OE-6.00, Revised 01-03-2017

**EXHIBIT B**

**EXHIBIT  1  pg. 25**



**GUARANTY OF LEASE**

WHEREAS, <u>Angela Danciu and George Danciu</u> , hereinafter "Lessor", and <u>Kool Blast Gas, Inc., a California corporation</u> , hereinafter "Lessee", are about to execute a document entitled "Lease" dated <u>November 7, 2017</u> concerning the premises commonly known as (street address, city, state, zip) <u>1351 Logan Avenue, Suite A, Costa Mesa, CA</u> wherein Lessor will lease the premises to Lessee, and

WHEREAS, <u>Lewis O'Reilly and Maryellen O'Reilly</u> hereinafter "Guarantors" have a financial interest in Lessee, and

WHEREAS, Lessor would not execute the Lease if Guarantors did not execute and deliver to Lessor this Guaranty of Lease.

NOW THEREFORE, in consideration of the execution of said Lease by Lessor and as a material inducement to Lessor to execute said Lease, Guarantors hereby jointly, severally, unconditionally and irrevocably guarantee the prompt payment by Lessee of all rents and all other sums payable by Lessee under said Lease and the faithful and prompt performance by Lessee of each and every one of the terms, conditions and covenants of said Lease to be kept and performed by Lessee.

It is specifically agreed by Lessor and Guarantors that: (i) the terms of the foregoing Lease may be modified by agreement between Lessor and Lessee, or by a course of conduct, and (ii) said Lease may be assigned by Lessor or any assignee of Lessor without the consent of or notice to Guarantors and that this Guaranty shall guarantee the performance of said Lease as so modified.

This Guaranty shall not be released, modified or affected by the failure or delay on the part of Lessor to enforce any of the rights or remedies of the Lessor under said Lease.

No notice of default by Lessee under the Lease need be given by Lessor to Guarantors, it being specifically agreed that the guarantee of the undersigned is a continuing guarantee under which Lessor may proceed immediately against Lessee and/or against Guarantors following any breach or default by Lessee or for the enforcement of any rights which Lessor may have as against Lessee under the terms of the Lease or at law or in equity.

Lessor shall have the right to proceed against Guarantors following any breach or default by Lessee under the Lease without first proceeding against Lessee and without previous notice to or demand upon either Lessee or Guarantors.

Guarantors hereby waive (a) notice of acceptance of this Guaranty, (b) demand of payment, presentation and protest, (c) all right to assert or plead any statute of limitations relating to this Guaranty or the Lease, (d) any right to require the Lessor to proceed against the Lessee or any other Guarantor or any other person or entity liable to Lessor, (e) any right to require Lessor to apply to any default any security deposit or other security it may hold under the Lease, (f) any right to require Lessor to proceed under any other remedy Lessor may have before proceeding against Guarantors, (g) any right of subrogation that Guarantors may have against Lessee.

Guarantors do hereby subordinate all existing or future indebtedness of Lessee to Guarantors to the obligations owed to Lessor under the Lease and this Guaranty.

If a Guarantor is married, such Guarantor expressly agrees that recourse may be had against his or her separate property for all of the obligations hereunder.

The obligations of Lessee under the Lease to execute and deliver estoppel statements and financial statements, as therein provided, shall be deemed to also require the Guarantors to do and provide the same to Lessor. The failure of the Guarantors to provide the same to Lessor shall constitute a default under the Lease.

The term "Lessor" refers to and means the Lessor named in the Lease and also Lessor's successors and assigns. So long as Lessor's interest in the Lease, the leased premises or the rents, issues and profits therefrom, are subject to any mortgage or deed of trust or assignment for security, no acquisition by Guarantors of the Lessor's interest shall affect the continuing obligation of Guarantors under this Guaranty which shall nevertheless continue in full force and effect for the benefit of the mortgagee, beneficiary, trustee or assignee under such mortgage, deed of trust or assignment and their successors and assigns.

The term "Lessee" refers to and means the Lessee named in the Lease and also Lessee's successors and assigns.

Any recovery by Lessor from any other guarantor or insurer shall first be credited to the portion of Lessee's indebtedness to Lessor which exceeds the maximum liability of Guarantors under this Guaranty.

No provision of this Guaranty or right of the Lessor can be waived, nor can the Guarantors be released from their obligations except in writing signed by the Lessor.

Any litigation concerning this Guaranty shall be initiated in a state court of competent jurisdiction in the county in which the leased premises are located and the Guarantors consent to the jurisdiction of such court. This Guaranty shall be governed by the laws of the State in which the leased premises are located and for the purposes of any rules regarding conflicts of law the parties shall be treated as if they were all residents of or domiciles of such State.

In the event any action be brought by said Lessor against Guarantors hereunder to enforce the obligation of Guarantors hereunder, the unsuccessful party in such action shall pay to the prevailing party therein a reasonable attorney's fee. The attorney's fee award shall not be computed in accordance with any court fee schedule, but shall be such as to full reimburse all attorneys' fees reasonably incurred.

If any Guarantor is a corporation, partnership, or limited liability company, each individual executing this Guaranty on said entity's behalf represents and warrants that he or she is duly authorized to execute this Guaranty on behalf of such entity.

**If this Form has been filled in, it has been prepared for submission to your attorney for his approval. No representation or recommendation is made BY AIR CRE, the real estate broker or its agents or employees as to the legal sufficiency, legal effect, or tax consequences of this Form or the transaction relating thereto.**

GUARANTORS                                         Executed At: _Irvine_
<u>Lewis O'Reilly and Maryellen O'Reilly</u>          On: _Nov 13, 2017_

By: _____                        By: _____
Name Printed: _Lewis O'Reilly_                      Name Printed: _MARYELLEN O'Reilly M.D._
Title: _Pres_                                       Title: _____
Address: ███████████                               Address: _____
_Irvine CA 92612_                                            _S.J.C. CA 72675_

AIR CRE. 500 North Brand Blvd, Suite 900, Glendale, CA 91203, Tel 213-687-8777, Email contracts@aircre.com
NOTICE: No part of these works may be reproduced in any form without permission in writing.

_____
INITIALS
© 2017 AIR CRE. All Rights Reserved.

Page 1 of 1
Last Edited: 11/8/2017 12:02 PM

INITIALS
GR-3.00, Revised 01-03-2017

**EXHIBIT B pg. 1**
**EXHIBIT 1 pg. 26**

EXHIBIT 2

PLD-C-010

ATTORNEY OR PARTY WITHOUT ATTORNEY (NAME AND ADDRESS):   TELEPHONE:

LEWIS R. O'REILLY (IN PROPER) 949-292-8868

▓▓▓▓▓▓ IRVINE, CA. 92612

ATTORNEY FOR (NAME): LEWIS R. O'REILLY (IN PRO PER)

FOR COURT USE ONLY:

Insert name of court, judicial district or branch court, if any, and post office and street address:
SUPERIOR COURT OF CA., COUNTY OF ORANGE
CENTRAL JUSTICE CENTER
700 CIVIC CENTER DRIVE WEST, SANTA ANA CA.
92701

PLAINTIFF:
ANGELA DANCIU AND GEORGE DANCIU

DEFENDANT:
KOOL BLAST GAS INC, A CALIFORNIA CORPORATION
LEWIS O'REILLY

**ANSWER—Contract**

[✓] TO COMPLAINT OF (name): ANGELA AND GEORGE DANCIU

[ ] TO CROSS-COMPLAINT (name): Kool Blast Gas + Lewis R O'Reilly

CASE NUMBER:
30-2020-01146632-
CU-BC-CJC

1. This pleading, including attachments and exhibits, consists of the following number of pages: ___12___

2. DEFENDANT (name):
   answers the complaint or cross-complaint as follows:

3. Check ONLY ONE of the next two boxes:
   a. [ ] Defendant generally denies each statement of the complaint or cross-complaint. (Do not check this box if the verified complaint or cross-complaint demands more than $1,000.)
   b. [✓] Defendant admits that all of the statements of the complaint or cross-complaint are true EXCEPT:
      (1) Defendant claims the following statements are false (use paragraph numbers or explain):

      PARAGRAPHS 11, 14, 15, 16, 17, 18

      SEE ATTACHMENT 3.b.1 (RESPONSE TO SUMMONS)

      [✓] Continued on Attachment 3.b.(1).

      (2) Defendant has no information or belief that the following statements are true, so defendant denies them (use paragraph numbers or explain):

      PARAGRAPHS 11, 14, 15, 16, 17, 18
      SEE ATTACHMENT 3.b.1 (RESPONSE TO SUMMONS)

      [ ] Continued on Attachment 3.b.(2).

      If this form is used to answer a cross-complaint, plaintiff means cross-complainant and defendant means cross-defendant.

Form Approved for Optional Use
Judicial Council of California
PLD-C-010 [Rev. January 1, 2007]

**ANSWER—Contract**

Page 1 of 2

Code of Civil Procedure, § 425.12
www.courtinfo.ca.gov

**EXHIBIT 2 pg. 1**

*ATTACHMENT 3.b.1*

# Response to SUMMONS (Case no. 30-2020-01146632-CU-BC-CJC)

**Defendant:**
Kool Blast Gas, Inc., a California Corporation, Lewis O'Reilly

**Plaintiff:**
Angela Danciu and George Danciu

The following is the defendant response to each allegation made by the plaintiffs:

1-10. These items are correct.

11. Kool blast never renewed the lease but continued to pay what we could with little or no income because of Covid-19.

12. As is.

13. As is.

14. This statement is simply not true. It is true we did not pay any rent during the Covid lockdown months of February, March and April due to being closed and no income. However, we slowly started back to work by June 1st, 2020 and in July of 2020 paid $20,000 in rent monies. By the end of December,2020 we had paid an additional $45,000 for a total of $65,000 for the year of Covid (2020). All rent monies for the original two-year lease had been paid in full. Sixty percent of 2020's rent had been paid. The Danciu's would not see their way clear for any relief in rent due to the economic conditions caused by the virus.

15. True for me but Maryellen O'Reilly's notice was sent to the wrong address and she was never notified.

16. As stated above in item 14, this is absolutely not true. Please see our Exhibit A attached.

17. Again this is false because this Summons was drawn up in May of 2020 but not served until February of 2021. It does not include the $65,000 of payments in the last six months of 2020 and the math is totally incorrect.

18. The plaintiffs have not maintained this building at all. Kool blast was constantly spending money on this building to be able to use it for its intended use. One example of this was every October and November, termites would rain down out of the ceiling and get in our clothes and hair to the point we couldn't work. The Danciu's refused to do anything about it. Angela's daughter actually ordered a termite company. When Angela found out about it, she canceled them.

19. AS IS

EXHIBIT 2  pg. 2

PLD-C-010

| SHORT TITLE: DANCIU VS KOOL BLAST GAS AND LEWIS O'REILLY | CASE NUMBER: 30-2020-01146632-cu-Bc-CJC |
|---|---|

## ANSWER—Contract

4. ☑ AFFIRMATIVE DEFENSES Defendant alleges the following additional reasons that plaintiff is not entitled to recover anything:

SEE ATTACHED SECOND CAUSE OF ACTION
AND SUMMARY CONTINUED
ON ATTACHMENT 4

☑ Continued on Attachment 4.

5. ☑ Other

SEE ATTACHMENT 4 SUMMARY

6. DEFENDANT PRAYS
   a. that plaintiff take nothing.
   b. ☑ for costs of suit.
   c. ☐ other (specify):

Lewis R. O'Reilly
(Type or print name)

Lewis R. O'Reilly
(Signature of party or attorney)

PLD-C-010 [Rev. January 1, 2007]

ANSWER—Contract

Page 2 of 2

EXHIBIT 2 pg. 3

ATTACHMENT 4
CASE # 30-2020-01146632-CU-BC-CJC

19. As is.

### Second Cause of Action

I have enclosed an affidavit (Exhibit B) which the plaintiffs have been supplied. It Is the truth and explains what happened at the signing of the two-year lease. Maryellen O'Reilly did not sign this lease and had no knowledge of it. I signed it without her knowledge. The Notice of Default dated April 10, 2020 the plaintiffs' attorney sent it to a wrong address. Maryellen O'Reilly only learned of her name on this lease in February 2021 when she was served.

Additionally, the amount of money being asked for is incorrect due to the missing $65,000 in the plaintiffs' complaint that was paid by Kool Blast in the last six months of 2020.

### Summary

I believe the Danciu's were landlords of neglect and did little to uphold their end of the lease contract. They simply did what landlords do best...collect rent. They did everything as cheaply as they could to repair the building, and often, I had to have it done correctly by licensed contractors to prevent injury. She however, always refused to have it done right and would not pay for it as outlined in her lease. All the four heaters and air conditions are used residential units and never should have been installed in this commercial building. Three of them currently do not work. The garage door needs replaced and the roof leaks. The building needs exterminated.

Even with all of this we would have continued in this building until we finished our medical device project, which we believe would have rocked the world. None of this would have happened if it had not been for a virus which no one could have predicted. It has caused untold human and economic suffering from which we will never recover. It is a shame that the Danciu's could not have seen their way clear to compromise and keep us in business. I am sure their rewards could have been very worthwhile.

Lewis R. O'Reilly
CEO  Kool Blast Gas, Inc.

03/04/2021
03/04/2021

**EXHIBIT 2 pg. 4**

2:31 PM

03104121

Kool Blast Gas INC. Case # 30-2020-01146632-
CU-BC-CJC

## All Rental Transactions for Angela Danciu u

### 2020

| Type | Num | Date | Account | Amount |
|------|-----|------|---------|--------|
| Jan - Dec 20 | | | | |
| Bill | | 12/09/2020 | 2000 • Accounts _ | -5,000.00 |
| Bill Pmt-Check | 5181 | 12/09/2020 | 103-2 • Banc of C... | -5,000.00 |
| Bill | | 11/12/2020 | 2000 • Accounts .._ | -5,000.00 |
| Bill Pmt-Check | 5175 | 11/12/2020 | 103-2 • Banc of C... | -5,000.00 |
| Bill | | 10/23/2020 | 2000 • Accounts .. | -5,000.00 |
| Bill Pmt -Check | 5164 | 10/23/2020 | 103-2 Banc of C.. | -5,000.00 |
| B ill | | 10/09/2020 | 2000 • Accounts ._ . | -5,000.00 |
| Bill Pmt -Check | 5161 | 10/09/2020 | 103-2 • Banc of C... | -5,000.00 |
| Bill Pmt -Check | 5149 | 09/21/2020 | 103-2 • Banc of C... | -5,000.00 |
| Bill | | 09/04/2020 | 2000 • Accounts _ | -5,000.00 |
| Bill Pmt -Check | 5145 | 09/04/2020 | 103-2 • Banc of C... | 5,000.00 |
| Bill | | 08/2112020 | 2000  Accounts ._ | -5,000.00 |
| Bill Pmt -Check | 5143 | 08/21/2020 | 103-2 • Banc of C... | -5,000.00 |
| Check | 5136 | 08/19/2020 | 103-2 • Banc of C... | -5,000.00 |
| Bill | | 07/2112020 | 2000 • Accounts .... | -5,000.00 |
| Bill Pmt -Check | 5133 | 07/2112020 | 103-2 • Banc of C... | -5,000.00 |
| Bill Pmt -Check | 5124 | 07/21/2020 | 103-2 • Banc of C.... | -5,000.00 |
| Bill | | 07/17/2020 | 2000 • Accounts .... | 5,000.00 |
| Bill | | 07/08/2020 | 2000 • Accounts .. | -10,000.00 |
| Bill Pmt -Check | 5125 | 07/08/2020 | 103-2 Banc of C.... | 0.00 |
| Bill Pmt -Check | 5126 | 07/08/2020 | 103-2 • Banc of C... | 10,000.00 |
| Bill Pmt -Check | Rent | 01/21/2020 | 103.5 Bank of A... | -10,015.00 |
| Bill | | 01/05/2020 | 2000 • Accounts .. | -10,015.00 |
| Jan - Dec 20 | | | | |

EXHIBIT  2  pg. 5

## O'Reilly Affidavit
Case No. 30-2020-01146632-CU-BC-CJC

My name is Lewis O'Reilly. I am providing this document to affirm that I signed my ex-wife's name (Maryellen O'Reilly) to the lease document for rental property at 1351 Logan Avenue, Suite A, Costa Mesa California on November 13, 2017. I had sufficient funds, at that time, from the sale of another business to personally guarantee this lease. I took this action without Maryellen's knowledge or permission to expedite the completion of this short two year lease. There was no intention to harm anyone or engage in wrong doing. It never occurred to me that this would result in a problem for anyone and I viewed it as a simple formality.

Lewis R. O'Reilly

03/04/2021
Date

EXHIBIT  2  pg. 6

Electronically Filed by Superior Court of California, County of Orange, 05/28/2020 01:13:28 PM. **SUM-100**
30-2020-01146632-CU-BC-CJC - ROA # 4 - DAVID H. YAMASAKI, Clerk of the Court By Valerie Hammer, Deputy

# SUMMONS
## (CITACION JUDICIAL)

> FOR COURT USE ONLY
> (SOLO PARA USO DE LA CORTE)

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
Kool Blast Gas, Inc., a California Corporation, Lewis O'Reilly and,
Maryellen O'Reilly, and Does 1 through 60

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
Angela Danciu and George Danciu

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):*<br>SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE<br>Central Justice Center<br>700 Civic Center Drive West, Santa Ana, CA 92701 | **CASE NUMBER:**<br>*(Número del Caso):*<br>30-2020-01146632-CU-BC-CJC<br><br>Judge Derek W. Hunt |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Francis T. Donohue III    (Bar # 106801)
Voss, Cook & Thel LLP                                          Phone No.: (949) 435-0225
2301 Dupont Drive, Suite 500, Irvine, CA 92612

DATE:
*(Fecha)* 05/28/2020   DAVID H. YAMASAKI, Clerk of the Court   Clerk, by _Van Hammer_, Deputy
                                                        *(Secretario)*              *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*   Valerie Hammer

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify)*:

   KOOL BLAST GAS, INC A CALIFORNIA
3. ☑ on behalf of *(specify)*: CORPORATION

   under: ☑ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
           ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
           ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)

           ☐ other *(specify)*:
4. ☑ by personal delivery on *(date)*:

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**   2-5-21

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov
LexisNexis® Automated California Judicial Council Forms

**EXHIBIT 2 pg. 7**

Case 8:22-ap-01002-ES    Doc 1    Filed 01/11/22    Entered 01/11/22 11:43:10    Desc
Main Document    Page 44 of 83
Electronically Filed by Superior Court of California, County of Orange, 05/28/2020 01:13:28 PM.
30-2020-01146632-CU-BC-CJC - ROA # 2 - DAVID H. YAMASAKI, Clerk of the Court By Valerie Hammer, Deputy Clerk.

1 | Francis T. Donohue III, Esq. (CSB# 106801)
   | VOSS, COOK & THEL LLP
2 | 2301 Dupont Drive, Suite 500
   | Irvine, California 92612-7504
3 | (949) 435-0225
   | email: ftd@vctlaw.com
4 |
5 | Attorneys for Plaintiffs Angela Danciu and George Danciu
6 |
7 |
8 |                    SUPERIOR COURT OF THE STATE OF CALIFORNIA
9 |                     ORANGE COUNTY, CENTRAL JUSTICE CENTER

10 | Angela Danciu and George Danciu          )   CASE NO. 30-2020-01146632-CU-BC-CJC
11 |                 Plaintiffs,              )
    |                                         )   Complaint for:
12 |     vs.                                  )
    |                                         )   1. Breach of Contract (Lease)
13 | Kool   Blast   Gas,   Inc,   a  California )   2. Breach Contract (Guaranty)
    | Corporation; Lewis O'Reilly and Maryellen )
14 | O'Reilly and Does 1 through 60;          )   ASSIGNED FOR ALL PURPOSES TO:
    |                                         )
15 |                 Defendants.              )   Judge Derek W. Hunt

16 |     Plaintiffs Angela Danciu and George Danciu ("Plaintiffs") allege as follows:

17 |

18 |     1.    Plaintiffs Angela Danciu and George Danciu are residents of California

19 |     2.    Defendant Kool Blast Gas, Inc. is a California Corporation with its

20 | principal place of business located at 1351 Logan Avenue, Suite A, Costa Mesa. This

21 | defendant is referred to as "Kool Blast" herein.

22 |     3.    Lewis O'Reilly is an individual and a resident of California.

23 |     4.    Maryellen O'Reilly is an individual and resident of California.

24 |     5.    Plaintiffs do not currently know the identities of defendants named herein

25 | as DOES 1 to 10. DOES 1 to 10 are in some other way liable and responsible for the

26 | damages suffered by Plaintiff as alleged herein. Plaintiff reserves the right to amend

27 | this pleading to insert the names of these persons at a later time when the name and

28 | capacity of any such Doe becomes known to Plaintiff.

<div align="center">-1-</div>
<div align="center">COMPLAINT</div>

EXHIBIT  2  pg. 8

1

2                            **FIRST CAUSE OF ACTION**

3                          For Breach of Contract (Lease)

4                     By Plaintiffs Against Kool Blast Gas, Inc.

5          6.      Plaintiffs repeat and reallege each and every allegation contained above,

6  as though fully set forth herein.

7          7.      Plaintiffs Angela Danciu and George Danciu entered into a written lease

8  contract with defendant Kool Blast for the lease of real estate located at 1351 Logan

9  Avenue, Suite A, Costa Mesa, CA.  A true and correct copy of the contract is Exhibit A

10 to this complaint and is incorporated herein by reference. The contract is referred to as

11 the "Lease" herein.

12         8.      Under the terms of the Lease at paragraph 4.1 the "Rent" is defined as all

13 monetary obligations of the Lessee to the Lessor under the terms of the Lease.  The Rent

14 in this Lease consists of the Base Rent and also the Lessee's Share of the Company Area

15 Operating Expenses, as provided in section 4.2 of the Lease.  The Lessee's share of the

16 Operating Expenses is referred to as "CAM" charges in this complaint.

17         9.      Paragraph 1.5 of the Lease provides that the Rent to be paid under the

18 Lease is due on the 1st day of each month and that the Base Rent was $7,461 per month

19 from January 1, 2018 to December 14, 2019.

20         10.     Paragraph 54 of the Lease provides that if the Lease is renewed, the Base

21 Rent for the Renewal Years shall be $7,915 per month for the period of December 15,

22 2019 to December 14, 2020 and $8,152 per month for the period December 15, 2020 to

23 December 14, 2021.  The CAM charges are $1,580 per month.

24         11.     Kool Blast renewed the Lease for the term through December 14, 2020 and

25 Kool Blast continues to occupy the premises.

26         12.     The Lease provides at paragraph 13.5 that any monetary payment due

27 Lessor under the Lease, other than late charges, shall bear interest at 10% from the 31st

28 day after it was due.

                                      -2-
                                  COMPLAINT

EXHIBIT  2  pg. 9

1    13.    The Lease provides at paragraph 31 that attorney fees shall be awarded to

2    the prevailing party on any action or proceeding involving the leased premises.  The

3    same paragraph allows for recovery of attorney fees incurred by Lessor in the

4    preparation and service of notices of default and consultations in connection therewith.

5    Plaintiffs incurred attorney fees of $1,921 in preparing and service of the notice of

6    default on defendant.  Plaintiffs have also now incurred and will continue to incur

7    attorney fees and expenses associated with litigation in this lawsuit over the

8    defendants' breach of lease and the related guaranty of lease.

9    14.    Defendant Kool Blast has breached the lease by failing to timely pay the

10    rent as it came due under the Lease, including failing to timely pay the base rent and

11    the CAM charges.  As of April 10, 2020 defendant Kool Blast was delinquent in its Rent

12    and was behind in payments, and had made no payment towards the February, March,

13    or April rent for 2020.  As of April 10, 2020 Kool Blast owed $36,163 in back rent and

14    late charges, not including the interest owed on the unpaid Rent balances.

15    15.    On April 10, 2020 plaintiffs sent written notice to Kool Blast and to

16    defendants Lewis O'Reilly and Maryellen O'Reilly that Kool Blast was in breach of its

17    Lease and of the amount owed.  The notice also informed the defendants that because

18    Kool Blast had failed to timely pay rent for three consecutive months, Lessors were now

19    demanding that rent be paid on a quarterly basis in advance as provided by paragraph

20    13.4 of the Lease.

21    16.    No rent payment has been made to Plaintiffs since a partial payment was

22    last made in January 2020.

23    17.    Plaintiffs have been damaged by Kool Blast's breaches of the Lease in an

24    in the amount of at least $108,324, plus late charges on payments due after May 10,

25    2020, plus the incurred attorney fees, and plus interest on the late rent payments. This

26    amount includes all rent payments and late charges through May of 2020, and includes

27    the rent payments (Base Rent and CAMs) through the remainder of the Lease ending

28    December 14, 2020.

-3-

COMPLAINT

EXHIBIT  2  pg. 10

1    18.    Plaintiffs have performed all material conditions, covenants, and promises
2 on their part to be performed under the agreement, except as excused by defendant's
3 breaches. Plaintiffs have given all notices and taken all actions necessary to sue for the
4 damages requested in this lawsuit.

5    19.    The written Lease agreement also includes a provision for recovery of
6 attorney fees and costs for the prevailing party in any action brought upon this
7 agreement. Plaintiffs have been required to hire an attorney to assist them in this
8 lawsuit to enforce this agreement, and are thus entitled to recover those attorney fees
9 and costs.

10

11                          SECOND CAUSE OF ACTION
12                        For Breach of Contract (Guaranty)
13    By All Plaintiffs against Defendants Lewis O'Reilly and Maryellen O'Reilly
14    20.    Plaintiffs repeat and reallege each and every allegation in paragraphs 1
15 through 19 above as though fully set forth herein.

16    21.    As part of the consideration for Plaintiffs to lease the premises to Kool
17 Blast, both Lewis O'Reilly and Maryellen O'Reilly entered a written agreement with
18 Plaintiffs in which Lewis O'Reilly and Maryellen O'Reilly agreed to guaranty the
19 obligations of Kool Blast under the Lease. Lewis O'Reilly and Maryellen O'Reilly are
20 referred to as "Guarantors" herein. A true copy of the written guaranty is attached to
21 this pleading as Exhibit B and its terms are incorporated herein.

22    22.    Guarantors have breached the Guaranty Agreement because despite
23 receiving notice of the breach by Kool Blast, Guarantors have failed to pay any or all of
24 the rent and other payments owed by Kool Blast to plaintiffs under the Lease.

25    23.    Plaintiffs have been damaged by Guarantor's breaches of the Guaranty
26 Agreement in an amount in the amount of at least $108,324, plus late charges on
27 payments due after May 10, 2020, and plus interest on the late rent payments. This
28 amount includes all rent payments and late charges through May of 2020, and includes

                                -4-
                            COMPLAINT

EXHIBIT  2  pg. 11

1  the rent payments (Base Rent and CAMs) through the remainder of the Lease ending
2  December 14, 2020.

3      24.    Plaintiffs have performed all material conditions, covenants, and promises
4  on their part to be performed under the agreement, except as excused by defendant's
5  breaches.  Plaintiffs have given all notices and taken all actions necessary to sue for the
6  damages requested in this lawsuit.

7      25.    The written Guaranty Agreement and the Lease both includes a provision
8  for recovery of attorney fees and costs for the prevailing party in any action brought
9  upon the Lease or Guaranty Agreement.  Plaintiffs have been required to hire an
10  attorney to assist them in this lawsuit to enforce this agreement, and are thus entitled to
11  recover those attorney fees and costs.

12

13      WHEREFORE, Plaintiffs request judgment against Defendants as follows:

14      1.    For monetary damages of $108,324 or such larger amount as proven at
15  trial, plus pre-litigation attorney fees of $1,921, plus interest according to contract, plus
16  such other damages that result from the failure of defendants to pay the additional rent
17  as the rent comes due thereafter.

18      2.    For costs of suit.

19      3.    For attorney fees.

20      4.    For such other and further relief as the court deems just and proper.

21

22  DATED: May 26, 2020          VOSS, COOK & THEL LLP

23

24                  By:    _____

25                        Francis T. Donohue III, Esq.
                      for Plaintiffs

26

27

28

-5-
COMPLAINT

EXHIBIT 2 pg. 12

POS-050/EFS-050

| ATTORNEY OR PARTY WITHOUT ATTORNEY    STATE BAR NO  N/A | FOR COURT USE ONLY |
|---|---|
| NAME:  Lewis R. O'Reilly | |
| FIRM NAME  Kool Blast Gas, Inc. | |
| STREET ADDRESS: | |
| CITY  Irvine                    STATE  CA    ZIP CODE  92612 | |
| TELEPHONE NO :  949 292-8868    FAX NO.. | |
| E-MAIL ADDRESS:  lew@koolblastgas.com | |
| ATTORNEY FOR (name):  N/A | |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF  Orange |
|---|
| STREET ADDRESS:  700 Civic Center Drive West |
| MAILING ADDRESS: |
| CITY AND ZIP CODE:  Santa Ana                    92701 |
| BRANCH NAME:  Central Justice Center |

| PLAINTIFF/PETITIONER: Angela Danciu and George Danciu | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: Lewis R. O'Reilly and Kool Blast Gas, Inc. | 30-2020-01146632-CU-BC-CJC |
| | JUDICIAL OFFICER: |

| PROOF OF ELECTRONIC SERVICE | DEPARTMENT: |
|---|---|

1.  I am at least 18 years old.

   a.  My residence or business address is *(specify):*

     ■ Irvine, California  92612

   b.  My electronic service address is *(specify):*

     ~~Same~~  lew@koolblastgas.com

2.  I electronically served the following documents *(exact titles):*

   PLD-C-010, Response to SUMMONS(Attachment 3.6.1) Attachment 4, Rental Transactions, O'Reilly Affidavit, Summons

   [ x ] The documents served are listed in an attachment. *(Form POS-050(D)/EFS-050(D) may be used for this purpose.)*

3.  I electronically served the documents listed in 2 as follows:

   a.  Name of person served: Francis T. Donahue III

     On behalf of *(name or names of parties represented, if person served is an attorney):*

     Angela Danciu and George Danciu

   b.  Electronic service address of person served :

     ftd@vctlaw.com

   c.  On *(date):* 03/05/2021

     [ x ] The documents listed in item 2 were served electronically on the persons and in the manner described in an attachment. *(Form POS-050(P)/EFS-050(P) may be used for this purpose.)*

Date: 03/05/2021

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Lewis R. O'Reilly
_____
(TYPE OR PRINT NAME OF DECLARANT)

_____
(SIGNATURE OF DECLARANT)

Page 1 of 1

Form Approved for Optional Use
Judicial Council of California
POS-050/EFS-050 [Rev. February 1, 2017]

**PROOF OF ELECTRONIC SERVICE**
**(Proof of Service/Electronic Filing and Service)**

CEB

Cal. Rules of Court, rule 2.251
www.courts.ca.gov

EXHIBIT  2  pg. 13

EXHIBIT 3

Electronically Filed by Superior Court of California, County of Orange, 07/16/2021 12:00:00 PM.
30-2020-01146632-CU-BC-CJC - ROA # 27 - DAVID H. YAMASAKI, Clerk of the Court By Kari Frumento, Deputy Clerk.

1  Francis T. Donohue III, Esq. (CSB# 106801)
   VOSS, COOK & THEL LLP
2  2301 Dupont Drive, Suite 500
   Irvine, California 92612-7504
3  (949) 435-0225
   email: ftd@vctlaw.com
4
5  Attorneys for Plaintiffs Angela Danciu and George Danciu

6

7

8                   **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

                    **ORANGE COUNTY, CENTRAL JUSTICE CENTER**
9

10  Angela Danciu and George Danciu          )   CASE NO.  30-2020-01146632-CU-BC-CJC
                                             )
11              Plaintiffs,                  )   **First Amended Complaint for:**
                                             )
12      vs.                                  )   **1.  Breach of Contract (Lease)**
                                             )   **2.  Breach Contract (Guaranty)**
13  Kool  Blast  Gas,  Inc.,  a  California  )   **3.  Fraud**
    Corporation; Lewis O'Reilly, and Does 1 )
    through 10                               )
14                                           )
                                             )
15              Defendants.                  )

16      Plaintiffs Angela Danciu and George Danciu ("Plaintiffs") allege as follows:

17      1.      Plaintiffs Angela Danciu and George Danciu are residents of California

18      2.      Defendant Kool Blast Gas, Inc. is a California Corporation with its

19  principal place of business located at 1351 Logan Avenue, Suite A, Costa Mesa.  This

20  defendant is referred to as "Kool Blast" herein.

21      3.      Lewis O'Reilly is an individual and a resident of California.

22      4.      [Intentionally omitted.]

23      5.      Plaintiffs do not currently know the identities of defendants named herein

24  as DOES 1 to 10.  DOES 1 to 10 are in some other way liable and responsible for the

25  damages suffered by Plaintiff as alleged herein.  Plaintiff reserves the right to amend

26  this pleading to insert the names of these persons at a later time when the name and

27  capacity of any such Doe becomes known to Plaintiff.

28

<div align="center">
-1-
<hr>
**FIRST AMENDED COMPLAINT**
</div>

**EXHIBIT  3   pg. 1**

**FIRST CAUSE OF ACTION**

**For Breach of Contract (Lease)**

**By Plaintiffs Against Kool Blast Glass, Inc.**

6.     Plaintiffs repeat and reallege each and every allegation contained above, as though fully set forth herein.

7.     Plaintiffs Angela Danciu and George Danciu entered into a written lease contract with defendant Kool Blast for the lease of real estate located at 1351 Logan Avenue, Suite A, Costa Mesa, CA.  A true and correct copy of the contract is **Exhibit A** to this complaint and is incorporated herein by reference. The contract is referred to as the "**Lease**" herein.

8.     Under the terms of the Lease at paragraph 4.1 the "Rent" is defined as all monetary obligations of the Lessee to the Lessor under the terms of the Lease.  The Rent in this Lease consists of the Base Rent and also the Lessee's Share of the Company Area Operating Expenses, as provided in section 4.2 of the Lease.  The Lessee's share of the Operating Expenses is referred to as **"CAM"** charges in this complaint.

9.     Paragraph 1.5 of the Lease provides that the Rent to be paid under the Lease is due on the 1st day of each month and that the Base Rent was $7,461 per month from January 1, 2018 to December 14, 2019.

10.     Paragraph 54 of the Lease provides that if the Lease is renewed, the Base Rent for the Renewal Years shall $7,915 per month for the period of December 15, 2019 to December 14, 2020 and $8,152 per month for the period December 15, 2020 to December 14, 2021.  The CAM charges are $1,580 per month.

11.     Kool Blast renewed the Lease for the term through December 14, 2020 and Kool Blast continues to occupy the premises.

12.     The Lease provides at paragraph 13.5 that any monetary payment due Lessor under the Lease, other than late charges, shall bear interest at 10% from the 31st day after it was due.

-2-

**FIRST AMENDED COMPLAINT**

**EXHIBIT  3   pg. 2**

13.    The Lease provides at paragraph 31 that attorney fees shall be awarded to the prevailing party on any action or proceeding involving the leased premises.  The same paragraph allows for recovery of attorney fees incurred by Lessor in the preparation and service of notices of default and consultations in connection therewith.  Plaintiffs incurred attorney fees of $1,921 in preparing and service of the notice of default on defendant.  Plaintiffs have also now incurred and will continue to incur attorney fees and expenses associated with litigation in this lawsuit over the defendants' breach of lease and the related guaranty of lease.

14.    Defendant Kool Blast has breached the lease by failing timely pay the rent as it came due under the Lease, including failing to timely pay the base rent and the CAM charges.  As of April 10, 2020 defendant Kool Blast was delinquent in its Rent and was behind in payments, and had made no payment towards the February, March, or April rent for 2020.  As of April 10, 2020 Kool Blast owed $36,163 in back rent and late charges, not including the interest owed on the unpaid Rent balances.

15.    On April 10, 2020 plaintiffs sent written notice to Kool Blast and to defendants Lewis O'Reilly and Maryellen O'Reilly that Kool Blast was in breach of its Lease and of the amount owed.  The notice also informed the defendants that because Kool Blast had failed to timely pay rent for three consecutive months, Lessors were now demanding that rent be paid on a quarterly basis in advance as provided by paragraph 13.4 of the Lease.

16.    Subsequent to the April 10, 2020 notice, no rent payment was timely made, although a payment of $25,000 was made on or about December 29, 2020.

17.    Plaintiffs have been damaged by Kool Blast's breaches of the Lease in an in the amount of at least $116,502, plus the incurred attorney fees, and plus interest on the late rent payments.  This amount includes all rent payments and late charges through April of 2021, and includes the all payments made through May 2021, with the last payment of $25,000 made on or about December 29, 2020.

18.    Plaintiffs have performed all material conditions, covenants, and promises

-3-

**FIRST AMENDED COMPLAINT**

EXHIBIT 3  pg. 3

1  on their part to be performed under the agreement, except as excused by defendant's

2  breaches.  Plaintiffs have given all notices and taken all actions necessary to sue for the

3  damages requested in this lawsuit.

4      19.    The written Lease agreement also includes a provision for recovery of

5  attorney fees and costs for the prevailing party in any action brought upon this

6  agreement.  Plaintiffs have been required to hire an attorney to assist them in this

7  lawsuit to enforce this agreement, and are thus entitled to recover those attorney fees

8  and costs.

9

10           **SECOND CAUSE OF ACTION**

11          **For Breach of Contract (Guaranty)**

12      **By All Plaintiffs against Defendant Lewis O'Reilly**

13      20.    Plaintiffs repeat and reallege each and every allegation in paragraphs 1

14  through 19 above as though fully set forth herein.

15      21.    As part of the consideration for Plaintiffs to lease the premises to Kool

16  Blast, both Lewis O'Reilly and Maryellen O'Reilly entered a written agreement with

17  Plaintiffs in which Lewis O'Reilly and Maryellen O'Reilly agreed to guaranty the

18  obligations of Kool Blast under the Lease.  Lewis O'Reilly and Maryellen O'Reilly are

19  referred to as "Guarantors" herein.  A true copy of the written guaranty is attached to

20  this pleading as **Exhibit B** and its terms are incorporated herein.

21      22.    Guarantors have breached the Guaranty Agreement because despite

22  receiving notice of the breach by Kool Blast, Guarantors have failed to pay any or all of

23  the rent and other payments owed by Kool Blast to plaintiffs under the Lease.

24      23.    Plaintiffs have been damaged by Guarantor's breaches of the Guaranty

25  Agreement in an amount in the amount of at least  $116,502 plus interest on the late rent

26  payments, plus incurred attorney fees and costs.

27      24.    Plaintiffs have performed all material conditions, covenants, and promises

28  on their part to be performed under the agreement, except as excused by defendant's

-4-
**FIRST AMENDED COMPLAINT**

**EXHIBIT  3   pg. 4**

1  breaches.  Plaintiffs have given all notices and taken all actions necessary to sue for the

2  damages requested in this lawsuit.

3        25.      The written Guaranty Agreement and the Lease both includes a provision

4  for recovery of attorney fees and costs for the prevailing party in any action brought

5  upon the Lease or Guaranty Agreement.  Plaintiffs have been required to hire an

6  attorney to assist them in this lawsuit to enforce this agreement, and are thus entitled to

7  recover those attorney fees and costs.

8

9  **THIRD CAUSE OF ACTION**

10  **For Fraud**

11  **By All Plaintiffs against All Defendants**

12        26.      Plaintiffs repeat and reallege each and every allegation in paragraphs 1

13  through 25 above as though fully set forth herein.

14        27.      Lewis O'Reilly, acting for himself and as an officer of Kool Blast and on

15  behalf of Kool Blast,  falsely and fraudulently forged the signature for Maryellen

16  O'Reilly on the written Guaranty Agreement (Exhibit B.)  Lewis O'Reilly has admitted

17  the same in his answer to the original complaint in this lawsuit, and plaintiffs

18  discovered the fraud in 2021 at or about the time that they received O'Reilly's

19  declaration that he had forged Maryellen O'Reilly's signature.

20        28.      Lewis O'Reilly and Kool Blast presented the Guaranty Agreement to

21  plaintiffs representing that the signatures on the Guaranty were Lewis O'Reilly's and

22  that of Maryellen O'Reilly when Lewis O'Reilly and Kool Blast knew that the

23  representations were false and that Lewis had forged Maryellen O'Reilly's signature on

24  the Guaranty Agreement without permission of Maryellen O'Reilly.

25        29.      Plaintiffs are informed and believe and thereon allege that defendant Does

26  1-3 knew or reasonably should have known that the signature of Maryellen O'Reilly

27  was forged and was not her real or authorized signature, that the representations that it

28  was her valid signature were false, and that plaintiffs would rely upon those

-5-

**FIRST AMENDED COMPLAINT**

**EXHIBIT  3  pg. 5**

1  representations.

2      30.    Plaintiffs are informed and believe and thereon allege that Does 1-3 aided

3  and abetted Kool Blast and Lewis O'Reilly in their fraud by not disclosing to plaintiffs

4  that the signature of Maryellen O'Reilly was forged and that it was not her real or

5  authorized signature, and that by presenting the Guaranty Agreement bearing the

6  fraudulent Maryellen O'Reilly signature to plaintiffs they represented that it was

7  Maryellen O'Reilly's signature.  Plaintiffs further allege that defendants knew that

8  plaintiffs would rely on the representation that it was Maryellen O'Reilly's signature

9  and Plaintiffs would believe that the signature for Maryellen O'Reilly on the Guaranty

10  Agreement was hers and was valid.

11      31.    Plaintiffs reasonably relied upon the forged signature of Maryellen

12  O'Reilly and the representations that both Lewis O'Reilly and Maryellen O'Reilly had

13  guaranteed the lease obligations of Kool Blast when plaintiffs agreed to lease the subject

14  property to Kool Blast.

15      32.    Plaintiffs were damaged by the fraud of defendants in that they leased the

16  subject property to Kool Blast relying upon the false representations, and Kool Blast has

17  defaulted on its duty to make rental payments, and as a result plaintiffs will need to

18  look to the guaranty to recover the damages they have suffered by the breaches of the

19  Lease Agreement.  But the purported guarantor Maryellen O'Reilly has stated that she

20  is not a guarantor and will not agree to make payment for the losses plaintiffs will

21  suffer because of the breaches of the Lease Agreement by Kool Blast.

22      33.    As a proximate result of this fraud and forgery, Plaintiffs were damaged

23  in an amount of at least $116,502 plus interest for the unpaid rent and late charges, plus

24  incurred attorney fees, and such additional funds plaintiffs will spend on attorney fees

25  and costs trying to recover the unpaid funds under the Guaranty Agreement.

26      34.    The above alleged acts of defendants include acts of fraud that were done

27  with knowledge that plaintiffs could be harmed by the deception.  These acts were done

28  with such malice and oppression that exemplary damages should be awarded against

-6-

**FIRST AMENDED COMPLAINT**

**EXHIBIT  3   pg. 6**

1    each of them.

2

3        WHEREFORE, Plaintiffs request judgment against Defendants as follows:

4        1.    For monetary damages of $116,502 or such larger amount as proven at

5    trial, plus pre-litigation attorney fees of $1,921, plus interest according to contract, plus

6    such other damages that result from the failure of defendants to pay the additional rent

7    as the rent comes due thereafter.

8        2.    For costs of suit.

9        3.    For attorney fees.

10        4.    For award of punitive damages based on the Fourth Cause of Action.

11        5.    For such other and further relief as the court deems just and proper.

12

13    DATED: June 16, 2021                VOSS, COOK & THEL LLP

14

15                        By: _____

16                            Francis T. Donohue III, Esq.
                             for Plaintiffs

17

18

19

20

21

22

23

24

25

26

27

28

-7-

**FIRST AMENDED COMPLAINT**

**EXHIBIT  3   pg. 7**

**EXHIBIT A**

**EXHIBIT  3   pg. 8**

# AIRCRE

## STANDARD INDUSTRIAL/COMMERCIAL MULTI-TENANT LEASE - NET

**1.    Basic Provisions ("Basic Provisions").**

1.1  **Parties.** This Lease ("Lease"), dated for reference purposes only __November 7, 2017__ , is made by and between __Angela Danciu and George Danciu__ ("Lessor") and __Kool Blast Gas, Inc., a California corporation__ ("Lessee"), (collectively the "Parties", or individually a "Party").

1.2(a)  **Premises:** That certain real property, including all improvements therein or to be provided by Lessor under the terms of this Lease, commonly known as (street address, unit/suite, city, state): __1351 Logan Avenue, Suite A, Costa Mesa, CA__ ("Premises"). The Premises are located in the County of __Orange__ , and are generally described as (describe briefly the nature of the Premises and the "Project"): __Approximately 8,776 square feet part of larger industrial warehouse building__ . In addition to Lessee's rights to use and occupy the Premises as hereinafter specified, Lessee shall have non-exclusive rights to any utility raceways of the building containing the Premises ("Building") and to the Common Areas (as defined in Paragraph 2.7 below), but shall not have any rights to the roof, or exterior walls of the Building or to any other buildings in the Project. The Premises, the Building, the Common Areas, the land upon which they are located, along with all other buildings and improvements thereon, are herein collectively referred to as the "Project." (See also Paragraph 2)

1.2(b)  **Parking:** __18 outside of fenced yard and 2 stalls immediately inside the fenced gate__ unreserved vehicle parking spaces. (See also Paragraph 2.6)

1.3  **Term:** __Two (2)__ years and __zero (0)__ months ("Original Term") commencing· __December 15, 2017__ ("Commencement Date") and ending __December 14, 2019__ ("Expiration Date"). (See also Paragraph 3)

1.4  **Early Possession:** Lessee shall have non-exclusive access to the Premises for the purpose of cabling, futurization and storage of personal property beginning on November 15, 2017. The parties understand that Lessee's Early Occupancy shall be at Lessee's liability and risk as Lessor and its vendors will be accessing the Premises for the purposes of completing Lessor's Work prior to the Commencement Date. Additionally, Lessee shall not interfere with Lessor and Lessor's Vendors completing Lessor's Work during the Early Occupancy Period. If the Premises are available Lessee may have non-exclusive possession of the Premises commencing ("Early Possession Date"). (See also Paragraphs 3.2 and 3.3)

1.5  **Base Rent:** __$7,461.00__ per month ("Base Rent"), payable on the __1st__ day of each month commencing __January 1, 2018__ . (See also Paragraph 4)

☑ If this box is checked, there are provisions in this Lease for the Base Rent to be adjusted. See Paragraph __54__ .

1.6  **Lessee's Share of Common Area Operating Expenses:** __approx. forty-four__ percent ( __44__ %) ("Lessee's Share"). In the event that the size of the Premises and/or the Project are modified during the term of this Lease, Lessor shall recalculate Lessee's Share to reflect such modification.

1.7  **Base Rent and Other Monies Paid Upon Execution:**

(a)  **Base Rent:** __$3,730.00__ for the period __December 15-31, 2017__ .

(b)  **Common Area Operating Expenses:** __$790.00__ for the period __December 15-31, 2017__ .

(c)  **Security Deposit:** __$7,685.00__ ("Security Deposit"). (See also Paragraph 5)

(d)  **Other:** ___ for ___ .

(e)  **Total Due Upon Execution of this Lease:** __$12,205.00__ .

1.8  **Agreed Use:** __Medical laser repair and distribution__ . (See also Paragraph 6)

1.9  **Insuring Party.** Lessor is the "Insuring Party". (See also Paragraph 8)

1.10  **Real Estate Brokers.** (See also Paragraph 15 and 25)

(a)  **Representation:** The following real estate brokers (the "Brokers") and brokerage relationships exist in this transaction (check applicable boxes):

☑ __Voit Real Estate Services/Michael Cargile & John Viscounty__ represents Lessor exclusively ("Lessor's Broker");

☑ __Newmark Grubb Knight Frank/John Scruggs__ represents Lessee exclusively ("Lessee's Broker"); or

☐ ___ represents both Lessor and Lessee ("Dual Agency").

(b)  **Payment to Brokers.** Upon execution and delivery of this Lease by both Parties, Lessor shall pay to the Brokers the brokerage fee agreed to in a separate written agreement (or if there is no such agreement, the sum of ___ or __5.5__ % of the total Base Rent) for the brokerage services rendered by the Brokers __to be split 3% to Newmark Grubb Knight Frank and 2.5% to Voit Real Estate Services__.

1.11  **Guarantor.** The obligations of the Lessee under this Lease are to be guaranteed by __Lewis O'Reilly and Maryellen O'Reilly__ ("Guarantor"). (See also Paragraph 37)

1.12  **Attachments.** Attached hereto are the following, all of which constitute a part of this Lease:

☑ an Addendum consisting of Paragraphs __50__ through __54__ ;

☑ a site floor plan depicting the Premises;

☐ a site plan depicting the Project;

☐ a current set of the Rules and Regulations for the Project;

☐ a current set of the Rules and Regulations adopted by the owners' association;

☐ a Work Letter;

☐ other (specify): ___ .

**2.    Premises.**

2.1  **Letting.** Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, the Premises, for the term, at the rental, and upon all of the terms, covenants and conditions set forth in this Lease. While the approximate square footage of the Premises may have been used in the marketing of the Premises for purposes of comparison, the Base Rent stated herein is NOT tied to square footage and is not subject to adjustment should the actual size be determined to be different. **NOTE: Lessee is advised to verify the actual size prior to executing this Lease.**

2.2  **Condition.** Lessor shall deliver that portion of the Premises contained within the Building ("Unit") to Lessee broom clean and free of debris on the Commencement Date or the Early Possession Date, whichever first occurs ("Start Date"), and, so long as the required service contracts described in Paragraph 7.1(b) below are obtained by Lessee and in effect within thirty days following the Start Date, warrants that the existing electrical, plumbing, fire sprinkler, lighting, heating, ventilating and air conditioning systems ("HVAC"), loading doors, sump pumps, if any, and all other such elements in the Unit, other than those constructed by Lessee, shall be in good operating condition on said date, that the structural elements of the roof, bearing walls and foundation of the Unit shall be free of material defects, and that the Unit does not contain hazardous levels of any mold or fungi defined as toxic under applicable state or federal law. If a non-compliance with such warranty exists as of the Start Date, or if one of such systems or elements should malfunction or fail within the appropriate warranty period, Lessor shall, as Lessor's sole obligation with respect to such matter, except as otherwise provided in this Lease, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, malfunction or failure, rectify same at Lessor's expense. The warranty periods shall be as follows: (i) 6 months as to the HVAC systems, and (ii) 30 days as to the remaining systems and other elements of the Unit. If Lessee does not give Lessor the required notice within the appropriate warranty period, correction of any such non-compliance, malfunction or failure shall be the obligation of Lessee at Lessee's sole cost and expense (except for the repairs to the fire sprinkler systems, roof, foundations, and/or bearing walls - see Paragraph 7). Lessor also warrants that, unless otherwise specified in writing, Lessor is unaware of (i) any recorded Notices of Default affecting the Premise; (ii) any delinquent amounts due under any loan secured by the Premises; and (iii) any bankruptcy proceeding affecting the Premises.

2.3  **Compliance.** Lessor warrants that to the best of its knowledge the improvements on the Premises comply with the building codes, applicable

_____
INITIALS

Page 1 of 13
Last Edited: 11/10/2017 11:18 AM

© 2017 AIR CRE. All Rights Reserved.

_____
INITIALS

MTN-26.00, Revised 01-03-2017

**EXHIBIT  A  pg. 1**
**EXHIBIT  3   pg. 9**

require during the term of this Lease the construction of an addition to or an alteration of the Unit, Premises and/or Building, the remediation of any Hazardous Substance, or the reinforcement or other physical modification of the Unit, Premises and/or Building ("**Capital Expenditure**"), Lessor and Lessee shall allocate the cost of such work as follows:

(a)   Subject to Paragraph 2.3(c) below, if such Capital Expenditures are required as a result of the specific and unique use of the Premises by Lessee as compared with uses by tenants in general, Lessee shall be fully responsible for the cost thereof, provided, however, that if such Capital Expenditure is required during the last 2 years of this Lease and the cost thereof exceeds 6 months' Base Rent, Lessee may instead terminate this Lease unless Lessor notifies Lessee, in writing, within 10 days after receipt of Lessee's termination notice that Lessor has elected to pay the difference between the actual cost thereof and the amount equal to 6 months' Base Rent. If Lessee elects termination, Lessee shall immediately cease the use of the Premises which requires such Capital Expenditure and deliver to Lessor written notice specifying a termination date at least 90 days thereafter. Such termination date shall, however, in no event be earlier than the last day that Lessee could legally utilize the Premises without commencing such Capital Expenditure.

(b)   If such Capital Expenditure is not the result of the specific and unique use of the Premises by Lessee (such as, governmentally mandated seismic modifications), then Lessor shall pay for such Capital Expenditure and Lessee shall only be obligated to pay, each month during the remainder of the term of this Lease or any extension thereof, on the date that on which the Base Rent is due, an amount equal to 1/144th of the portion of such costs reasonably attributable to the Premises. Lessee shall pay interest on the balance but may prepay its obligation at any time. If, however, such Capital Expenditure is required during the last 2 years of this Lease or if Lessor reasonably determines that it is not economically feasible to pay such share thereof, Lessor shall have the option to terminate this Lease upon 90 days prior written notice to Lessee unless Lessee notifies Lessor, in writing, within 10 days after receipt of Lessor's termination notice that Lessee will pay for such Capital Expenditure. If Lessor does not elect to terminate, and fails to tender its share of any such Capital Expenditure, Lessee may advance such funds and deduct same, with interest, from Rent until Lessor's share of such costs have been fully paid. If Lessee is unable to finance Lessor's share, or if the balance of the Rent due and payable for the remainder of this Lease is not sufficient to fully reimburse Lessee on an offset basis, Lessee shall have the right to terminate this Lease upon 30 days written notice to Lessor.

(c)   Notwithstanding the above, the provisions concerning Capital Expenditures are intended to apply only to non-voluntary, unexpected, and new Applicable Requirements. If the Capital Expenditures are instead triggered by Lessee as a result of an actual or proposed change in use, change in intensity of use, or modification to the Premises then, and in that event, Lessee shall either: (i) immediately cease such changed use or intensity of use and/or take such other steps as may be necessary to eliminate the requirement for such Capital Expenditure, or (ii) complete such Capital Expenditure at its own expense. Lessee shall not have any right to terminate this Lease.

2.4   **Acknowledgements.**  Lessee acknowledges that:  (a) it has been given an opportunity to inspect and measure the Premises, (b) it has been advised by Lessor and/or Brokers to satisfy itself with respect to the size and condition of the Premises (including but not limited to the electrical, HVAC and fire sprinkler systems, security, environmental aspects, and compliance with Applicable Requirements and the Americans with Disabilities Act), and their suitability for Lessee's intended use, (c) Lessee has made such investigation as it deems necessary with reference to such matters and assumes all responsibility therefor as the same relate to its occupancy of the Premises, (d) it is not relying on any representation as to the size of the Premises made by Brokers or Lessor, (e) the square footage of the Premises was not material to Lessee's decision to lease the Premises and pay the Rent stated herein, and (f) neither Lessor, Lessor's agents, nor Brokers have made any oral or written representations or warranties with respect to said matters other than as set forth in this Lease. In addition, Lessor acknowledges that: (i) Brokers have made no representations, promises or warranties concerning Lessee's ability to honor the Lease or suitability to occupy the Premises, and (ii) it is Lessor's sole responsibility to investigate the financial capability and/or suitability of all proposed tenants.

2.5   **Lessee as Prior Owner/Occupant.**  The warranties made by Lessor in Paragraph 2 shall be of no force or effect if immediately prior to the Start Date Lessee was the owner or occupant of the Premises.  In such event, Lessee shall be responsible for any necessary corrective work.

2.6   **Vehicle Parking.**  Lessee shall be entitled to use the number of Parking Spaces specified in Paragraph 1.2(b) on those portions of the Common Areas designated from time to time by Lessor for parking.  Lessee shall not use more parking spaces than said number.  Said parking spaces shall be used for parking by vehicles no larger than full-size passenger automobiles or pick-up trucks, herein called "**Permitted Size Vehicles.**"  Lessor may regulate the loading and unloading of vehicles by adopting Rules and Regulations as provided in Paragraph 2.9.  No vehicles other than Permitted Size Vehicles may be parked in the Common Area without the prior written permission of Lessor.  In addition:

(a)   Lessee shall not permit or allow any vehicles that belong to or are controlled by Lessee or Lessee's employees, suppliers, shippers, customers, contractors or invitees to be loaded, unloaded, or parked in areas other than those designated by Lessor for such activities.

(b)   Lessee shall not service or store any vehicles in the Common Areas.

(c)   If Lessee permits or allows any of the prohibited activities described in this Paragraph 2.6, then Lessor shall have the right, without notice, in addition to such other rights and remedies that it may have, to remove or tow away the vehicle involved and charge the cost to Lessee, which cost shall be immediately payable upon demand by Lessor.

2.7   **Common Areas - Definition.**  The term "**Common Areas**" is defined as all areas and facilities outside the Premises and within the exterior boundary line of the Project and interior utility raceways and installations within the Unit that are provided and designated by the Lessor from time to time for the general non-exclusive use of Lessor, Lessee and other tenants of the Project and their respective employees, suppliers, shippers, customers, contractors and invitees, including parking areas, loading and unloading areas, trash areas, roofs, roadways, walkways, driveways and landscaped areas.

2.8   **Common Areas - Lessee's Rights.**  Lessor grants to Lessee, for the benefit of Lessee and its employees, suppliers, shippers, contractors, customers and invitees, during the term of this Lease, the non-exclusive right to use, in common with others entitled to such use, the Common Areas as they exist from time to time, subject to any rights, powers, and privileges reserved by Lessor under the terms hereof or under the terms of any rules and regulations or restrictions governing the use of the Project.  Under no circumstances shall the right herein granted to use the Common Areas be deemed to include the right to store any property, temporarily or permanently, in the Common Areas.  Any such storage shall be permitted only by the prior written consent of Lessor or Lessor's designated agent, which consent may be revoked at any time.  In the event that any unauthorized storage shall occur, then Lessor shall have the right, without notice, in addition to such other rights and remedies that it may have, to remove the property and charge the cost to Lessee, which cost shall be immediately payable upon demand by Lessor.

2.9   **Common Areas - Rules and Regulations.**  Lessor or such other person(s) as Lessor may appoint shall have the exclusive control and management of the Common Areas and shall have the right, from time to time, to establish, modify, amend and enforce reasonable rules and regulations ("**Rules and Regulations**") for the management, safety, care, and cleanliness of the grounds, the parking and unloading of vehicles and the preservation of good order, as well as for the convenience of other occupants or tenants of the Building and the Project and their invitees.  Lessee agrees to abide by and conform to all such Rules and Regulations, and shall use its best efforts to cause its employees, suppliers, shippers, customers, contractors and invitees to so abide and conform.  Lessor shall not be responsible to Lessee for the non-compliance with said Rules and Regulations by other tenants of the Project.

2.10  **Common Areas - Changes.**  Lessor shall have the right, in Lessor's sole discretion, from time to time:

(a)   To make changes to the Common Areas, including, without limitation, changes in the location, size, shape and number of driveways, entrances, parking spaces, parking areas, loading and unloading areas, ingress, egress, direction of traffic, landscaped areas, walkways and utility raceways;

(b)   To close temporarily any of the Common Areas for maintenance purposes so long as reasonable access to the Premises remains available;

(c)   To designate other land outside the boundaries of the Project to be a part of the Common Areas;

(d)   To add additional buildings and improvements to the Common Areas;

(e)   To use the Common Areas while engaged in making additional improvements, repairs or alterations to the Project, or any portion thereof; and

(f)   To do and perform such other acts and make such other changes in, to or with respect to the Common Areas and Project as Lessor may, in the exercise of sound business judgment, deem to be appropriate.

**3.    Term.**

3.1   **Term.**  The Commencement Date, Expiration Date and Original Term of this Lease are as specified in Paragraph 1.3.

3.2   **Early Possession.**  Any provision herein granting Lessee Early Possession of the Premises is subject to and conditioned upon the Premises being available for such possession prior to the Commencement Date.  Any grant of Early Possession only conveys a non-exclusive right to occupy the Premises.  If Lessee totally or partially occupies the Premises prior to the Commencement Date, the obligation to pay Base Rent shall be abated for the period of such Early Possession.  All other terms of this Lease (including but not limited to the obligations to pay Lessee's Share of Common Area Operating Expenses, Real Property Taxes and insurance premiums and to maintain the Premises) shall be in effect during such period.  Any such Early Possession shall not affect the Expiration Date.

3.3   **Delay In Possession.**  Lessee agrees to use its best commercially reasonable efforts to deliver possession of the Premises to Lessee by the Commencement Date.  If, despite said efforts, Lessor is unable to deliver possession by such date, Lessor shall not be subject to any liability therefor, nor shall such failure affect the validity of this Lease or change the Expiration Date.  Lessee shall not, however, be obligated to pay Rent or perform its other obligations until Lessor delivers possession of the Premises and any period of rent abatement that Lessee would otherwise have enjoyed shall run from the date of delivery of possession and continue for a period equal to what Lessee would otherwise have enjoyed under the terms hereof, but minus any days of delay caused by the acts or omissions of Lessee.  If possession is not delivered within 60 days after the Commencement Date, as the same may be extended under the terms of any Work Letter executed by Parties, Lessee may, at its option, by notice in writing within 10 days after the end of such 60 day period, cancel this Lease, in which event the Parties shall be discharged from all obligations hereunder.  If such written notice is not received by Lessor within said 10 day period, Lessee's right to cancel shall terminate.  If possession of the Premises is not delivered within 120 days after the Commencement Date, this Lease shall terminate unless other agreements are reached between Lessor and Lessee, in writing.

© 2017 AIR CRE.  All Rights Reserved.

MTN-26.00, Revised 01-03-2017

3.4 **Lessee Compliance**. Lessor shall not be required to tender possession of the Premises to Lessee until Lessee complies with its obligation to provide evidence of insurance (Paragraph 8.5). Pending delivery of such evidence, Lessee shall be required to perform all of its obligations under this Lease from and after the Start Date, including the payment of Rent, notwithstanding Lessor's election to withhold possession pending receipt of such evidence of insurance. Further, if Lessee is required to perform any other conditions prior to or concurrent with the Start Date, the Start Date shall occur but Lessor may elect to withhold possession until such conditions are satisfied.

4. **Rent.**

4.1. **Rent Defined**. All monetary obligations of Lessee to Lessor under the terms of this Lease (except for the Security Deposit) are deemed to be rent ("**Rent**").

4.2 **Common Area Operating Expenses**. Lessee shall pay to Lessor during the term hereof, in addition to the Base Rent, Lessee's Share (as specified in Paragraph 1.6) of all Common Area Operating Expenses, as hereinafter defined, during each calendar year of the term of this Lease, in accordance with the following provisions:

(a) **"Common Area Operating Expenses"** are defined, for purposes of this Lease, as all costs relating to the ownership and operation of the Project, including, but not limited to, the following:

(i) The operation, repair and maintenance, in neat, clean, good order and condition , and if necessary the replacement, of the following:

(aa) The Common Areas and Common Area improvements, including parking areas, loading and unloading areas, trash areas, roadways, parkways, walkways, driveways, landscaped areas, bumpers, irrigation systems, Common Area lighting facilities, fences and gates, elevators, roofs, exterior walls of the buildings, building systems and roof drainage systems.

(bb) Exterior signs and any tenant directories.

(cc) Any fire sprinkler systems.

(dd) All other areas and improvements that are within the exterior boundaries of the Project but outside of the Premises and/or any other space occupied by a tenant.

(ii) The cost of water, gas, electricity and telephone to service the Common Areas and any utilities not separately metered.

(iii) The cost of trash disposal, pest control services, property management, security services, owners' association dues and fees, the cost to repaint the exterior of any structures and the cost of any environmental inspections.

(iv) Reserves set aside for maintenance, repair and/or replacement of Common Area improvements and equipment.

(v) Real Property Taxes (as defined in Paragraph 10).

(vi) The cost of the premiums for the insurance maintained by Lessor pursuant to Paragraph 8.

(vii) Any deductible portion of an insured loss concerning the Building or the Common Areas.

(viii) Auditors', accountants' and attorneys' fees and costs related to the operation, maintenance, repair and replacement of the Project.

(ix) The cost of any capital improvement to the Building or the Project not covered under the provisions of Paragraph 2.3 provided; however, that Lessor shall allocate the cost of any such capital improvement over a 12 year period and Lessee shall not be required to pay more than Lessee's Share of 1/144th of the cost of such capital improvement in any given month.

(x) The cost of any other services to be provided by Lessor that are stated elsewhere in this Lease to be a Common Area Operating Expense.

(b) Any Common Area Operating Expenses and Real Property Taxes that are specifically attributable to the Unit, the Building or to any other building in the Project or to the operation, repair and maintenance thereof, shall be allocated entirely to such Unit, Building, or other building. However, any Common Area Operating Expenses and Real Property Taxes that are not specifically attributable to the Building or to any other building or to the operation, repair and maintenance thereof, shall be equitably allocated by Lessor to all buildings in the Project.

(c) The inclusion of the improvements, facilities and services set forth in Subparagraph 4.2(a) shall not be deemed to impose an obligation upon Lessor to either have said improvements or facilities or to provide those services unless the Project already has the same, Lessor already provides the services, or Lessor has agreed elsewhere in this Lease to provide the same or some of them.

(d) Lessee's Share of Common Area Operating Expenses is payable monthly on the same day as the Base Rent is due hereunder. The amount of such payments shall be based on Lessor's estimate of the annual Common Area Operating Expenses. Within 60 days after written request (but not more than once each year) Lessor shall deliver to Lessee a reasonably detailed statement showing Lessee's Share of the actual Common Area Operating Expenses for the preceding year. If Lessee's payments during such year exceed Lessee's Share, Lessor shall credit the amount of such over-payment against Lessee's future payments. If Lessee's payments during such year were less than Lessee's Share, Lessee shall pay to Lessor the amount of the deficiency within 10 days after delivery by Lessor to Lessee of the statement.

(e) Common Area Operating Expenses shall not include any expenses paid by any tenant directly to third parties, or as to which Lessor is otherwise reimbursed by any third party, other tenant, or insurance proceeds.

4.3 **Payment**. Lessee shall cause payment of Rent to be received by Lessor in lawful money of the United States, without offset or deduction (except as specifically permitted in this Lease), on or before the day on which it is due. All monetary amounts shall be rounded to the nearest whole dollar. In the event that any invoice prepared by Lessor is inaccurate such inaccuracy shall not constitute a waiver and Lessee shall be obligated to pay the amount set forth in this Lease. Rent for any period during the term hereof which is for less than one full calendar month shall be prorated based upon the actual number of days of said month. Payment of Rent shall be made to Lessor at its address stated herein or to such other persons or place as Lessor may from time to time designate in writing. Acceptance of a payment which is less than the amount then due shall not be a waiver of Lessor's rights to the balance of such Rent, regardless of Lessor's endorsement of any check so stating. In the event that any check, draft, or other instrument of payment given by Lessee to Lessor is dishonored for any reason, Lessee agrees to pay to Lessor the sum of $25 in addition to any Late Charge and Lessor, at its option, may require all future Rent be paid by cashier's check. Payments will be applied first to accrued late charges and attorney's fees, second to accrued interest, then to Base Rent and Common Area Operating Expenses, and any remaining amount to any other outstanding charges or costs.

5. **Security Deposit.** Lessee shall deposit with Lessor upon execution hereof the Security Deposit as security for Lessee's faithful performance of its obligations under this Lease. If Lessee fails to pay Rent, or otherwise Defaults under this Lease, Lessor may use, apply or retain all or any portion of said Security Deposit for the payment of any amount already due Lessor, for Rents which will be due in the future, and/ or to reimburse or compensate Lessor for any liability, expense, loss or damage which Lessor may suffer or incur by reason thereof. If Lessor uses or applies all or any portion of the Security Deposit, Lessee shall within 10 days after written request therefor deposit monies with Lessor sufficient to restore said Security Deposit to the full amount required by this Lease. If the Base Rent increases during the term of this Lease, Lessee shall, upon written request from Lessor, deposit additional monies with Lessor so that the total amount of the Security Deposit shall at all times bear the same proportion to the increased Base Rent as the initial Security Deposit bore to the initial Base Rent. Should the Agreed Use be amended to accommodate a material change in the business of Lessee or to accommodate a sublessee or assignee, Lessor shall have the right to increase the Security Deposit to the extent necessary, in Lessor's reasonable judgment, to account for any increased wear and tear that the Premises may suffer as a result thereof. If a change in control of Lessee occurs during this Lease and following such change the financial condition of Lessee is, in Lessor's reasonable judgment, significantly reduced, Lessee shall deposit such additional monies with Lessor as shall be sufficient to cause the Security Deposit to be at a commercially reasonable level based on such change in financial condition. Lessor shall not be required to keep the Security Deposit separate from its general accounts. Within 90 days after the expiration or termination of this Lease, Lessor shall return that portion of the Security Deposit not used or applied by Lessor. Lessor shall upon written request provide Lessee with an accounting showing how that portion of the Security Deposit that was not returned was applied. No part of the Security Deposit shall be considered to be held in trust, to bear interest or to be prepayment for any monies to be paid by Lessee under this Lease. THE SECURITY DEPOSIT SHALL NOT BE USED BY LESSEE IN LIEU OF PAYMENT OF THE LAST MONTH'S RENT.

6. **Use.**

6.1 **Use**. Lessee shall use and occupy the Premises only for the Agreed Use, or any other legal use which is reasonably comparable thereto, and for no other purpose. Lessee shall not use or permit the use of the Premises in a manner that is unlawful, creates damage, waste or a nuisance, or that disturbs occupants of or causes damage to neighboring premises or properties. Other than guide, signal and seeing eye dogs, Lessee shall not keep or allow in the Premises any pets, animals, birds, fish, or reptiles. Lessor shall not unreasonably withhold or delay its consent to any written request for a modification of the Agreed Use, so long as the same will not impair the structural integrity of the Building or the mechanical or electrical systems therein, and/or is not significantly more burdensome to the Project. If Lessor elects to withhold consent, Lessor shall within 7 days after such request give written notification of same, which notice shall include an explanation of Lessor's objections to the change in the Agreed Use.

6.2 **Hazardous Substances.**

(a) **Reportable Uses Require Consent**. The term "**Hazardous Substance**" as used in this Lease shall mean any product, substance, or waste whose presence, use, manufacture, disposal, transportation, or release, either by itself or in combination with other materials expected to be on the Premises, is either: (i) potentially injurious to the public health, safety or welfare, the environment or the Premises, (ii) regulated or monitored by any governmental authority, or (iii) a basis for potential liability of Lessor to any governmental agency or third party under any applicable statute or common law theory. Hazardous Substances shall include, but not be limited to, hydrocarbons, petroleum, gasoline, and/or crude oil or any products, by-products or fractions thereof. Lessee shall not engage in any activity in or on the Premises which constitutes a Reportable Use of Hazardous Substances without the express prior written consent of Lessor and timely compliance (at Lessee's expense) with all Applicable Requirements. "**Reportable Use**" shall mean (i) the installation or use of any above or below ground storage tank, (ii) the generation,



© 2017 AIR CRE. All Rights Reserved.

possession, storage, use, transportation, or disposal of a Hazardous Substance that requires a permit from, or with respect to which a report, notice, registration or business plan is required to be filed with, any governmental authority, and/or (iii) the presence at the Premises of a Hazardous Substance with respect to which any Applicable Requirements requires that a notice be given to persons entering or occupying the Premises or neighboring properties. Notwithstanding the foregoing, Lessee may use any ordinary and customary materials reasonably required to be used in the normal course of the Agreed Use, ordinary office supplies (copier toner, liquid paper, glue, etc.) and common household cleaning materials, so long as such use is in compliance with all Applicable Requirements, is not a Reportable Use, and does not expose the Premises or neighboring property to any meaningful risk of contamination or damage or expose Lessor to any liability therefor. In addition, Lessor may condition its consent to any Reportable Use upon receiving such additional assurances as Lessor reasonably deems necessary to protect itself, the public, the Premises and/or the environment against damage, contamination, injury and/or liability, including, but not limited to, the installation (and removal on or before Lease expiration or termination) of protective modifications (such as concrete encasements) and/or increasing the Security Deposit.

(b)    **Duty to Inform Lessor.** If Lessee knows, or has reasonable cause to believe, that a Hazardous Substance has come to be located in, on, under or about the Premises, other than as previously consented to by Lessor, Lessee shall immediately give written notice of such fact to Lessor, and provide Lessor with a copy of any report, notice, claim or other documentation which it has concerning the presence of such Hazardous Substance.

(c)    **Lessee Remediation.** Lessee shall not cause or permit any Hazardous Substance to be spilled or released in, on, under, or about the Premises (including through the plumbing or sanitary sewer system) and shall promptly, at Lessee's expense, comply with all Applicable Requirements and take all investigatory and/or remedial action reasonably recommended, whether or not formally ordered or required, for the cleanup of any contamination of, and for the maintenance, security and/or monitoring of the Premises or neighboring properties, that was caused or materially contributed to by Lessee, or pertaining to or involving any Hazardous Substance brought onto the Premises during the term of this Lease, by or for Lessee, or any third party.

(d)    **Lessee Indemnification.** Lessee shall indemnify, defend and hold Lessor, its agents, employees, lenders and ground lessor, if any, harmless from and against any and all loss of rents and/or damages, liabilities, judgments, claims, expenses, penalties, and attorneys' and consultants' fees arising out of or involving any Hazardous Substance brought onto the Premises by or for Lessee, or any third party (provided, however, that Lessee shall have no liability under this Lease with respect to underground migration of any Hazardous Substance under the Premises from areas outside of the Project not caused or contributed to by Lessee). Lessee's obligations shall include, but not be limited to, the effects of any contamination or injury to person, property or the environment created or suffered by Lessee, and the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease. No termination, cancellation or release agreement entered into by Lessor and Lessee shall release Lessee from its obligations under this Lease with respect to Hazardous Substances, unless specifically so agreed by Lessor in writing at the time of such agreement.

(e)    **Lessor Indemnification.** Except as otherwise provided in paragraph 8.7, Lessor and its successors and assigns shall indemnify, defend, reimburse and hold Lessee, its employees and lenders, harmless from and against any and all environmental damages, including the cost of remediation, which are suffered as a direct result of Hazardous Substances on the Premises prior to Lessee taking possession or which are caused by the gross negligence or willful misconduct of Lessor, its agents or employees. Lessor's obligations, as and when required by the Applicable Requirements, shall include, but not be limited to, the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease.

(f)    **Investigations and Remediations.** Lessor shall retain the responsibility and pay for any investigations or remediation measures required by governmental entities having jurisdiction with respect to the existence of Hazardous Substances on the Premises prior to the Lessee taking possession, unless such remediation measure is required as a result of Lessee's use (including "Alterations", as defined in paragraph 7.3(a) below) of the Premises, in which event Lessee shall be responsible for such payment. Lessee shall cooperate fully in any such activities at the request of Lessor, including allowing Lessor and Lessor's agents to have reasonable access to the Premises at reasonable times in order to carry out Lessor's investigative and remedial responsibilities.

(g)    **Lessor Termination Option.** If a Hazardous Substance Condition (see Paragraph 9.1(e)) occurs during the term of this Lease, unless Lessee is legally responsible therefor (in which case Lessee shall make the investigation and remediation thereof required by the Applicable Requirements and this Lease shall continue in full force and effect, but subject to Lessor's rights under Paragraph 6.2(d) and Paragraph 13), Lessor may, at Lessor's option, either (i) investigate and remediate such Hazardous Substance Condition, if required, as soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) if the estimated cost to remediate such condition exceeds 12 times the then monthly Base Rent or $100,000, whichever is greater, give written notice to Lessee, within 30 days after receipt by Lessor of knowledge of the occurrence of such Hazardous Substance Condition, of Lessor's desire to terminate this Lease as of the date 60 days following the date of such notice. In the event Lessor elects to give a termination notice, Lessee may, within 10 days thereafter, give written notice to Lessor of Lessee's commitment to pay the amount by which the cost of the remediation of such Hazardous Substance Condition exceeds an amount equal to 12 times the then monthly Base Rent or $100,000, whichever is greater. Lessee shall provide Lessor with said funds or satisfactory assurance thereof within 30 days following such commitment. In such event, this Lease shall continue in full force and effect, and Lessor shall proceed to make such remediation as soon as reasonably possible after the required funds are available. If Lessee does not give such notice and provide the required funds or assurance thereof within the time provided, this Lease shall terminate as of the date specified in Lessor's notice of termination.

6.3    **Lessee's Compliance with Applicable Requirements.** Except as otherwise provided in this Lease, Lessee shall, at Lessee's sole expense, fully, diligently and in a timely manner, materially comply with all Applicable Requirements, the requirements of any applicable fire insurance underwriter or rating bureau, and the recommendations of Lessor's engineers and/or consultants which relate in any manner to the Premises, without regard to whether said Applicable Requirements are now in effect or become effective after the Start Date. Lessee shall, within 10 days after receipt of Lessor's written request, provide Lessor with copies of all permits and other documents, and other information evidencing Lessee's compliance with any Applicable Requirements specified by Lessor, and shall immediately upon receipt, notify Lessor in writing (with copies of any documents involved) of any threatened or actual claim, notice, citation, warning, complaint or report pertaining to or involving the failure of Lessee or the Premises to comply with any Applicable Requirements. Likewise, Lessee shall immediately give written notice to Lessor of: (i) any water damage to the Premises and any suspected seepage, pooling, dampness or other condition conducive to the production of mold; or (ii) any mustiness or other odors that might indicate the presence of mold in the Premises.

6.4    **Inspection; Compliance.** Lessor and Lessor's "Lender" (as defined in Paragraph 30) and consultants authorized by Lessor shall have the right to enter into Premises at any time, in the case of an emergency, and otherwise at reasonable times after reasonable notice, for the purpose of inspecting and/or testing the condition of the Premises and/or for verifying compliance by Lessee with this Lease. The cost of any such inspections shall be paid by Lessor, unless a violation of Applicable Requirements, or a Hazardous Substance Condition (see Paragraph 9.1) is found to exist or be imminent, or the inspection is requested or ordered by a governmental authority. In such case, Lessee shall upon request reimburse Lessor for the cost of such inspection, so long as such inspection is reasonably related to the violation or contamination. In addition, Lessee shall provide copies of all relevant material safety data sheets (**MSDS**) to Lessor within 10 days of the receipt of written request therefor. Lessee acknowledges that any failure on its part to allow such inspections or testing will expose Lessor to risks and potentially cause Lessor to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain. Accordingly, should the Lessee fail to allow such inspections and/or testing in a timely fashion the Base Rent shall be automatically increased, without any requirement for notice to Lessee, by an amount equal to 10% of the then existing Base Rent or $100, whichever is greater for the remainder to the Lease. The Parties agree that such increase in Base Rent represents fair and reasonable compensation for the additional risk/costs that Lessor will incur by reason of Lessee's failure to allow such inspection and/or testing. Such increase in Base Rent shall in no event constitute a waiver of Lessee's Default or Breach with respect to such failure nor prevent the exercise of any of the other rights and remedies granted hereunder.

**7.    Maintenance; Repairs; Utility Installations; Trade Fixtures and Alterations.**

7.1    Lessee's Obligations.

(a)    **In General.** Subject to the provisions of Paragraph 2.2 (Condition), 2.3 (Compliance), 6.3 (Lessee's Compliance with Applicable Requirements), 7.2 (Lessor's Obligations), 9 (Damage or Destruction), and 14 (Condemnation), Lessee shall, at Lessee's sole expense, keep the Premises, Utility Installations (intended for Lessee's exclusive use, no matter where located), and Alterations in good order, condition and repair (whether or not the portion of the Premises requiring repairs, or the means of repairing the same, are reasonably or readily accessible to Lessee, and whether or not the need for such repairs occurs as a result of Lessee's use, any prior use, the elements or the age of such portion of the Premises), including, but not limited to, all equipment or facilities, such as plumbing, HVAC equipment, electrical, lighting facilities, boilers, pressure vessels, fixtures, interior surfaces of exterior walls, ceilings, floors, windows, doors, plate glass, and skylights but excluding any items which are the responsibility of Lessor pursuant to Paragraph 7.2. Lessee, in keeping the Premises in good order, condition and repair, shall exercise and perform good maintenance practices, specifically including the procurement and maintenance of the service contracts required by Paragraph 7.1(b) below. Lessee's obligations shall include restorations, replacements or renewals when necessary to keep the Premises and all improvements thereon or a part thereof in good order, condition and state of repair.

(b)    **Service Contracts.** Lessee shall, at Lessee's sole expense, procure and maintain contracts, with copies to Lessor, in customary form and substance for, and with contractors specializing and experienced in the maintenance of the following equipment and improvements, if any, if and when installed on the Premises: (i) HVAC equipment, (ii) boiler and pressure vessels, and (iii) clarifiers. However, Lessor reserves the right, upon notice to Lessee, to procure and maintain any or all of such service contracts, and Lessee shall reimburse Lessor, upon demand, for the cost thereof.

(c)    **Failure to Perform.** If Lessee fails to perform Lessee's obligations under this Paragraph 7.1, Lessor may enter upon the Premises after 10 days' prior written notice to Lessee (except in the case of an emergency, in which case no notice shall be required), perform such obligations on Lessee's behalf, and put the Premises in good order, condition and repair, and Lessee shall promptly pay to Lessor a sum equal to 115% of the cost thereof.

(d)    **Replacement.** Subject to Lessee's indemnification of Lessor as set forth in Paragraph 8.7 below, and without relieving Lessee of liability resulting from Lessee's failure to exercise and perform good maintenance practices, if an item described in Paragraph 7.1(b) cannot be repaired other than at a cost which is in excess

---

INITIALS

© 2017 AIR CRE. All Rights Reserved.

INITIALS

MTN-26.00, Revised 01-03-2017

of 50% of the cost of replacing such item, then such item shall be replaced by Lessor, and the cost thereof shall be prorated between the Parties and Lessee shall only be obligated to pay, each month during the remainder of the term of this Lease, on the date on which Base Rent is due, an amount equal to the product of multiplying the cost of such replacement by a fraction, the numerator of which is one, and the denominator of which is 144 (ie. 1/144th of the cost per month). Lessee shall pay Interest on the unamortized balance but may prepay its obligation at any time.

7.2   **Lessor's Obligations.** Subject to the provisions of Paragraphs 2.2 (Condition), 2.3 (Compliance), 4.2 (Common Area Operating Expenses), 6 (Use), 7.1 (Lessee's Obligations), 9 (Damage or Destruction) and 14 (Condemnation), Lessor, subject to reimbursement pursuant to Paragraph 4.2, shall keep in good order, condition and repair the foundations, exterior walls, structural condition of interior bearing walls, exterior roof, fire sprinkler system, Common Area fire alarm and/or smoke detection systems, fire hydrants, parking lots, walkways, parkways, driveways, landscaping, fences, signs and utility systems serving the Common Areas and all parts thereof, as well as providing the services for which there is a Common Area Operating Expense pursuant to Paragraph 4.2. Lessor shall not be obligated to paint the exterior or interior surfaces of exterior walls nor shall Lessor be obligated to maintain, repair or replace windows, doors or plate glass of the Premises.

7.3   **Utility Installations; Trade Fixtures; Alterations.**

(a)   **Definitions.** The term "Utility Installations" refers to all floor and window coverings, air and/or vacuum lines, power panels, electrical distribution, security and fire protection systems, communication cabling, lighting fixtures, HVAC equipment, plumbing, and fencing in or on the Premises. The term "Trade Fixtures" shall mean Lessee's machinery and equipment that can be removed without doing material damage to the Premises. The term "Alterations" shall mean any modification of the improvements, other than Utility Installations or Trade Fixtures, whether by addition or deletion. "Lessee Owned Alterations and/or Utility Installations" are defined as Alterations and/or Utility Installations made by Lessee that are not yet owned by Lessor pursuant to Paragraph 7.4(a).

(b)   **Consent.** Lessee shall not make any Alterations or Utility Installations to the Premises without Lessor's prior written consent. Lessee may, however, make non-structural Alterations or Utility Installations to the interior of the Premises (excluding the roof) without such consent but upon notice to Lessor, as long as they are not visible from the outside, do not involve puncturing, relocating or removing the roof or any existing walls, will not affect the electrical, plumbing, HVAC, and/or life safety systems, do not trigger the requirement for additional modifications and/or improvements to the Premises resulting from Applicable Requirements, such as compliance with Title 24, and/or life safety systems, and the cumulative cost thereof during this Lease as extended does not exceed a sum equal to 3 month's Base Rent in the aggregate or a sum equal to one month's Base Rent in any one year. Notwithstanding the foregoing, Lessee shall not make or permit any roof penetrations and/or install anything on the roof without the prior written approval of Lessor. Lessee may, as a precondition to granting such approval, require Lessee to utilize a contractor chosen and/or approved by Lessor. Any Alterations or Utility Installations that Lessee shall desire to make and which require the consent of the Lessor shall be presented to Lessor in written form with detailed plans. Consent shall be deemed conditioned upon Lessee's: (i) acquiring all applicable governmental permits, (ii) furnishing Lessor with copies of both the permits and the plans and specifications prior to commencement of the work, and (iii) compliance with all conditions of said permits and other Applicable Requirements in a prompt and expeditious manner. Any Alterations or Utility Installations shall be performed in a workmanlike manner with good and sufficient materials. Lessee shall promptly upon completion furnish Lessor with as-built plans and specifications. For work which costs an amount in excess of one month's Base Rent, Lessor may condition its consent upon Lessee providing a lien and completion bond in an amount equal to 150% of the estimated cost of such Alteration or Utility Installation and/or upon Lessee's posting an additional Security Deposit with Lessor.

(c)   **Liens; Bonds.** Lessee shall pay, when due, all claims for labor or materials furnished to or for Lessee at or for use on the Premises, which claims are or may be secured by any mechanic's or materialmen's lien against the Premises or any interest therein. Lessee shall give Lessor not less than 10 days notice prior to the commencement of any work in, on or about the Premises, and Lessor shall have the right to post notices of non-responsibility. If Lessee shall contest the validity of any such lien, claim or demand, then Lessee shall, at its sole expense defend and protect itself, Lessor and the Premises against the same and shall pay and satisfy any such adverse judgment that may be rendered thereon before the enforcement thereof. If Lessor shall require, Lessee shall furnish a surety bond in an amount equal to 150% of the amount of such contested lien, claim or demand, indemnifying Lessor against liability for the same. If Lessor elects to participate in any such action, Lessee shall pay Lessor's attorneys' fees and costs.

7.4   **Ownership; Removal; Surrender; and Restoration.**

(a)   **Ownership.** Subject to Lessor's right to require removal or elect ownership as hereinafter provided, all Alterations and Utility Installations made by Lessee shall be the property of Lessee, but considered a part of the Premises. Lessor may, at any time, elect in writing to be the owner of all or any specified part of the Lessee Owned Alterations and Utility Installations. Unless otherwise instructed per paragraph 7.4(b) hereof, all Lessee Owned Alterations and Utility Installations shall, at the expiration or termination of this Lease, become the property of Lessor and be surrendered by Lessee with the Premises.

(b)   **Removal.** By delivery to Lessee of written notice from Lessor not earlier than 90 and not later than 30 days prior to the end of the term of this Lease, Lessor may require that any or all Lessee Owned Alterations or Utility Installations be removed by the expiration or termination of this Lease. Lessor may require the removal at any time of all or any part of any Lessee Owned Alterations or Utility Installations made without the required consent.

(c)   **Surrender; Restoration.** Lessee shall surrender the Premises by the Expiration Date or any earlier termination date, with all of the improvements, parts and surfaces thereof broom clean and free of debris, and in good operating order, condition and state of repair, ordinary wear and tear excepted. "Ordinary wear and tear" shall not include any damage or deterioration that would have been prevented by good maintenance practice. Notwithstanding the foregoing, if the Lessee occupies the Premises for 12 months or less, then Lessee shall surrender the Premises in the same condition as delivered to Lessee on the Start Date with NO allowance for ordinary wear and tear. Lessee shall repair any damage occasioned by the installation, maintenance or removal of Trade Fixtures, Lessee owned Alterations and/or Utility Installations, furnishings, and equipment as well as the removal of any storage tank installed by or for Lessee. Lessee shall also remove from the Premises any and all Hazardous Substances brought onto the Premises by or for Lessee, or any third party (except Hazardous Substances which were deposited via underground migration from areas outside of the Project) to the level specified in Applicable Requirements. Trade Fixtures shall remain the property of Lessee and shall be removed by Lessee. Any personal property of Lessee not removed on or before the Expiration Date or any earlier termination date shall be deemed to have been abandoned by Lessee and may be disposed of or retained by Lessor as Lessor may desire. The failure by Lessee to timely vacate the Premises pursuant to this Paragraph 7.4(c) without the express written consent of Lessor shall constitute a holdover under the provisions of Paragraph 26 below.

8.   **Insurance; Indemnity.**

8.1   **Payment of Premiums.** The cost of the premiums for the insurance policies required to be carried by Lessor, pursuant to Paragraphs 8.2(b), 8.3(a) and 8.3(b), shall be a Common Area Operating Expense. Premiums for policy periods commencing prior to, or extending beyond, the term of this Lease shall be prorated to coincide with the corresponding Start Date or Expiration Date.

8.2   **Liability Insurance.**

(a)   **Carried by Lessee.** Lessee shall obtain and keep in force a Commercial General Liability policy of insurance protecting Lessee and Lessor as an additional insured against claims for bodily injury, personal injury and property damage based upon or arising out of the ownership, use, occupancy or maintenance of the Premises and all areas appurtenant thereto. Such insurance shall be on an occurrence basis providing single limit coverage in an amount not less than $1,000,000 per occurrence with an annual aggregate of not less than $2,000,000. Lessee shall add Lessor as an additional insured by means of an endorsement at least as broad as the Insurance Service Organization's "Additional Insured-Managers or Lessors of Premises" Endorsement. The policy shall not contain any intra-insured exclusions as between insured persons or organizations, but shall include coverage for liability assumed under this Lease as an "insured contract" for the performance of Lessee's indemnity obligations under this Lease. The limits of said insurance shall not, however, limit the liability of Lessee nor relieve Lessee of any obligation hereunder. Lessee shall provide an endorsement on its liability policy(ies) which provides that its insurance shall be primary to and not contributory with any similar insurance carried by Lessor, whose insurance shall be considered excess insurance only.

(b)   **Carried by Lessor.** Lessor shall maintain liability insurance as described in Paragraph 8.2(a), in addition to, and not in lieu of, the insurance required to be maintained by Lessee. Lessee shall not be named as an additional insured therein.

8.3   **Property Insurance - Building, Improvements and Rental Value.**

(a)   **Building and Improvements.** Lessor shall obtain and keep in force a policy or policies of Insurance in the name of Lessor, with loss payable to Lessor, any ground-lessor, and to any Lender insuring loss or damage to the Premises. The amount of such insurance shall be equal to the full insurable replacement cost of the Premises, as the same shall exist from time to time, or the amount required by any Lender, but in no event more than the commercially reasonable and available insurable value thereof. Lessee Owned Alterations and Utility Installations, Trade Fixtures, and Lessee's personal property shall be insured by Lessee and not by Lessor. If the coverage is available and commercially appropriate, such policy or policies shall insure against all risks of direct physical loss or damage (except the perils of flood and/or earthquake unless required by a Lender), including coverage for debris removal and the enforcement of any Applicable Requirements requiring the upgrading, demolition, reconstruction or replacement of any portion of the Premises as the result of a covered loss. Said policy or policies shall also contain an agreed valuation provision in lieu of any coinsurance clause, waiver of subrogation, and inflation guard protection causing an increase in the annual property insurance coverage amount by a factor of not less than the adjusted U.S. Department of Labor Consumer Price Index for All Urban Consumers for the city nearest to where the Premises are located. If such insurance coverage has a deductible clause, the deductible amount shall not exceed $5,000 per occurrence.

(b)   **Rental Value.** Lessor shall also obtain and keep in force a policy or policies in the name of Lessor with loss payable to Lessor and any Lender, insuring the loss of the full Rent for one year with an extended period of indemnity for an additional 180 days ("Rental Value Insurance"). Said insurance shall contain an agreed valuation provision in lieu of any coinsurance clause, and the amount of coverage shall be adjusted annually to reflect the projected Rent otherwise payable by Lessee, for the next 12 month period.

(c)   **Adjacent Premises.** Lessee shall pay for any increase in the premiums for the property insurance of the Building and for the Common Areas or other buildings in the Project if said increase is caused by Lessee's acts, omissions, use or occupancy of the Premises.

(d)   **Lessee's Improvements.** Since Lessor is the Insuring Party, Lessor shall not be required to insure Lessee Owned Alterations and Utility Installations

---

Page 5 of 13
Last Edited: 11/8/2017 12:02 PM

INITIALS

MTN-26.00, Revised 01-03-2017

unless the item in question has become the property of Lessor under the terms of this Lease.

8.4 **Lessee's Property; Business Interruption Insurance; Worker's Compensation Insurance.**

(a) **Property Damage.** Lessee shall obtain and maintain insurance coverage on all of Lessee's personal property, Trade Fixtures, and Lessee Owned Alterations and Utility Installations. Such insurance shall be full replacement cost coverage with a deductible of not to exceed $1,000 per occurrence. The proceeds from any such insurance shall be used by Lessee for the replacement of personal property, Trade Fixtures and Lessee Owned Alterations and Utility Installations.

(b) **Business Interruption.** Lessee shall obtain and maintain loss of income and extra expense insurance in amounts as will reimburse Lessee for direct or indirect loss of earnings attributable to all perils commonly insured against by prudent lessees in the business of Lessee or attributable to prevention of access to the Premises as a result of such perils.

(c) **Worker's Compensation Insurance.** Lessee shall obtain and maintain Worker's Compensation Insurance in such amount as may be required by Applicable Requirements. Such policy shall include a 'Waiver of Subrogation' endorsement. Lessee shall provide Lessor with a copy of such endorsement along with the certificate of insurance or copy of the policy required by paragraph 8.5.

(d) **No Representation of Adequate Coverage.** Lessor makes no representation that the limits or forms of coverage of insurance specified herein are adequate to cover Lessee's property, business operations or obligations under this Lease.

8.5 **Insurance Policies.** Insurance required herein shall be by companies maintaining during the policy term a "General Policyholders Rating" of at least A-, VII, as set forth in the most current issue of "Best's Insurance Guide", or such other rating as may be required by a Lender. Lessee shall not do or permit to be done anything which invalidates the required insurance policies. Lessee shall, prior to the Start Date, deliver to Lessor certified copies of policies of such insurance or certificates with copies of the required endorsements evidencing the existence and amounts of the required insurance. No such policy shall be cancelable or subject to modification except after 30 days prior written notice to Lessor. Lessee shall, at least 10 days prior to the expiration of such policies, furnish Lessor with evidence of renewals or "insurance binders" evidencing renewal thereof, or Lessor may increase his liability insurance coverage and charge the cost thereof to Lessee, which amount shall be payable by Lessee to Lessor upon demand. Such policies shall be for a term of at least one year, or the length of the remaining term of this Lease, whichever is less. If either Party shall fail to procure and maintain the insurance required to be carried by it, the other Party may, but shall not be required to, procure and maintain the same.

8.6 **Waiver of Subrogation.** Without affecting any other rights or remedies, Lessee and Lessor each hereby release and relieve the other, and waive their entire right to recover damages against the other, for loss of or damage to its property arising out of or incident to the perils required to be insured against herein. The effect of such releases and waivers is not limited by the amount of insurance carried or required, or by any deductibles applicable hereto. The Parties agree to have their respective property damage insurance carriers waive any right to subrogation that such companies may have against Lessor or Lessee, as the case may be, so long as the insurance is not invalidated thereby.

8.7 **Indemnity.** Except for Lessor's gross negligence or willful misconduct, Lessee shall indemnify, protect, defend and hold harmless the Premises, Lessor and its agents, Lessor's master or ground lessor, partners and Lenders, from and against any and all claims, loss of rents and/or damages, liens, judgments, penalties, attorneys' and consultants' fees, expenses and/or liabilities arising out of, involving, or in connection with, the use and/or occupancy of the Premises by Lessee. If any action or proceeding is brought against Lessor by reason of any of the foregoing matters, Lessee shall upon notice defend the same at Lessee's expense by counsel reasonably satisfactory to Lessor and Lessor shall cooperate with Lessee in such defense. Lessor need not have first paid any such claim in order to be defended or indemnified.

8.8 **Exemption of Lessor and its Agents from Liability.** Notwithstanding the negligence or breach of this Lease by Lessor or its agents, neither Lessor nor its agents shall be liable under any circumstances for: (i) injury or damage to the person or goods, wares, merchandise or other property of Lessee, Lessee's employees, contractors, invitees, customers, or any other person in or about the Premises, whether such damage or injury is caused by or results from fire, steam, electricity, gas, water or rain, indoor air quality, the presence of mold or from the breakage, leakage, obstruction or other defects of pipes, fire sprinklers, wires, appliances, plumbing, HVAC or lighting fixtures, or from any other cause, whether the said injury or damage results from conditions arising upon the Premises or upon other portions of the Building, or from other sources or places, (ii) any damages arising from any act or neglect of any other tenant of Lessor or from the failure of Lessor or its agents to enforce the provisions of any other lease in the Project, or (iii) injury to Lessee's business or for any loss of income or profit therefrom. Instead, it is intended that Lessee's sole recourse in the event of such damages or injury be to file a claim on the insurance policy(ies) that Lessee is required to maintain pursuant to the provisions of paragraph 8.

8.9 **Failure to Provide Insurance.** Lessee acknowledges that any failure on its part to obtain or maintain the insurance required herein will expose Lessor to risks and potentially cause Lessor to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain. Accordingly, for any month or portion thereof that Lessee does not maintain the required insurance and/or does not provide Lessor with the required binders or certificates evidencing the existence of the required insurance, the Base Rent shall be automatically increased, without any requirement for notice to Lessee, by an amount equal to 10% of the then existing Base Rent or $100, whichever is greater. The parties agree that such increase in Base Rent represents fair and reasonable compensation for the additional risk/costs that Lessor will incur by reason of Lessee's failure to maintain the required insurance. Such increase in Base Rent shall in no event constitute a waiver of Lessee's Default or Breach with respect to the failure to maintain such insurance, prevent the exercise of any of the other rights and remedies granted hereunder, nor relieve Lessee of its obligation to maintain the insurance specified in this Lease.

**9.    Damage or Destruction.**

9.1 **Definitions.**

(a) **"Premises Partial Damage"** shall mean damage or destruction to the Improvements on the Premises, other than Lessee Owned Alterations and Utility Installations, which can reasonably be repaired in 3 months or less from the date of the damage or destruction, and the cost thereof does not exceed a sum equal to 6 month's Base Rent. Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not the damage is Partial or Total.

(b) **"Premises Total Destruction"** shall mean damage or destruction to the Improvements on the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which cannot reasonably be repaired in 3 months or less from the date of the damage or destruction and/or the cost thereof exceeds a sum equal to 6 month's Base Rent. Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not the damage is Partial or Total.

(c) **"Insured Loss"** shall mean damage or destruction to Improvements on the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which was caused by an event required to be covered by the insurance described in Paragraph 8.3(a), irrespective of any deductible amounts or coverage limits involved.

(d) **"Replacement Cost"** shall mean the cost to repair or rebuild the improvements owned by Lessor at the time of the occurrence to their condition existing immediately prior thereto, including demolition, debris removal and upgrading required by the operation of Applicable Requirements, and without deduction for depreciation.

(e) **"Hazardous Substance Condition"** shall mean the occurrence or discovery of a condition involving the presence of, or a contamination by, a Hazardous Substance, in, on, or under the Premises which requires restoration.

9.2 **Partial Damage - Insured Loss.** If a Premises Partial Damage that is an Insured Loss occurs, then Lessor shall, at Lessor's expense, repair such damage (but not Lessee's Trade Fixtures or Lessee Owned Alterations and Utility Installations) as soon as reasonably possible and this Lease shall continue in full force and effect; provided, however, that Lessee shall, at Lessor's election, make the repair of any damage or destruction the total cost to repair of which is $10,000 or less, and, in such event, Lessor shall make any applicable insurance proceeds available to Lessee on a reasonable basis for that purpose. Notwithstanding the foregoing, if the required insurance was not in force or the insurance proceeds are not sufficient to effect such repair, the Insuring Party shall promptly contribute the shortage in proceeds as and when required to complete said repairs. In the event, however, such shortage was due to the fact that, by reason of the unique nature of the improvements, full replacement cost insurance coverage was not commercially reasonable and available, Lessor shall have no obligation to pay for the shortage in insurance proceeds or to fully restore the unique aspects of the Premises unless Lessee provides Lessor with the funds to cover same, or adequate assurance thereof, within 10 days following receipt of written notice of such shortage and request therefor. If Lessor receives said funds or adequate assurance thereof within said 10 day period, the party responsible for making the repairs shall complete them as soon as reasonably possible and this Lease shall remain in full force and effect. If such funds or assurance are not received, Lessor may nevertheless elect by written notice to Lessee within 10 days thereafter to: (i) make such restoration and repair as is commercially reasonable with Lessor paying any shortage in proceeds, in which case this Lease shall remain in full force and effect, or (ii) have this Lease terminate 30 days thereafter. Lessee shall not be entitled to reimbursement of any funds contributed by Lessee to repair any such damage or destruction. Premises Partial Damage due to flood or earthquake shall be subject to Paragraph 9.3, notwithstanding that there may be some insurance coverage, but the net proceeds of any such insurance shall be made available for the repairs if made by either Party.

9.3 **Partial Damage - Uninsured Loss.** If a Premises Partial Damage that is not an Insured Loss occurs, unless caused by a negligent or willful act of Lessee (in which event Lessee shall make the repairs at Lessee's expense), Lessor may either: (i) repair such damage as soon as reasonably possible at Lessor's expense (subject to reimbursement pursuant to Paragraph 4.2), in which event this Lease shall continue in full force and effect, or (ii) terminate this Lease by giving written notice to Lessee within 30 days after receipt by Lessor of knowledge of the occurrence of such damage. Such termination shall be effective 60 days following the date of such notice. In the event Lessor elects to terminate this Lease, Lessee shall have the right within 10 days after receipt of the termination notice to give written notice to Lessor of Lessee's commitment to pay for the repair of such damage without reimbursement from Lessor. Lessee shall provide Lessor with said funds or satisfactory assurance thereof within 30 days after making such commitment. In such event this Lease shall continue in full force and effect, and Lessor shall proceed to make such repairs as soon as reasonably possible after the required funds are available. If Lessee does not make the required commitment, this Lease shall terminate as of

© 2017 AIR CRE.  All Rights Reserved.

MTN-26.00, Revised 01-03-2017

**EXHIBIT  A  pg. 6**
**EXHIBIT  3   pg. 14**

the date specified in the termination notice.

9.4  **Total Destruction.** Notwithstanding any other provision hereof, if a Premises Total Destruction occurs, this Lease shall terminate 60 days following such Destruction. If the damage or destruction was caused by the gross negligence or willful misconduct of Lessee, Lessor shall have the right to recover Lessor's damages from Lessee, except as provided in Paragraph 8.6.

9.5  **Damage Near End of Term.** If at any time during the last 6 months of this Lease there is damage for which the cost to repair exceeds one month's Base Rent, whether or not an Insured Loss, Lessor may terminate this Lease effective 60 days following the date of occurrence of such damage by giving a written termination notice to Lessee within 30 days after the date of occurrence of such damage. Notwithstanding the foregoing, if Lessee at that time has an exercisable option to extend this Lease or to purchase the Premises, then Lessee may preserve this Lease by, (a) exercising such option and (b) providing Lessor with any shortage in insurance proceeds (or adequate assurance thereof) needed to make the repairs on or before the earlier of (i) the date which is 10 days after Lessee's receipt of Lessor's written notice purporting to terminate this Lease, or (ii) the day prior to the date upon which such option expires. If Lessee duly exercises such option during such period and provides Lessor with funds (or adequate assurance thereof) to cover any shortage in insurance proceeds, Lessor shall, at Lessor's commercially reasonable expense, repair such damage as soon as reasonably possible and this Lease shall continue in full force and effect. If Lessee fails to exercise such option and provide such funds or assurance during such period, then this Lease shall terminate on the date specified in the termination notice and Lessee's option shall be extinguished.

9.6  **Abatement of Rent; Lessee's Remedies.**

(a)  **Abatement.** In the event of Premises Partial Damage or Premises Total Destruction or a Hazardous Substance Condition for which Lessee is not responsible under this Lease, the Rent payable by Lessee for the period required for the repair, remediation or restoration of such damage shall be abated in proportion to the degree to which Lessee's use of the Premises is impaired, but not to exceed the proceeds received from the Rental Value insurance. All other obligations of Lessee hereunder shall be performed by Lessee, and Lessor shall have no liability for any such damage, destruction, remediation, repair or restoration except as provided herein.

(b)  **Remedies.** If Lessor is obligated to repair or restore the Premises and does not commence, in a substantial and meaningful way, such repair or restoration within 90 days after such obligation shall accrue, Lessee may, at any time prior to the commencement of such repair or restoration, give written notice to Lessor and to any Lenders of which Lessee has actual notice, of Lessee's election to terminate this Lease on a date not less than 60 days following the giving of such notice. If Lessee gives such notice and such repair or restoration is not commenced within 30 days thereafter, this Lease shall terminate as of the date specified in said notice. If the repair or restoration is commenced within such 30 days, this Lease shall continue in full force and effect. "Commence" shall mean either the unconditional authorization of the preparation of the required plans, or the beginning of the actual work on the Premises, whichever first occurs.

9.7  **Termination; Advance Payments.** Upon termination of this Lease pursuant to Paragraph 6.2(g) or Paragraph 9, an equitable adjustment shall be made concerning advance Base Rent and any other advance payments made by Lessee to Lessor. Lessor shall, in addition, return to Lessee so much of Lessee's Security Deposit as has not been, or is not then required to be, used by Lessor.

**10.  Real Property Taxes.**

10.1  **Definition.** As used herein, the term **"Real Property Taxes"** shall include any form of assessment; real estate, general, special, ordinary or extraordinary, or rental levy or tax (other than inheritance, personal income or estate taxes); improvement bond; and/or license fee imposed upon or levied against any legal or equitable interest of Lessor in the Project, Lessor's right to other income therefrom, and/or Lessor's business of leasing, by any authority having the direct or indirect power to tax and where the funds are generated with reference to the Project address. The term "Real Property Taxes" shall also include any tax, fee, levy, assessment or charge, or any increase therein: (i) imposed by reason of events occurring during the term of this Lease, including but not limited to, a change in the ownership of the Project, (ii) a change in the improvements thereon, and/or (iii) levied or assessed on machinery or equipment provided by Lessor to Lessee pursuant to this Lease. In calculating Real Property Taxes for any calendar year, the Real Property Taxes for any real estate tax year shall be included in the calculation of Real Property Taxes for such calendar year based upon the number of days which such calendar year and tax year have in common.

10.2  **Payment of Taxes.** Except as otherwise provided in Paragraph 10.3, Lessor shall pay the Real Property Taxes applicable to the Project, and said payments shall be included in the calculation of Common Area Operating Expenses in accordance with the provisions of Paragraph 4.2.

10.3  **Additional Improvements.** Common Area Operating Expenses shall not include Real Property Taxes specified in the tax assessor's records and work sheets as being caused by additional improvements placed upon the Project by other lessees or by Lessor for the exclusive enjoyment of such other lessees. Notwithstanding Paragraph 10.2 hereof, Lessee shall, however, pay to Lessor at the time Common Area Operating Expenses are payable under Paragraph 4.2, the entirety of any increase in Real Property Taxes if assessed solely by reason of Alterations, Trade Fixtures or Utility Installations placed upon the Premises by Lessee or at Lessee's request or by reason of any alterations or improvements to the Premises made by Lessor subsequent to the execution of this Lease by the Parties.

10.4  **Joint Assessment.** If the Building is not separately assessed, Real Property Taxes allocated to the Building shall be an equitable proportion of the Real Property Taxes for all of the land and improvements included within the tax parcel assessed, such proportion to be determined by Lessor from the respective valuations assigned in the assessor's work sheets or such other information as may be reasonably available. Lessor's reasonable determination thereof, in good faith, shall be conclusive.

10.5  **Personal Property Taxes.** Lessee shall pay prior to delinquency all taxes assessed against and levied upon Lessee Owned Alterations and Utility Installations, Trade Fixtures, furnishings, equipment and all personal property of Lessee contained in the Premises. When possible, Lessee shall cause its Lessee Owned Alterations and Utility Installations, Trade Fixtures, furnishings, equipment and all other personal property to be assessed and billed separately from the real property of Lessor. If any of Lessee's said property shall be assessed with Lessor's real property, Lessee shall pay Lessor the taxes attributable to Lessee's property within 10 days after receipt of a written statement setting forth the taxes applicable to Lessee's property.

**11.  Utilities and Services.** Lessee shall pay for all water, gas, heat, light, power, telephone, trash disposal and other utilities and services supplied to the Premises, together with any taxes thereon. Notwithstanding the provisions of Paragraph 4.2, if at any time in Lessor's sole judgment, Lessor determines that Lessee is using a disproportionate amount of water, electricity or other commonly metered utilities, or that Lessee is generating such a large volume of trash as to require an increase in the size of the trash receptacle and/or an increase in the number of times per month that it is emptied, then Lessor may increase Lessee's Base Rent by an amount equal to such increased costs. There shall be no abatement of Rent and Lessor shall not be liable in any respect whatsoever for the inadequacy, stoppage, interruption or discontinuance of any utility or service due to riot, strike, labor dispute, breakdown, accident, repair or other cause beyond Lessor's reasonable control or in cooperation with governmental request or directions.

**12.  Assignment and Subletting.**

12.1  **Lessor's Consent Required.**

(a)  Lessee shall not voluntarily or by operation of law assign, transfer, mortgage or encumber (collectively, **"assign or assignment"**) or sublet all or any part of Lessee's interest in this Lease or in the Premises without Lessor's prior written consent.

(b)  Unless Lessee is a corporation and its stock is publicly traded on a national stock exchange, a change in the control of Lessee shall constitute an assignment requiring consent. The transfer, on a cumulative basis, of 25% or more of the voting control of Lessee shall constitute a change in control for this purpose.

(c)  The involvement of Lessee or its assets in any transaction, or series of transactions (by way of merger, sale, acquisition, financing, transfer, leveraged buy-out or otherwise), whether or not a formal assignment or hypothecation of this Lease or Lessee's assets occurs, which results or will result in a reduction of the Net Worth of Lessee by an amount greater than 25% of such Net Worth as it was represented at the time of the execution of this Lease or at the time of the most recent assignment to which Lessor has consented, or as it exists immediately prior to said transaction or transactions constituting such reduction, whichever was or is greater, shall be considered an assignment of this Lease to which Lessor may withhold its consent.  **"Net Worth of Lessee"** shall mean the net worth of Lessee (excluding any guarantors) established under generally accepted accounting principles.

(d)  An assignment or subletting without consent shall, at Lessor's option, be a Default curable after notice per Paragraph 13.1(d), or a noncurable Breach without the necessity of any notice and grace period. If Lessor elects to treat such unapproved assignment or subletting as a noncurable Breach, Lessor may either: (i) terminate this Lease, or (ii) upon 30 days written notice, increase the monthly Base Rent to 110% of the Base Rent then in effect. Further, in the event of such Breach and rental adjustment, (i) the purchase price of any option to purchase the Premises held by Lessee shall be subject to similar adjustment to 110% of the price previously in effect, and (ii) all fixed and non-fixed rental adjustments scheduled during the remainder of the Lease term shall be increased to 110% of the scheduled adjusted rent.

(e)  Lessee's remedy for any breach of Paragraph 12.1 by Lessor shall be limited to compensatory damages and/or injunctive relief.

(f)  Lessor may reasonably withhold consent to a proposed assignment or subletting if Lessee is in Default at the time consent is requested.

(g)  Notwithstanding the foregoing, allowing a de minimis portion of the Premises, ie. 20 square feet or less, to be used by a third party vendor in connection with the installation of a vending machine or payphone shall not constitute a subletting.

12.2  **Terms and Conditions Applicable to Assignment and Subletting.**

(a)  Regardless of Lessor's consent, no assignment or subletting shall : (i) be effective without the express written assumption by such assignee or sublessee of the obligations of Lessee under this Lease, (ii) release Lessee of any obligations hereunder, or (iii) alter the primary liability of Lessee for the payment of Rent or for the performance of any other obligations to be performed by Lessee.

(b)  Lessor may accept Rent or performance of Lessee's obligations from any person other than Lessee pending approval or disapproval of an assignment. Neither a delay in the approval or disapproval of such assignment nor the acceptance of Rent or performance shall constitute a waiver or estoppel of Lessor's right to

INITIALS

© 2017 AIR CRE.  All Rights Reserved.

Page 7 of 13
Last Edited: 11/8/2017 12:02 PM

INITIALS

MTN-26.00, Revised 01-03-2017

exercise its remedies for Lessee's Default or Breach.

(c)   Lessor's consent to any assignment or subletting shall not constitute a consent to any subsequent assignment or subletting.

(d)   In the event of any Default or Breach by Lessee, Lessor may proceed directly against Lessee, any Guarantors or anyone else responsible for the performance of Lessee's obligations under this Lease, including any assignee or sublessee, without first exhausting Lessor's remedies against any other person or entity responsible therefor to Lessor, or any security held by Lessor.

(e)   Each request for consent to an assignment or subletting shall be in writing, accompanied by information relevant to Lessor's determination as to the financial and operational responsibility and appropriateness of the proposed assignee or sublessee, including but not limited to the intended use and/or required modification of the Premises, if any, together with a fee of $500 as consideration for Lessor's considering and processing said request.  Lessee agrees to provide Lessor with such other or additional information and/or documentation as may be reasonably requested. (See also Paragraph 36)

(f)   Any assignee of, or sublessee under, this Lease shall, by reason of accepting such assignment, entering into such sublease, or entering into possession of the Premises or any portion thereof, be deemed to have assumed and agreed to conform and comply with each and every term, covenant, condition and obligation herein to be observed or performed by Lessee during the term of said assignment or sublease, other than such obligations as are contrary to or inconsistent with provisions of an assignment or sublease to which Lessor has specifically consented to in writing.

(g)   Lessor's consent to any assignment or subletting shall not transfer to the assignee or sublessee any Option granted to the original Lessee by this Lease unless such transfer is specifically consented to by Lessor in writing. (See Paragraph 39.2)

12.3   **Additional Terms and Conditions Applicable to Subletting.**  The following terms and conditions shall apply to any subletting by Lessee of all or any part of the Premises and shall be deemed included in all subleases under this Lease whether or not expressly incorporated therein:

(a)   Lessee hereby assigns and transfers to Lessor all of Lessee's interest in all Rent payable on any sublease, and Lessor may collect such Rent and apply same toward Lessee's obligations under this Lease; provided, however, that until a Breach shall occur in the performance of Lessee's obligations, Lessee may collect said Rent.  In the event that the amount collected by Lessor exceeds Lessee's then outstanding obligations any such excess shall be refunded to Lessee.  Lessor shall not, by reason of the foregoing or any assignment of such sublease, nor by reason of the collection of Rent, be deemed liable to the sublessee for any failure of Lessee to perform and comply with any of Lessee's obligations to such sublessee.  Lessee hereby irrevocably authorizes and directs any such sublessee, upon receipt of a written notice from Lessor stating that a Breach exists in the performance of Lessee's obligations under this Lease, to pay to Lessor all Rent due and to become due under the sublease.  Sublessee shall rely upon any such notice from Lessor and shall pay all Rents to Lessor without any obligation or right to inquire as to whether such Breach exists, notwithstanding any claim from Lessee to the contrary.

(b)   In the event of a Breach by Lessee, Lessor may, at its option, require sublessee to attorn to Lessor, in which event Lessor shall undertake the obligations of the sublessor under such sublease from the time of the exercise of said option to the expiration of such sublease; provided, however, Lessor shall not be liable for any prepaid rents or security deposit paid by such sublessee to such sublessor or for any prior Defaults or Breaches of such sublessor.

(c)   Any matter requiring the consent of the sublessor under a sublease shall also require the consent of Lessor.

(d)   No sublessee shall further assign or sublet all or any part of the Premises without Lessor's prior written consent.

(e)   Lessor shall deliver a copy of any notice of Default or Breach by Lessee to the sublessee, who shall have the right to cure the Default of Lessee within the grace period, if any, specified in such notice.  The sublessee shall have a right of reimbursement and offset from and against Lessee for any such Defaults cured by the sublessee.

## 13.   Default; Breach; Remedies.

13.1   **Default; Breach.**  A **"Default"** is defined as a failure by the Lessee to comply with or perform any of the terms, covenants, conditions or Rules and Regulations under this Lease.  A **"Breach"** is defined as the occurrence of one or more of the following Defaults, and the failure of Lessee to cure such Default within any applicable grace period:

(a)   The abandonment of the Premises; or the vacating of the Premises without providing a commercially reasonable level of security, or where the coverage of the property insurance described in Paragraph 8.3 is jeopardized as a result thereof, or without providing reasonable assurances to minimize potential vandalism.

(b)   The failure of Lessee to make any payment of Rent or any Security Deposit required to be made by Lessee hereunder, whether to Lessor or to a third party, when due, to provide reasonable evidence of insurance or surety bond, or to fulfill any obligation under this Lease which endangers or threatens life or property, where such failure continues for a period of 3 business days following written notice to Lessee.  THE ACCEPTANCE BY LESSOR OF A PARTIAL PAYMENT OF RENT OR SECURITY DEPOSIT SHALL NOT CONSTITUTE A WAIVER OF ANY OF LESSOR'S RIGHTS, INCLUDING LESSOR'S RIGHT TO RECOVER POSSESSION OF THE PREMISES.

(c)   The failure of Lessee to allow Lessor and/or its agents access to the Premises or the commission of waste, act or acts constituting public or private nuisance, and/or an illegal activity on the Premises by Lessee, where such actions continue for a period of 3 business days following written notice to Lessee.  In the event that Lessee commits waste, a nuisance or an illegal activity a second time then, the Lessor may elect to treat such conduct as a non-curable Breach rather than a Default.

(d)   The failure by Lessee to provide (i) reasonable written evidence of compliance with Applicable Requirements, (ii) the service contracts, (iii) the rescission of an unauthorized assignment or subletting, (iv) an Estoppel Certificate or financial statements, (v) a requested subordination, (vi) evidence concerning any guaranty and/or Guarantor, (vii) any document requested under Paragraph 41, (viii) material safety data sheets (MSDS), or (ix) any other documentation or information which Lessor may reasonably require of Lessee under the terms of this Lease, where any such failure continues for a period of 10 days following written notice to Lessee.

(e)   A Default by Lessee as to the terms, covenants, conditions or provisions of this Lease, or of the rules adopted under Paragraph 2.9 hereof, other than those described in subparagraphs 13.1(a), (b), (c) or (d), above, where such Default continues for a period of 30 days after written notice; provided, however, that if the nature of Lessee's Default is such that more than 30 days are reasonably required for its cure, then it shall not be deemed to be a Breach if Lessee commences such cure within said 30 day period and thereafter diligently prosecutes such cure to completion.

(f)   The occurrence of any of the following events: (i) the making of any general arrangement or assignment for the benefit of creditors; (ii) becoming a "debtor" as defined in 11 U.S.C. § 101 or any successor statute thereto (unless, in the case of a petition filed against Lessee, the same is dismissed within 60 days); (iii) the appointment of a trustee or receiver to take possession of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where possession is not restored to Lessee within 30 days; or (iv) the attachment, execution or other judicial seizure of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where such seizure is not discharged within 30 days; provided, however, in the event that any provision of this subparagraph is contrary to any applicable law, such provision shall be of no force or effect, and not affect the validity of the remaining provisions.

(g)   The discovery that any financial statement of Lessee or of any Guarantor given to Lessor was materially false.

(h)   If the performance of Lessee's obligations under this Lease is guaranteed: (i) the death of a Guarantor, (ii) the termination of a Guarantor's liability with respect to this Lease other than in accordance with the terms of such guaranty, (iii) a Guarantor's becoming insolvent or the subject of a bankruptcy filing, (iv) a Guarantor's refusal to honor the guaranty, or (v) a Guarantor's breach of its guaranty obligation on an anticipatory basis, and Lessee's failure, within 60 days following written notice of any such event, to provide written alternative assurance or security, which, when coupled with the then existing resources of Lessee, equals or exceeds the combined financial resources of Lessee and the Guarantors that existed at the time of execution of this Lease.

13.2   **Remedies.**  If Lessee fails to perform any of its affirmative duties or obligations, within 10 days after written notice (or in case of an emergency, without notice), Lessor may, at its option, perform such duty or obligation on Lessee's behalf, including but not limited to the obtaining of reasonably required bonds, insurance policies, or governmental licenses, permits or approvals.  Lessee shall pay to Lessor an amount equal to 115% of the costs and expenses incurred by Lessor in such performance upon receipt of an invoice therefor.  In the event of a Breach, Lessor may, with or without further notice or demand, and without limiting Lessor in the exercise of any right or remedy which Lessor may have by reason of such Breach:

(a)   Terminate Lessee's right to possession of the Premises by any lawful means, in which case this Lease shall terminate and Lessee shall immediately surrender possession to Lessor.  In such event Lessor shall be entitled to recover from Lessee: (i) the unpaid Rent which had been earned at the time of termination; (ii) the worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that the Lessee proves could have been reasonably avoided; (iii) the worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that the Lessee proves could be reasonably avoided; and (iv) any other amount necessary to compensate Lessor for all the detriment proximately caused by the Lessee's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, including but not limited to the cost of recovering possession of the Premises, expenses of reletting, including necessary renovation and alteration of the Premises, reasonable attorneys' fees, and that portion of any leasing commission paid by Lessor in connection with this Lease applicable to the unexpired term of this Lease.  The worth at the time of award of the amount referred to in provision (iii) of the immediately preceding sentence shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of the District within which the Premises are located at the time of award plus one percent.  Efforts by Lessor to mitigate damages caused by Lessee's Breach of this Lease shall not waive Lessor's right to recover any damages to which Lessor is otherwise entitled.  If termination of this Lease is obtained through the provisional remedy of unlawful detainer, Lessor shall have the right to recover in such proceeding any unpaid Rent and damages as are recoverable therein, or Lessor may reserve the right to recover all or any part thereof in a separate suit.  If a notice and grace period required under Paragraph 13.1 was not previously given, a notice to pay rent or quit, or to perform or quit given to Lessee under the unlawful detainer statute shall also constitute the notice required by Paragraph 13.1.  In such case, the applicable grace period required by Paragraph 13.1 and the unl

INITIALS

© 2017 AIR CRE.  All Rights Reserved.

Page 8 of 13
Last Edited: 11/8/2017 12:02 PM

INITIALS

MTN-26.00, Revised 01-03-2017

detainer statute shall run concurrently, and the failure of Lessee to cure the Default within the greater of the two such grace periods shall constitute both an unlawful detainer and a Breach of this Lease entitling Lessor to the remedies provided for in this Lease and/or by said statute.

(b)    Continue the Lease and Lessee's right to possession and recover the Rent as it becomes due, in which event Lessee may sublet or assign, subject only to reasonable limitations. Acts of maintenance, efforts to relet, and/or the appointment of a receiver to protect the Lessor's interests, shall not constitute a termination of the Lessee's right to possession.

(c)    Pursue any other remedy now or hereafter available under the laws or judicial decisions of the state wherein the Premises are located. The expiration or termination of this Lease and/or the termination of Lessee's right to possession shall not relieve Lessee from liability under any Indemnity provisions of this Lease as to matters occurring or accruing during the term hereof or by reason of Lessee's occupancy of the Premises.

13.3  **Inducement Recapture.** Any agreement for free or abated rent or other charges, the cost of tenant improvements for Lessee paid for or performed by Lessor, or for the giving or paying by Lessor to or for Lessee of any cash or other bonus, inducement or consideration for Lessee's entering into this Lease, all of which concessions are hereinafter referred to as "**Inducement Provisions**," shall be deemed conditioned upon Lessee's full and faithful performance of all of the terms, covenants and conditions of this Lease. Upon Breach of this Lease by Lessee, any such Inducement Provision shall automatically be deemed deleted from this Lease and of no further force or effect, and any rent, other charge, bonus, inducement or consideration theretofore abated, given or paid by Lessor under such an Inducement Provision shall be immediately due and payable by Lessee to Lessor, notwithstanding any subsequent cure of said Breach by Lessee. The acceptance by Lessor of rent or the cure of the Breach which initiated the operation of this paragraph shall not be deemed a waiver by Lessor of the provisions of this paragraph unless specifically so stated in writing by Lessor at the time of such acceptance.

13.4  **Late Charges.** Lessee hereby acknowledges that late payment by Lessee of Rent will cause Lessor to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed upon Lessor by any Lender. Accordingly, if any Rent shall not be received by Lessor within 5 days after such amount shall be due, then, without any requirement for notice to Lessee, Lessee shall immediately pay to Lessor a one-time late charge equal to 10% of each such overdue amount or $100, whichever is greater. The parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Lessor will incur by reason of such late payment. Acceptance of such late charge by Lessor shall in no event constitute a waiver of Lessee's Default or Breach with respect to such overdue amount, nor prevent the exercise of any of the other rights and remedies granted hereunder. In the event that a late charge is payable hereunder, whether or not collected, for 3 consecutive installments of Base Rent, then notwithstanding any provision of this Lease to the contrary, Base Rent shall, at Lessor's option, become due and payable quarterly in advance.

13.5  **Interest.** Any monetary payment due Lessor hereunder, other than late charges, not received by Lessor, when due shall bear interest from the 31st day after it was due. The interest ("**Interest**") charged shall be computed at the rate of 10% per annum but shall not exceed the maximum rate allowed by law. Interest is payable in addition to the potential late charge provided for in Paragraph 13.4.

13.6  **Breach by Lessor.**

(a)    **Notice of Breach.** Lessor shall not be deemed in breach of this Lease unless Lessor fails within a reasonable time to perform an obligation required to be performed by Lessor. For purposes of this Paragraph, a reasonable time shall in no event be less than 30 days after receipt by Lessor, and any Lender whose name and address shall have been furnished to Lessee in writing for such purpose, of written notice specifying wherein such obligation of Lessor has not been performed; provided, however, that if the nature of Lessor's obligation is such that more than 30 days are reasonably required for its performance, then Lessor shall not be in breach if performance is commenced within such 30 day period and thereafter diligently pursued to completion.

(b)    **Performance by Lessee on Behalf of Lessor.** In the event that neither Lessor nor Lender cures said breach within 30 days after receipt of said notice, or if having commenced said cure they do not diligently pursue it to completion, then Lessee may elect to cure said breach at Lessee's expense and offset from Rent the actual and reasonable cost to perform such cure, provided however, that such offset shall not exceed an amount equal to the greater of one month's Base Rent or the Security Deposit, reserving Lessee's right to reimbursement from Lessor for any such expense in excess of such offset. Lessee shall document the cost of said cure and supply said documentation to Lessor.

**14.  Condemnation.** If the Premises or any portion thereof are taken under the power of eminent domain or sold under the threat of the exercise of said power (collectively "**Condemnation**"), this Lease shall terminate as to the part taken as of the date the condemning authority takes title or possession, whichever first occurs. If more than 10% of the floor area of the Unit, or more than 25% of the parking spaces is taken by Condemnation, Lessee may, at Lessee's option, to be exercised in writing within 10 days after Lessor shall have given Lessee written notice of such taking (or in the absence of such notice, within 10 days after the condemning authority shall have taken possession) terminate this Lease as of the date the condemning authority takes such possession. If Lessee does not terminate this Lease in accordance with the foregoing, this Lease shall remain in full force and effect as to the portion of the Premises remaining, except that the Base Rent shall be reduced in proportion to the reduction in utility of the Premises caused by such Condemnation. Condemnation awards and/or payments shall be the property of Lessor, whether such award shall be made as compensation for diminution in value of the leasehold, the value of the part taken, or for severance damages; provided, however, that Lessee shall be entitled to any compensation paid by the condemnor for Lessee's relocation expenses, loss of business goodwill and/or Trade Fixtures, without regard to whether or not this Lease is terminated pursuant to the provisions of this Paragraph. All Alterations and Utility Installations made to the Premises by Lessee, for purposes of Condemnation only, shall be considered the property of the Lessee and Lessee shall be entitled to any and all compensation which is payable therefor. In the event that this Lease is not terminated by reason of the Condemnation, Lessor shall repair any damage to the Premises caused by such Condemnation.

**15.  Brokerage Fees.**

~~15.1  Additional Commission. In addition to the payments owed pursuant to Paragraph 1.10 above, Lessor agrees that: (a) if Lessee exercises any Option, (b) if Lessee or anyone affiliated with Lessee acquires from Lessor any rights to the Premises or other premises owned by Lessor and located within the Project, (c) if Lessee remains in possession of the Premises, with the consent of Lessor, after the expiration of this Lease, or (d) if Base Rent is increased, whether by an agreement or operation of an escalation clause herein, then, Lessor shall pay Brokers a fee in accordance with the fee schedule of the Brokers in effect at the time the Lease was executed.~~

15.2  **Assumption of Obligations.** Any buyer or transferee of Lessor's interest in this Lease shall be deemed to have assumed Lessor's obligation hereunder. Brokers shall be third party beneficiaries of the provisions of Paragraphs 1.10, 15, 22 and 31. If Lessor fails to pay to Brokers any amounts due as and for brokerage fees pertaining to this Lease when due, then such amounts shall accrue Interest. In addition, if Lessor fails to pay any amounts to Lessee's Broker when due, Lessee's Broker may send written notice to Lessor and Lessee of such failure and if Lessor fails to pay such amounts within 10 days after said notice, Lessee shall pay said monies to its Broker and offset such amounts against Rent. In addition, Lessee's Broker shall be deemed to be a third party beneficiary of any commission agreement entered into by and/or between Lessor and Lessor's Broker for the limited purpose of collecting any brokerage fee owed.

15.3  **Representations and Indemnities of Broker Relationships.** Lessee and Lessor each represent and warrant to the other that it has had no dealings with any person, firm, broker or finder (other than the Brokers, if any) in connection with this Lease, and that no one other than said named Brokers is entitled to any commission or finder's fee in connection herewith. Lessee and Lessor do each hereby agree to indemnify, protect, defend and hold the other harmless from and against liability for compensation or charges which may be claimed by any such unnamed broker, finder or other similar party by reason of any dealings or actions of the Indemnifying Party, including any costs, expenses, attorneys' fees reasonably incurred with respect thereto.

**16.  Estoppel Certificates.**

(a)    Each Party (as "**Responding Party**") shall within 10 days after written notice from the other Party (the "**Requesting Party**") execute, acknowledge and deliver to the Requesting Party a statement in writing in form similar to the then most current "**Estoppel Certificate**" form published BY AIR CRE, plus such additional information, confirmation and/or statements as may be reasonably requested by the Requesting Party.

(b)    If the Responding Party shall fail to execute or deliver the Estoppel Certificate within such 10 day period, the Requesting Party may execute an Estoppel Certificate stating that: (i) the Lease is in full force and effect without modification except as may be represented by the Requesting Party, (ii) there are no uncured defaults in the Requesting Party's performance, and (iii) if Lessor is the Requesting Party, not more than one month's rent has been paid in advance. Prospective purchasers and encumbrancers may rely upon the Requesting Party's Estoppel Certificate, and the Responding Party shall be estopped from denying the truth of the facts contained in said Certificate. In addition, Lessee acknowledges that any failure on its part to provide such an Estoppel Certificate will expose Lessor to risks and potentially cause Lessor to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain. Accordingly, should the Lessee fail to execute and/or deliver a requested Estoppel Certificate in a timely fashion the monthly Base Rent shall be automatically increased, without any requirement for notice to Lessee, by an amount equal to 10% of the then existing Base Rent or $100, whichever is greater for remainder of the Lease. The Parties agree that such increase in Base Rent represents fair and reasonable compensation for the additional risk/costs that Lessor will incur by reason of Lessee's failure to provide the Estoppel Certificate. Such increase in Base Rent shall in no event constitute a waiver of Lessee's Default or Breach with respect to the failure to provide the Estoppel Certificate nor prevent the exercise of any of the other rights and remedies granted hereunder.

(c)    If Lessor desires to finance, refinance, or sell the Premises, or any part thereof, Lessee and all Guarantors shall within 10 days after written notice from Lessor deliver to any potential lender or purchaser designated by Lessor such financial statements as may be reasonably required by such lender or purchaser, including but not limited to Lessee's financial statements for the past 3 years. All such financial statements shall be received by Lessor and such lender or purchaser in confidence and shall be used only for the purposes herein set forth.

**17. Definition of Lessor.** The term "**Lessor**" as used herein shall mean the owner or owners at the time in question of the fee title to the Premises, or, if this is a sublease, of the Lessee's interest in the prior lease. In the event of a transfer of Lessor's title or interest in the Premises or this Lease, Lessor shall deliver to the transferee or assignee (in cash or by credit) any unused Security Deposit held by Lessor. Upon such transfer or assignment and delivery of the Security Deposit, as aforesaid, the prior Lessor shall be relieved of all liability with respect to the obligations and/or covenants under this Lease thereafter to be performed by the Lessor. Subject to the foregoing, the obligations and/or covenants in this Lease to be performed by the Lessor shall be binding only upon the Lessor as hereinabove defined.

**18. Severability.** The invalidity of any provision of this Lease, as determined by a court of competent jurisdiction, shall in no way affect the validity of any other provision hereof.

**19. Days.** Unless otherwise specifically indicated to the contrary, the word "**days**" as used in this Lease shall mean and refer to calendar days.

**20. Limitation on Liability.** The obligations of Lessor under this Lease shall not constitute personal obligations of Lessor, or its partners, members, directors, officers or shareholders, and Lessee shall look to the Premises, and to no other assets of Lessor, for the satisfaction of any liability of Lessor with respect to this Lease, and shall not seek recourse against Lessor's partners, members, directors, officers or shareholders, or any of their personal assets for such satisfaction.

**21. Time of Essence.** Time is of the essence with respect to the performance of all obligations to be performed or observed by the Parties under this Lease.

**22. No Prior or Other Agreements; Broker Disclaimer.** This Lease contains all agreements between the Parties with respect to any matter mentioned herein, and no other prior or contemporaneous agreement or understanding shall be effective. Lessor and Lessee each represents and warrants to the Brokers that it has made, and is relying solely upon, its own investigation as to the nature, quality, character and financial responsibility of the other Party to this Lease and as to the use, nature, quality and character of the Premises. Brokers have no responsibility with respect thereto or with respect to any default or breach hereof by either Party.

**23. Notices.**

23.1 **Notice Requirements.** All notices required or permitted by this Lease or applicable law shall be in writing and may be delivered in person (by hand or by courier) or may be sent by regular, certified or registered mail or U.S. Postal Service Express Mail, with postage prepaid, or by facsimile transmission, or by email, and shall be deemed sufficiently given if served in a manner specified in this Paragraph 23. The addresses noted adjacent to a Party's signature on this Lease shall be that Party's address for delivery or mailing of notices. Either Party may by written notice to the other specify a different address for notice, except that upon Lessee's taking possession of the Premises, the Premises shall constitute Lessee's address for notice. A copy of all notices to Lessor shall be concurrently transmitted to such party or parties at such addresses as Lessor may from time to time hereafter designate in writing.

23.2 **Date of Notice.** Any notice sent by registered or certified mail, return receipt requested, shall be deemed given on the date of delivery shown on the receipt card, or if no delivery date is shown, the postmark thereon. If sent by regular mail the notice shall be deemed given 72 hours after the same is addressed as required herein and mailed with postage prepaid. Notices delivered by United States Express Mail or overnight courier that guarantees next day delivery shall be deemed given 24 hours after delivery of the same to the Postal Service or courier. Notices delivered by hand, or transmitted by facsimile transmission or by email shall be deemed delivered upon actual receipt. If notice is received on a Saturday, Sunday or legal holiday, it shall be deemed received on the next business day.

**24. Waivers.**

(a) No waiver by Lessor of the Default or Breach of any term, covenant or condition hereof by Lessee, shall be deemed a waiver of any other term, covenant or condition hereof, or of any subsequent Default or Breach by Lessee of the same or of any other term, covenant or condition hereof. Lessor's consent to, or approval of, any act shall not be deemed to render unnecessary the obtaining of Lessor's consent to, or approval of, any subsequent or similar act by Lessee, or be construed as the basis of an estoppel to enforce the provision or provisions of this Lease requiring such consent.

(b) The acceptance of Rent by Lessor shall not be a waiver of any Default or Breach by Lessee. Any payment by Lessee may be accepted by Lessor on account of monies or damages due Lessor, notwithstanding any qualifying statements or conditions made by Lessee in connection therewith, which such statements and/or conditions shall be of no force or effect whatsoever unless specifically agreed to in writing by Lessor at or before the time of deposit of such payment.

(c) THE PARTIES AGREE THAT THE TERMS OF THIS LEASE SHALL GOVERN WITH REGARD TO ALL MATTERS RELATED THERETO AND HEREBY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE TO THE EXTENT THAT SUCH STATUTE IS INCONSISTENT WITH THIS LEASE.

**25. Disclosures Regarding The Nature of a Real Estate Agency Relationship.**

(a) When entering into a discussion with a real estate agent regarding a real estate transaction, a Lessor or Lessee should from the outset understand what type of agency relationship or representation it has with the agent or agents in the transaction. Lessor and Lessee acknowledge being advised by the Brokers in this transaction, as follows:

(i) *Lessor's Agent.* A Lessor's agent under a listing agreement with the Lessor acts as the agent for the Lessor only. A Lessor's agent or subagent has the following affirmative obligations: *To the Lessor:* A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Lessor. *To the Lessee and the Lessor:* (a) Diligent exercise of reasonable skills and care in performance of the agent's duties. (b) A duty of honest and fair dealing and good faith. (c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties. An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

(ii) *Lessee's Agent.* An agent can agree to act as agent for the Lessee only. In these situations, the agent is not the Lessor's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Lessor. An agent acting only for a Lessee has the following affirmative obligations. *To the Lessee:* A fiduciary duty of utmost care, integrity, honesty and loyalty in dealings with the Lessee. *To the Lessee and the Lessor:* (a) Diligent exercise of reasonable skills and care in performance of the agent's duties. (b) A duty of honest and fair dealing and good faith. (c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties. An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

(iii) *Agent Representing Both Lessor and Lessee.* A real estate agent, either acting directly or through one or more associate licenses, can legally be the agent of both the Lessor and the Lessee in a transaction, but only with the knowledge and consent of both the Lessor and the Lessee. In a dual agency situation, the agent has the following affirmative obligations to both the Lessor and the Lessee: (a) A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either Lessor or the Lessee. (b) Other duties to the Lessor and the Lessee as stated above in subparagraphs (i) or (ii). In representing both Lessor and Lessee, the agent may not without the express permission of the respective Party, disclose to the other Party that the Lessor will accept rent in an amount less than that indicated in the listing or that the Lessee is willing to pay a higher rent than that offered. The above duties of the agent in a real estate transaction do not relieve a Lessor or Lessee from the responsibility to protect their own interests. Lessor and Lessee should carefully read all agreements to assure that they adequately express their understanding of the transaction. A real estate agent is a person qualified to advise about real estate. If legal or tax advice is desired, consult a competent professional.

(b) Brokers have no responsibility with respect to any default or breach hereof by either Party. The Parties agree that no lawsuit or other legal proceeding involving any breach of duty, error or omission relating to this Lease may be brought against Broker more than one year after the Start Date and that the liability (including court costs and attorneys' fees), of any Broker with respect to any such lawsuit and/or legal proceeding shall not exceed the fee received by such Broker pursuant to this Lease; provided, however, that the foregoing limitation on each Broker's liability shall not be applicable to any gross negligence or willful misconduct of such Broker.

(c) Lessor and Lessee agree to identify to Brokers as "Confidential" any communication or information given Brokers that is considered by such Party to be confidential.

**26. No Right To Holdover.** Lessee has no right to retain possession of the Premises or any part thereof beyond the expiration or termination of this Lease. In the event that Lessee holds over, then the Base Rent shall be increased to 150% of the Base Rent applicable immediately preceding the expiration or termination. Holdover Base Rent shall be calculated on monthly basis. Nothing contained herein shall be construed as consent by Lessor to any holding over by Lessee.

**27. Cumulative Remedies.** No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity.

**28. Covenants and Conditions; Construction of Agreement.** All provisions of this Lease to be observed or performed by Lessee are both covenants and conditions. In construing this Lease, all headings and titles are for the convenience of the Parties only and shall not be considered a part of this Lease. Whenever required by the context, the singular shall include the plural and vice versa. This Lease shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if both Parties had prepared it.

**29. Binding Effect; Choice of Law.** This Lease shall be binding upon the parties, their personal representatives, successors and assigns and be governed by the laws of the State in which the Premises are located. Any litigation between the Parties hereto concerning this Lease shall be initiated in the county in which the Premises are located.

---

INITIALS

© 2017 AIR CRE. All Rights Reserved.

Page 10 of 13
Last Edited: 11/8/2017 12:02 PM

INITIALS

MTN-26.00, Revised 01-03-2017

**30.   Subordination; Attornment; Non-Disturbance.**

30.1  **Subordination.**  This Lease and any Option granted hereby shall be subject and subordinate to any ground lease, mortgage, deed of trust, or other hypothecation or security device (collectively, "**Security Device**"), now or hereafter placed upon the Premises, to any and all advances made on the security thereof, and to all renewals, modifications, and extensions thereof. Lessee agrees that the holders of any such Security Devices (in this Lease together referred to as "**Lender**") shall have no liability or obligation to perform any of the obligations of Lessor under this Lease. Any Lender may elect to have this Lease and/or any Option granted hereby superior to the lien of its Security Device by giving written notice thereof to Lessee, whereupon this Lease and such Options shall be deemed prior to such Security Device, notwithstanding the relative dates of the documentation or recordation thereof.

30.2  **Attornment.**  In the event that Lessor transfers title to the Premises, or the Premises are acquired by another upon the foreclosure or termination of a Security Device to which this Lease is subordinated (i) Lessee shall, subject to the non-disturbance provisions of Paragraph 30.3, attorn to such new owner, and upon request, enter into a new lease, containing all of the terms and provisions of this Lease, with such new owner for the remainder of the term hereof, or, at the election of the new owner, this Lease will automatically become a new lease between Lessee and such new owner, and (ii) Lessor shall thereafter be relieved of any further obligations hereunder and such new owner shall assume all of Lessor's obligations, except that such new owner shall not: (a) be liable for any act or omission of any prior lessor or with respect to events occurring prior to acquisition of ownership; (b) be subject to any offsets or defenses which Lessee might have against any prior lessor, (c) be bound by prepayment of more than one month's rent, or (d) be liable for the return of any security deposit paid to any prior lessor which was not paid or credited to such new  owner.

30.3  **Non-Disturbance.**  With respect to Security Devices entered into by Lessor after the execution of this Lease, Lessee's subordination of this Lease shall be subject to receiving a commercially reasonable non-disturbance agreement (a "**Non-Disturbance Agreement**") from the Lender which Non-Disturbance Agreement provides that Lessee's possession of the Premises, and this Lease, including any options to extend the term hereof, will not be disturbed so long as Lessee is not in Breach hereof and attorns to the record owner of the Premises. Further, within 60 days after the execution of this Lease, Lessor shall, if requested by Lessee, use its commercially reasonable efforts to obtain a Non-Disturbance Agreement from the holder of any pre-existing Security Device which is secured by the Premises. In the event that Lessor is unable to provide the Non-Disturbance Agreement within said 60 days, then Lessee may, at Lessee's option, directly contact Lender and attempt to negotiate for the execution and delivery of a Non-Disturbance Agreement.

30.4  **Self-Executing.**  The agreements contained in this Paragraph 30 shall be effective without the execution of any further documents; provided, however, that, upon written request from Lessor or a Lender in connection with a sale, financing or refinancing of the Premises, Lessee and Lessor shall execute such further writings as may be reasonably required to separately document any subordination, attornment and/or Non-Disturbance Agreement provided for herein.

**31.   Attorneys' Fees.**  If any Party or Broker brings an action or proceeding involving the Premises whether founded in tort, contract or equity, or to declare rights hereunder, the Prevailing Party (as hereafter defined) in any such proceeding, action, or appeal thereon, shall be entitled to reasonable attorneys' fees. Such fees may be awarded in the same suit or recovered in a separate suit, whether or not such action or proceeding is pursued to decision or judgment. The term, "**Prevailing Party**" shall include, without limitation, a Party or Broker who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other Party or Broker of its claim or defense. The attorneys' fees award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees reasonably incurred. In addition, Lessor shall be entitled to attorneys' fees, costs and expenses incurred in the preparation and service of notices of Default and consultations in connection therewith, whether or not a legal action is subsequently commenced in connection with such Default or resulting Breach ($200 is a reasonable minimum per occurrence for such services and consultation).

**32.   Lessor's Access; Showing Premises; Repairs.**  Lessor and Lessor's agents shall have the right to enter the Premises at any time, in the case of an emergency, and otherwise at reasonable times after reasonable prior notice for the purpose of showing the same to prospective purchasers, lenders, or tenants, and making such alterations, repairs, improvements or additions to the Premises as Lessor may deem necessary or desirable and the erecting, using and maintaining of utilities, services, pipes and conduits through the Premises and/or other premises as long as there is no material adverse effect on Lessee's use of the Premises. All such activities shall be without abatement of rent or liability to Lessee.

**33.   Auctions.**  Lessee shall not conduct, nor permit to be conducted, any auction upon the Premises without Lessor's prior written consent. Lessor shall not be obligated to exercise any standard of reasonableness in determining whether to permit an auction.

**34.   Signs.**  Lessor may place on the Premises ordinary "For Sale" signs at any time and ordinary "For Lease" signs during the last 6 months of the term hereof. Except for ordinary "For Sublease" signs which may be placed only on the Premises, Lessee shall not place any sign upon the Project without Lessor's prior written consent. All signs must comply with all Applicable Requirements.

**35.   Termination; Merger.**  Unless specifically stated otherwise in writing by Lessor, the voluntary or other surrender of this Lease by Lessee, the mutual termination or cancellation hereof, or a termination hereof by Lessor for Breach by Lessee, shall automatically terminate any sublease or lesser estate in the Premises; provided, however, that Lessor may elect to continue any one or all existing subtenancies. Lessor's failure within 10 days following any such event to elect to the contrary by written notice to the holder of any such lesser interest, shall constitute Lessor's election to have such event constitute the termination of such interest.

**36.   Consents.**  All requests for consent shall be in writing. Except as otherwise provided herein, wherever in this Lease the consent of a Party is required to an act by or for the other Party, such consent shall not be unreasonably withheld or delayed.  Lessor's actual reasonable costs and expenses (including but not limited to architects', attorneys', engineers' and other consultants' fees) incurred in the consideration of, or response to, a request by Lessee for any Lessor consent, including but not limited to consents to an assignment, a subletting or the presence or use of a Hazardous Substance, shall be paid by Lessee upon receipt of an invoice and supporting documentation therefor. Lessor's consent to any act, assignment or subletting shall not constitute an acknowledgement that no Default or Breach by Lessee of this Lease exists, nor shall such consent be deemed a waiver of any then existing Default or Breach, except as may be otherwise specifically stated in writing by Lessor at the time of such consent. The failure to specify herein any particular condition to Lessor's consent shall not preclude the imposition by Lessor at the time of consent of such further or other conditions as are then reasonable with reference to the particular matter for which consent is being given. In the event that either Party disagrees with any determination made by the other hereunder and reasonably requests the reasons for such determination, the determining party shall furnish its reasons in writing and in reasonable detail within 10 business days following such request.

**37.   Guarantor.**

37.1  **Execution.**  The Guarantors, if any, shall each execute a guaranty in the form most recently published BY AIR CRE.

37.2  **Default.**  It shall constitute a Default of the Lessee if any Guarantor fails or refuses, upon request to provide:  (a) evidence of the execution of the guaranty, including the authority of the party signing on Guarantor's behalf to obligate Guarantor, and in the case of a corporate Guarantor, a certified copy of a resolution of its board of directors authorizing the making of such guaranty, (b) current financial statements, (c) an Estoppel Certificate, or (d) written confirmation that the guaranty is still in effect.

**38.   Quiet Possession.**  Subject to payment by Lessee of the Rent and performance of all of the covenants, conditions and provisions on Lessee's part to be observed and performed under this Lease, Lessee shall have quiet possession and quiet enjoyment of the Premises during the term hereof.

**39.   Options.**  If Lessee is granted any option, as defined below, then the following provisions shall apply.

39.1  **Definition.**  "**Option**" shall mean: (a) the right to extend or reduce the term of or renew this Lease or to extend or reduce the term of or renew any lease that Lessee has on other property of Lessor; (b) the right of first refusal or first offer to lease either the Premises or other property of Lessor; (c) the right to purchase, the right of first offer to purchase or the right of first refusal to purchase the Premises or other property of Lessor.

39.2  **Options Personal To Original Lessee.**  Any Option granted to Lessee in this Lease is personal to the original Lessee, and cannot be assigned or exercised by anyone other than said original Lessee and only while the original Lessee is in full possession of the Premises and, if requested by Lessor, with Lessee certifying that Lessee has no intention of thereafter assigning or subletting.

39.3  **Multiple Options.**  In the event that Lessee has any multiple Options to extend or renew this Lease, a later Option cannot be exercised unless the prior Options have been validly exercised.

39.4  **Effect of Default on Options.**

(a)   Lessee shall have no right to exercise an Option:  (i) during the period commencing with the giving of any notice of Default and continuing until said Default is cured, (ii) during the period of time any Rent is unpaid (without regard to whether notice thereof is given Lessee), (iii) during the time Lessee is in Breach of this Lease, or (iv) in the event that Lessee has been given 3 or more notices of separate Default, whether or not the Defaults are cured, during the 12 month period immediately preceding the exercise of the Option.

(b)   The period of time within which an Option may be exercised shall not be extended or enlarged by reason of Lessee's inability to exercise an Option because of the provisions of Paragraph 39.4(a).

(c)   An Option shall terminate and be of no further force or effect, notwithstanding Lessee's due and timely exercise of the Option, if, after such exercise and prior to the commencement of the extended term or completion of the purchase, (i) Lessee fails to pay Rent for a period of 30 days after such Rent becomes due (without any necessity of Lessor to give notice thereof), or (ii) if Lessee commits a Breach of this Lease.

INITIALS
© 2017 AIR CRE.  All Rights Reserved.

INITIALS

MTN-26.00, Revised 01-03-2017

EXHIBIT  A  pg. 11
EXHIBIT  3   pg. 19

**40.    Security Measures.**  Lessee hereby acknowledges that the Rent payable to Lessor hereunder does not include the cost of guard service or other security measures, and that Lessor shall have no obligation whatsoever to provide same. Lessee assumes all responsibility for the protection of the Premises, Lessee, its agents and invitees and their property from the acts of third parties.

**41.    Reservations.**  Lessor reserves the right: (i) to grant, without the consent or joinder of Lessee, such easements, rights and dedications that Lessor deems necessary, (ii) to cause the recordation of parcel maps and restrictions, and (iii) to create and/or install new utility raceways, so long as such easements, rights, dedications, maps, restrictions, and utility raceways do not unreasonably interfere with the use of the Premises by Lessee.  Lessee agrees to sign any documents reasonably requested by Lessor to effectuate such rights.

**42.    Performance Under Protest.**  If at any time a dispute shall arise as to any amount or sum of money to be paid by one Party to the other under the provisions hereof, the Party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest" and such payment shall not be regarded as a voluntary payment and there shall survive the right on the part of said Party to institute suit for recovery of such sum.  If it shall be adjudged that there was no legal obligation on the part of said Party to pay such sum or any part thereof, said Party shall be entitled to recover such sum or so much thereof as it was not legally required to pay.  A Party who does not initiate suit for the recovery of sums paid "under protest" within 6 months shall be deemed to have waived its right to protest such payment.

**43.    Authority; Multiple Parties; Execution.**
        (a)    If either Party hereto is a corporation, trust, limited liability company, partnership, or similar entity, each individual executing this Lease on behalf of such entity represents and warrants that he or she is duly authorized to execute and deliver this Lease on its behalf.  Each Party shall, within 30 days after request, deliver to the other Party satisfactory evidence of such authority.
        (b)    If this Lease is executed by more than one person or entity as "Lessee", each such person or entity shall be jointly and severally liable hereunder.  It is agreed that any one of the named Lessees shall be empowered to execute any amendment to this Lease, or other document ancillary thereto and bind all of the named Lessees, and Lessor may rely on the same as if all of the named Lessees had executed such document.
        (c)    This Lease may be executed by the Parties in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

**44.    Conflict.**  Any conflict between the printed provisions of this Lease and the typewritten or handwritten provisions shall be controlled by the typewritten or handwritten provisions.

**45.    Offer.**  Preparation of this Lease by either party or their agent and submission of same to the other Party shall not be deemed an offer to lease to the other Party.  This Lease is not intended to be binding until executed and delivered by all Parties hereto.

**46.    Amendments.**  This Lease may be modified only in writing, signed by the Parties in interest at the time of the modification. As long as they do not materially change Lessee's obligations hereunder, Lessee agrees to make such reasonable non-monetary modifications to this Lease as may be reasonably required by a Lender in connection with the obtaining of normal financing or refinancing of the Premises.

**47.    Waiver of Jury Trial.**  THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING INVOLVING THE PROPERTY OR ARISING OUT OF THIS AGREEMENT.

**48.    Arbitration of Disputes.**  An Addendum requiring the Arbitration of all disputes between the Parties and/or Brokers arising out of this Lease ☐ is ✔ is not attached to this Lease.

**49.    Accessibility; Americans with Disabilities Act.**
        (a)    The Premises:
☑ have not undergone an inspection by a Certified Access Specialist (CASp).  Note: A Certified Access Specialist (CASp) can inspect the subject premises and determine whether the subject premises comply with all of the applicable construction-related accessibility standards under state law. Although state law does not require a CASp inspection of the subject premises, the commercial property owner or lessor may not prohibit the lessee or tenant from obtaining a CASp inspection of the subject premises for the occupancy or potential occupancy of the lessee or tenant, if requested by the lessee or tenant. The parties shall mutually agree on the arrangements for the time and manner of the CASp inspection, the payment of the fee for the CASp inspection, and the cost of making any repairs necessary to correct violations of construction-related accessibility standards within the premises.
☐ have undergone an inspection by a Certified Access Specialist (CASp) and it was determined that the Premises met all applicable construction-related accessibility standards pursuant to California Civil Code §55.51 et seq. Lessee acknowledges that it received a copy of the inspection report at least 48 hours prior to executing this Lease and agrees to keep such report confidential.
☐ have undergone an inspection by a Certified Access Specialist (CASp) and it was determined that the Premises did not meet all applicable construction-related accessibility standards pursuant to California Civil Code §55.51 et seq.  Lessee acknowledges that it received a copy of the inspection report at least 48 hours prior to executing this Lease and agrees to keep such report confidential except as necessary to complete repairs and corrections of violations of construction-related accessibility standards.

In the event that the Premises have been issued an inspection report by a CASp the Lessor shall provide a copy of the disability access inspection certificate to Lessee within 7 days of the execution of this Lease.

        (b)    Since compliance with the Americans with Disabilities Act (ADA) and other state and local accessibility statutes are dependent upon Lessee's specific use of the Premises, Lessor makes no warranty or representation as to whether or not the Premises comply with ADA or any similar legislation.  In the event that Lessee's use of the Premises requires modifications or additions to the Premises in order to be in compliance with ADA or other accessibility statutes, Lessee agrees to make any such necessary modifications and/or additions at Lessee's expense.

LESSOR AND LESSEE HAVE CAREFULLY READ AND REVIEWED THIS LEASE AND EACH TERM AND PROVISION CONTAINED HEREIN, AND BY THE EXECUTION OF THIS LEASE SHOW THEIR INFORMED AND VOLUNTARY CONSENT THERETO.  THE PARTIES HEREBY AGREE THAT, AT THE TIME THIS LEASE IS EXECUTED, THE TERMS OF THIS LEASE ARE COMMERCIALLY REASONABLE AND EFFECTUATE THE INTENT AND PURPOSE OF LESSOR AND LESSEE WITH RESPECT TO THE PREMISES.

ATTENTION:  NO REPRESENTATION OR RECOMMENDATION IS MADE BY AIR CRE OR BY ANY BROKER AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS LEASE OR THE TRANSACTION TO WHICH IT RELATES.  THE PARTIES ARE URGED TO:
1.    SEEK ADVICE OF COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS LEASE.
2.    RETAIN APPROPRIATE CONSULTANTS TO REVIEW AND INVESTIGATE THE CONDITION OF THE PREMISES.  SAID INVESTIGATION SHOULD INCLUDE BUT NOT BE LIMITED TO: THE POSSIBLE PRESENCE OF HAZARDOUS SUBSTANCES, THE ZONING OF THE PREMISES, THE STRUCTURAL INTEGRITY, THE CONDITION OF THE ROOF AND OPERATING SYSTEMS, COMPLIANCE WITH THE AMERICANS WITH DISABILITIES ACT AND THE SUITABILITY OF THE PREMISES FOR LESSEE'S INTENDED USE.

WARNING:  IF THE PREMISES ARE LOCATED IN A STATE OTHER THAN CALIFORNIA, CERTAIN PROVISIONS OF THE LEASE MAY NEED TO BE REVISED TO COMPLY WITH THE LAWS OF THE STATE IN WHICH THE PREMISES ARE LOCATED.

The parties hereto have executed this Lease at the place and on the dates specified above their respective signatures.

Executed at: ____
On: ____

By LESSOR:
  Angela Danciu and George Danciu

By: ____
Name Printed: Angela Danciu
Title: ____
Phone: ____
Fax: ____

INITIALS
© 2017 AIR CRE.  All Rights Reserved.

Executed at: Irvine
On: Nov 13, 2017

By LESSEE:
  Kool Blast Gas, Inc., a California corporation

By: _Lewis O'Reilly_
Name Printed: Lewis O'Reilly
Title: Pres
Phone: 949 292-8868
Fax: ____

INITIALS

Page 12 of 13
Last Edited: 11/8/2017 12:02 PM

MTN-26.00, Revised 01-03-2017

Email: ___

By: _____
Name Printed:  George Danciu
Title: ___
Phone: ___
Fax: ___
Email: ___

Address: ___
Federal ID No.: ___

Email: _lewe.kcglblastgas.com_

By: _Maryellen O'Reilly M.D._
Name Printed:  Maryellen O'Reilly
Title:  Sec
Phone:  949 421-7983
Fax: ___
Email:  medusdoc@gmail.com        SJC.92675
Address: ___
Federal ID No.

**BROKER**

 Voit Real Estate Services

Attn:  Michael Cargile/John Viscounty
Title:  Sr. Vice President/Associate

Address:  2020 Main Street, Suite 100, Irvine, CA  92614
Phone:  (949) 851-5100
Fax:  (949) 261-9092
Email:  mcargile@voitco.com, jviscounty@voitco.com
Federal ID No.: ___
Broker/Agent BRE License #:   00491668 / 02028915

**BROKER**

 Newmark Grubb Knight Frank

Attn:  John Scruggs
Title:  Managing Director

Address:  4675 MacArthur Court, Suite 1600, Newport Beach, CA  92660
Phone:  (949) 608-2102
Fax: ___
Email:  jscruggs@nguf.com
Federal ID No.: ___
Broker/Agent BRE License #:  01796826

AIR CRE. 500 North Brand Blvd, Suite 900, Glendale, CA 91203, Tel 213-687-8777, Email contracts@aircre.com
NOTICE:  No part of these works may be reproduced in any form without permission in writing.

___
INITIALS
© 2017 AIR CRE.  All Rights Reserved.

INITIALS
MTN-26.00, Revised 01-03-2017

40.  Security Measures.  Lessee hereby acknowledges that the Rent payable to Lessor hereunder does not include the cost of guard service or other security measures, and that Lessor shall have no obligation whatsoever to provide same.  Lessee assumes all responsibility for the protection of the Premises, Lessee, its agents and invitees and their property from the acts of third parties.

41.  Reservations.  Lessor reserves the right: (i) to grant, without the consent or joinder of Lessee, such easements, rights and dedications that Lessor deems necessary, (ii) to cause the recordation of parcel maps and restrictions, and (iii) to create and/or install new utility raceways, so long as such easements, rights, dedications, maps, restrictions, and utility raceways do not unreasonably interfere with the use of the Premises by Lessee.  Lessee agrees to sign any documents reasonably requested by Lessor to effectuate such rights.

42.  Performance Under Protest.  If at any time a dispute shall arise as to any amount or sum of money to be paid by one Party to the other under the provisions hereof, the Party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest" and such payment shall not be regarded as a voluntary payment and there shall survive the right on the part of said Party to institute suit for recovery of such sum.  If it shall be adjudged that there was no legal obligation on the part of said Party to pay such sum or any part thereof, said Party shall be entitled to recover such sum or so much thereof as it was not legally required to pay.  A Party who does not initiate suit for the recovery of sums paid "under protest" within 6 months shall be deemed to have waived its right to protest such payment.

43.  Authority; Multiple Parties; Execution.
    (a)    If either Party hereto is a corporation, trust, limited liability company, partnership, or similar entity, each individual executing this Lease on behalf of such entity represents and warrants that he or she is duly authorized to execute and deliver this Lease on its behalf.  Each Party shall, within 30 days after request, deliver to the other Party satisfactory evidence of such authority.
    (b)    If this Lease is executed by more than one person or entity as "Lessee", each such person or entity shall be jointly and severally liable hereunder.  It is agreed that any one of the named Lessees shall be empowered to execute any amendment to this Lease, or other document ancillary thereto and bind all of the named Lessees, and Lessor may rely on the same as if all of the named Lessees had executed such document.
    (c)    This Lease may be executed by the Parties in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

44.  Conflict.  Any conflict between the printed provisions of this Lease and the typewritten or handwritten provisions shall be controlled by the typewritten or handwritten provisions.

45.  Offer.  Preparation of this Lease by either party or their agent and submission of same to the other Party shall not be deemed an offer to lease to the other Party.  This Lease is not intended to be binding until executed and delivered by all Parties hereto.

46.  Amendments.  This Lease may be modified only in writing, signed by the Parties in interest at the time of the modification.  As long as they do not materially change Lessee's obligations hereunder, Lessee agrees to make such reasonable non-monetary modifications to this Lease as may be reasonably required by a Lender in connection with the obtaining of normal financing or refinancing of the Premises.

47.  Waiver of Jury Trial.  THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING INVOLVING THE PROPERTY OR ARISING OUT OF THIS AGREEMENT.

48.  Arbitration of Disputes.  An Addendum requiring the Arbitration of all disputes between the Parties and/or Brokers arising out of this Lease ___ is ✓ is not attached to this Lease.

49.  Accessibility; Americans with Disabilities Act.
    (a)    The Premises:
☑  have not undergone an inspection by a Certified Access Specialist (CASp).  Note: A Certified Access Specialist (CASp) can inspect the subject premises and determine whether the subject premises comply with all of the applicable construction-related accessibility standards under state law.  Although state law does not require a CASp inspection of the subject premises, the commercial property owner or lessor may not prohibit the lessee or tenant from obtaining a CASp inspection of the subject premises for the occupancy or potential occupancy of the lessee or tenant, if requested by the lessee or tenant.  The parties shall mutually agree on the arrangements for the time and manner of the CASp inspection, the payment of the fee for the CASp inspection, and the cost of making any repairs necessary to correct violations of construction-related accessibility standards within the premises.

☐  have undergone an inspection by a Certified Access Specialist (CASp) and it was determined that the Premises met all applicable construction-related accessibility standards pursuant to California Civil Code §55.51 et seq.  Lessee acknowledges that it received a copy of the inspection report at least 48 hours prior to executing this Lease and agrees to keep such report confidential.

☐  have undergone an inspection by a Certified Access Specialist (CASp) and it was determined that the Premises did not meet all applicable construction-related accessibility standards pursuant to California Civil Code §55.51 et seq.  Lessee acknowledges that it received a copy of the inspection report at least 48 hours prior to executing this Lease and agrees to keep such report confidential except as necessary to complete repairs and corrections of violations of construction related accessibility standards.

In the event that the Premises has been issued an inspection report by a CASp the Lessor shall provide a copy of the disability access inspection certificate to Lessee within 7 days of the execution of this Lease.

    (b)    Since compliance with the Americans with Disabilities Act (ADA) and other state and local accessibility statutes are dependent upon Lessee's specific use of the Premises, Lessor makes no warranty or representation as to whether or not the Premises comply with ADA or any similar legislation.  In the event that Lessee's use of the Premises requires modifications or additions to the Premises in order to be in compliance with ADA or other accessibility statutes, Lessee agrees to make any such necessary modifications and/or additions at Lessee's expense.

LESSOR AND LESSEE HAVE CAREFULLY READ AND REVIEWED THIS LEASE AND EACH TERM AND PROVISION CONTAINED HEREIN, AND BY THE EXECUTION OF THIS LEASE SHOW THEIR INFORMED AND VOLUNTARY CONSENT THERETO.  THE PARTIES HEREBY AGREE THAT, AT THE TIME THIS LEASE IS EXECUTED, THE TERMS OF THIS LEASE ARE COMMERCIALLY REASONABLE AND EFFECTUATE THE INTENT AND PURPOSE OF LESSOR AND LESSEE WITH RESPECT TO THE PREMISES.

ATTENTION:  NO REPRESENTATION OR RECOMMENDATION IS MADE BY AIR CRE OR BY ANY BROKER AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS LEASE OR THE TRANSACTION TO WHICH IT RELATES.  THE PARTIES ARE URGED TO:
1.    SEEK ADVICE OF COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS LEASE.
2.    RETAIN APPROPRIATE CONSULTANTS TO REVIEW AND INVESTIGATE THE CONDITION OF THE PREMISES.  SAID INVESTIGATION SHOULD INCLUDE BUT NOT BE LIMITED TO: THE POSSIBLE PRESENCE OF HAZARDOUS SUBSTANCES, THE ZONING OF THE PREMISES, THE STRUCTURAL INTEGRITY, THE CONDITION OF THE ROOF AND OPERATING SYSTEMS, COMPLIANCE WITH THE AMERICANS WITH DISABILITIES ACT AND THE SUITABILITY OF THE PREMISES FOR LESSEE'S INTENDED USE.

WARNING:  IF THE PREMISES ARE LOCATED IN A STATE OTHER THAN CALIFORNIA, CERTAIN PROVISIONS OF THE LEASE MAY NEED TO BE REVISED TO COMPLY WITH THE LAWS OF THE STATE IN WHICH THE PREMISES ARE LOCATED.

The parties hereto have executed this Lease at the place and on the dates specified above their respective signatures.

Executed at: ___    Executed at: Irvine
On: ___    On: Nov 13, 2017
By LESSOR:    By LESSEE:
Angela Danciu and George Danciu    Kooi Blast Gas, Inc., a California corporation
By: ___    By: Lewis O'Reilly
Name Printed: Angela Danciu    Name Printed: Lewis O'Reilly
Title: ___    Title: Pres
Phone: ___    Phone: 949 292-8868
Fax: ___    Fax: ___

INITIALS    INITIALS
Page 12 of 13
Last Edited: 11/8/2017 12:02 PM
© 2017 AIR CRE.  All Rights Reserved.    MTN-26.00, Revised 01-03-2017

EXHIBIT  A  pg. 14
EXHIBIT  3  pg. 22

Email: _____

By: _____
Name Printed: George Danciu
Title: ___
Phone: ___
Fax: ___
Email: ___

Address: ___
Federal ID No.: ___

Email: lewe.koalblastgas.com

By: _____
Name Printed: Maryellen O'Reilly
Title: Sec
Phone: 949 421-7983
Fax:
Email: medusadoc@gmail.com   SJC.92675
Address:
Federal ID No.:

BROKER

Voit Real Estate Services

Attn: Michael Cargile/John Viscounty
Title: Sr. Vice President/Associate

Address: 2020 Main Street, Suite 100, Irvine, CA 92614
Phone: (949) 851-5100
Fax: (949) 261-9092
Email: mcargile@voitco.com, jviscounty@voitco.com
Federal ID No.: ___
Broker/Agent BRE License #: 00491668 / 02028915

BROKER

Newmark Grubb Knight Frank

Attn: John Scruggs
Title: Managing Director

Address: 4675 MacArthur Court, Suite 1600, Newport
Beach, CA 92660
Phone: (949) 608-2102
Fax:
Email: jscruggs@nguf.com
Federal ID No.: ___
Broker/Agent BRE License #: 01796826

AIR CRE. 500 North Brand Blvd, Suite 900, Glendale, CA 91203, Tel 213-687-8777, Email contracts@aircre.com
NOTICE: No part of these works may be reproduced in any form without permission in writing.

INITIALS
© 2017 AIR CRE. All Rights Reserved.

Page 13 of 13
Last Edited: 11/8/2017 12:02 PM

INITIALS
MTN-26.00, Revised 01-03-2017



$ a²⁶⁵

**ADDENDUM**

Date:      November 7, 2017
By and Between
Lessor:    Angela Danciu and George Danciu
Lessee:    Kool Blast Gas, Inc., a California corporation
Property Address:      1351 Logan Avenue, Suite A, Costa Mesa, CA
                       (street address, city, state, zip)

Paragraph: _50-53_

In the event of any conflict between the provisions of this Addendum and the printed provisions of the Lease, this Addendum shall control.

50.   Base Monthly Rent Schedule:

December 15, 2017 - December 14, 2018:      $7,461.00 plus Cams/Nets

December 15, 2018 - December 14, 2019:      $7,685.00 plus Cams/Nets

51.   Operating Expense, Taxes and Insurance:  Base year - $1,580.00 per month not to increase greater than 5% for the second year of the lease term.  No cap applicable in the option term if exercised.

52.   Landlord Improvements:  Landlord shall deliver the Premises in broom clean condition including the following improvements:

a)  New carpet and paint throughout office areas / 1st floor entrance and private offices will have ceramic faux wood tile.

b)  Broken, stained or missing ceiling tiles replaced.

c)  Storefront elevations and windows cleaned.

d)  Loose warehouse ceiling insulation sheets re-attached.

53.   ADA Compliance: Tenant does not intend to make permit-required improvements to the Premises. However, Landlord, at its cost shall be responsible for maintaining the Building in compliance with applicable codes including the ADA throughout the term and extensions of the Lease, should upgrades be required by the City of Costa Mesa, unless such upgrades are a result of Landlord approved tenant improvements that require ADA compliance.

AIR CRE. 500 North Brand Blvd, Suite 900, Glendale, CA 91203, Tel 213-687-8777, Email contracts@aircre.com
NOTICE: No part of these works may be reproduced in any form without permission in writing.

# AIRCRE

## OPTION(S) TO EXTEND
### STANDARD LEASE ADDENDUM

Dated:       November 7, 2017
By and Between
    Lessor:       Angela Danciu and George Danciu
    Lessee:       Kool Blast Gas, Inc., a California corporation
    Property Address:       1351 Logan Avenue, Suite A, Costa Mesa, CA
                            (street address, city, state, zip)

Paragraph: 54

**A.    OPTION(S) TO EXTEND:**

Lessor hereby grants to Lessee the option to extend the term of this Lease for   2   additional   12   month period(s) commencing when the prior term expires upon each and all of the following terms and conditions:

    (i)    In order to exercise an option to extend, Lessee must give written notice of such election to Lessor and Lessor must receive the same at least   6   but not more than   12   months prior to the date that the option period would commence, time being of the essence.  If proper notification of the exercise of an option is not given and/or received, such option shall automatically expire.  Options (if there are more than one) may only be exercised consecutively.

    (ii)    The provisions of paragraph 39, including those relating to Lessee's Default set forth in paragraph 39.4 of this Lease, are conditions of this Option.

    (iii)    Except for the provisions of this Lease granting an option or options to extend the term, all of the terms and conditions of this Lease except where specifically modified by this option shall apply.

    (iv)    This Option is personal to the original Lessee, and cannot be assigned or exercised by anyone other than said original Lessee and only while the original Lessee is in full possession of the Premises and without the intention of thereafter assigning or subletting.

    (v)    The monthly rent for each month of the option period shall be calculated as follows, using the method(s) indicated below:

(Check Method(s) to be Used and Fill In Appropriately)

**☐   I.    Cost of Living Adjustment(s) (COLA)**
    a.    On (Fill in COLA Dates):   ___   the Base Rent shall be adjusted by the change, if any, from the Base Rent specified below, in the Consumer Price Index of the Bureau of Labor Statistics of the U.S. Department of Labor for (select one): ☐ CPI W (Urban Wage Earners and Clerical Workers) or ☐ CPI U (All Urban Consumers), for (Fill in Urban Area):   ___ . All Items (1982-1984 = 100), herein referred to as "CPI".

    b.    The monthly Base Rent payable in accordance with paragraph A.I.a. of this Addendum shall be calculated as follows: the Base Rent set forth in paragraph 1.5 of the attached Lease, shall be multiplied by a fraction the numerator of which shall be the CPI of the calendar month 2 months prior to the month(s) specified in paragraph A.I.a. above during which the adjustment is to take effect, and the denominator of which shall be the CPI of the calendar month which is 2 months prior to (select one): ☐ the first month of the term of this Lease as set forth in paragraph 1.3 ("Base Month") or ☐ (Fill in Other "Base Month"):   ___ . The sum so calculated shall constitute the new monthly Base Rent hereunder, but in no event, shall any such new monthly Base Rent be less than the Base Rent payable for the month immediately preceding the rent adjustment.

    c.    In the event the compilation and/or publication of the CPI shall be transferred to any other governmental department or bureau or agency or shall be discontinued, then the index most nearly the same as the CPI shall be used to make such calculation.  In the event that the Parties cannot agree on such alternative index, then the matter shall be submitted for decision to the American Arbitration Association in accordance with the then rules of said Association and the decision of the arbitrators shall be binding upon the parties.  The cost of said Arbitration shall be paid equally by the Parties.

**☐   II.    Market Rental Value Adjustment(s) (MRV)**
    a.    On (Fill in MRV Adjustment Date(s))   ___   the Base Rent shall be adjusted to the "Market Rental Value" of the property as follows:

        1)    Four months prior to each Market Rental Value Adjustment Date described above, the Parties shall attempt to agree upon what the new MRV will be on the adjustment date.  If agreement cannot be reached, within thirty days, then:

            (a)    Lessor and Lessee shall immediately appoint a mutually acceptable appraiser or broker to establish the new MRV within the next 30 days.  Any associated costs will be split equally between the Parties, or

            (b)    Both Lessor and Lessee shall each immediately make a reasonable determination of the MRV and submit such determination, in writing, to arbitration in accordance with the following provisions:

                (i)    Within 15 days thereafter, Lessor and Lessee shall each select an independent third party ☐ appraiser or ☐ broker ("Consultant" - check one) of their choice to act as an arbitrator (Note: the parties may not select either of the Brokers that was involved in negotiating the Lease).  The two arbitrators so appointed shall immediately select a third mutually acceptable Consultant to act as a third arbitrator.

                (ii)    The 3 arbitrators shall within 30 days of the appointment of the third arbitrator reach a decision as to what the actual MRV for the Premises is, and whether Lessor's or Lessee's submitted MRV is the closest thereto.  The decision of a majority of the arbitrators shall be binding on the Parties.  The submitted MRV which is determined to be the closest to the actual MRV shall thereafter be used by the Parties.

                (iii)    If either of the Parties fails to appoint an arbitrator within the specified 15 days, the arbitrator timely appointed by one of them shall reach a decision on his or her own, and said decision shall be binding on the Parties.

                (iv)    The entire cost of such arbitration shall be paid by the party whose submitted MRV is not selected, ie. the one that is NOT the closest to the actual MRV.

        2)    When determining MRV, the Lessor, Lessee and Consultants shall consider the terms of comparable market transactions which shall include, but not limited to, rent, rental adjustments, abated rent, lease term and financial condition of tenants.

        3)    Notwithstanding the foregoing, the new Base Rent shall not be less than the rent payable for the month immediately preceding the rent adjustment.

    b.    Upon the establishment of each New Market Rental Value:

        1)    the new MRV will become the new "Base Rent" for the purpose of calculating any further Adjustments, and

        2)    the first month of each Market Rental Value term shall become the new "Base Month" for the purpose of calculating any further Adjustments.

**☑   III.    Fixed Rental Adjustment(s) (FRA)**

The Base Rent shall be increased to the following amounts on the dates set forth below:

___
INITIALS

INITIALS

© 2017 AIR CRE.  All Rights Reserved.

OE-6.00, Revised 01-03-2017

**EXHIBIT B**

**EXHIBIT  3   pg. 27**



## GUARANTY OF LEASE

WHEREAS, Angela Danciu and George Danciu , hereinafter "Lessor", and  Kool Blast Gas, Inc., a California corporation ,
hereinafter "Lessee", are about to execute a document entitled "Lease" dated  November 7, 2017  concerning the premises commonly known as (street
address, city, state, zip) 1351 Logan Avenue, Suite A. Costa Mesa, CA  wherein Lessor will lease the premises to Lessee, and

WHEREAS,  Lewis O'Reilly and Maryellen O'Reilly  hereinafter "Guarantors" have a financial interest in Lessee, and

WHEREAS, Lessor would not execute the Lease if Guarantors did not execute and deliver to Lessor this Guaranty of Lease.

NOW THEREFORE, in consideration of the execution of said Lease by Lessor and as a material inducement to Lessor to execute said Lease, Guarantors hereby
jointly, severally, unconditionally and irrevocably guarantee the prompt payment by Lessee of all rents and all other sums payable by Lessee under said Lease and the
faithful and prompt performance  by Lessee of each and every one of the terms, conditions and covenants of said Lease to be kept and performed by Lessee.

It is specifically agreed by Lessor and Guarantors that: (i) the terms of the foregoing Lease may be modified by agreement between Lessor and Lessee, or by a
course of conduct, and (ii) said Lease may be assigned by Lessor or any assignee of Lessor without the consent of or notice to Guarantors and that this Guaranty shall
guarantee the performance of said Lease as so modified.

This Guaranty shall not be released, modified or affected by the failure or delay on the part of Lessor to enforce any of the rights or remedies of the Lessor under
said Lease.

No notice of default by Lessee under the Lease need be given by Lessor to Guarantors, it being specifically agreed that the guarantee of the undersigned is a
continuing guarantee under which Lessor may proceed immediately against Lessee and/or against Guarantors following any breach or default by Lessee or for the
enforcement of any rights which Lessor may have as against Lessee under the terms of the Lease or at law or in equity.

Lessor shall have the right to proceed against Guarantors following any breach or default by Lessee under the Lease without first proceeding against Lessee and
without previous notice to or demand upon either Lessee or Guarantors.

Guarantors hereby waive (a) notice of acceptance of this Guaranty, (b) demand of payment, presentation and protest, (c) all right to assert or plead any statute
of limitations relating to this Guaranty or the Lease, (d) any right to require the Lessor to proceed against the Lessee or any other Guarantor or any other person or
entity liable to Lessor, (e) any right to require Lessor to apply to any default any security deposit or other security it may hold under the Lease, (f) any right to require
Lessor to proceed under any other remedy Lessor may have before proceeding against Guarantors, (g) any right of subrogation  that Guarantors may have against
Lessee.

Guarantors do hereby subordinate all existing or future indebtedness of Lessee to Guarantors to the obligations owed to Lessor under the Lease and this
Guaranty.

If a Guarantor is married, such Guarantor expressly agrees that recourse may be had against his or her separate property for all of the obligations hereunder.

The obligations of Lessee under the Lease to execute and deliver estoppel statements and financial statements, as therein provided, shall be deemed to also
require the Guarantors to do and provide the same to Lessor. The failure of the Guarantors to provide the same to Lessor shall constitute a default under the Lease.

The term "Lessor" refers to and means the Lessor named in the Lease and also Lessor's successors and assigns. So long as Lessor's interest in the Lease, the
leased premises or the rents, issues and profits therefrom, are subject to any mortgage or deed of trust or assignment for security, no acquisition by Guarantors of the
Lessor's interest shall affect the continuing obligation of Guarantors under this Guaranty which shall nevertheless continue in full force and effect for the benefit of the
mortgagee, beneficiary, trustee or assignee under such mortgage, deed of trust or assignment and their successors and assigns.

The term "Lessee" refers to and means the Lessee named in the Lease and also Lessee's successors and assigns.

Any recovery by Lessor from any other guarantor or insurer shall first be credited to the portion of Lessee's indebtedness to Lessor which exceeds the maximum
liability of Guarantors under this Guaranty.

No provision of this Guaranty or right of the Lessor can be waived, nor can the Guarantors be released from their obligations except in writing signed by the
Lessor.

Any litigation concerning this Guaranty shall be initiated in a state court of competent jurisdiction in the county in which the leased premises are located and the
Guarantors consent to the jurisdiction of such court. This Guaranty shall be governed by the laws of the State in which the leased premises are located and for the
purposes of any rules regarding conflicts of law the parties shall be treated as if they were all residents or domiciles of such State.

In the event any action be brought by said Lessor against Guarantors hereunder to enforce the obligation of Guarantors hereunder, the unsuccessful party in
such action shall pay to the prevailing party therein a reasonable attorney's fee. The attorney's fee award shall not be computed in accordance with any court fee
schedule, but shall be such as to full reimburse all attorneys' fees reasonably incurred.

If any Guarantor is a corporation, partnership, or limited liability company, each individual executing this Guaranty on said entity's behalf represents and
warrants that he or she is duly authorized to execute this Guaranty on behalf of such entity.

**If this Form has been filled in, it has been prepared for submission to your attorney for his approval. No representation or recommendation is made BY AIR CRE,
the real estate broker or its agents or employees as to the legal sufficiency, legal effect, or tax consequences of this Form or the transaction relating thereto.**

GUARANTORS
Lewis O'Reilly and Maryellen O'Reilly

By:
Name Printed: Lewis O'Reilly
Title: Pres
Address:

Irvine CA 92612

Executed At: Irvine
On: Nov 13, 2017

By: Maryellen O'Reilly M. D.
Name Printed: MARYELLEN O'Reilly M. D.
Title:
Address
SJC. CA 72675

AIR CRE. 500 North Brand Blvd, Suite 900, Glendale, CA 91203, Tel 213-687-8777, Email contracts@aircre.com
NOTICE: No part of these works may be reproduced in any form without permission in writing.

INITIALS
© 2017 AIR CRE. All Rights Reserved.

INITIALS

GR-3.00, Revised 01-03-2017

EXHIBIT  B pg. 1
EXHIBIT  3   pg. 28

EXHIBIT 4

Electronically Filed by Superior Court of California, County of Orange, 09/09/2021 12:42:00 PM.
30-2020-01146632-CU-BC-NJC - ROA # 32 - DAVID H. YAMASAKI, Clerk of the Court By Dollie Campos, Deputy Clerk.

**CIV-100**

| ATTORNEY OR PARTY WITHOUT ATTORNEY: | | FOR COURT USE ONLY |
|---|---|---|
| NAME: Francis T. Donohue, III    STATE BAR NO: 106801 | | |

FIRM NAME: Voss, Cook  Thel LLP
STREET ADDRESS: 2301 Dupont Drive, Suite 500
CITY: Irvine          STATE: CA    ZIP CODE: 92612
TELEPHONE NO.: 949 435-0225      FAX NO.:
E-MAIL ADDRESS: ftd@vctlaw.com
ATTORNEY FOR (name): Plaintiffs Angela Danciu and George Danciu

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** Orange
STREET ADDRESS: 700 Civic Center
MAILING ADDRESS:
CITY AND ZIP CODE:   Santa Ana, CA 92710
BRANCH NAME: Central

Plaintiff/Petitioner: Angela Danciu and George Danciu
Defendant/Respondent: Kool Blast Gas, Inc, et al

| **REQUEST FOR** (Application) | [x] **Entry of Default**  [ ] **Clerk's Judgment**<br>[ ] **Court Judgment** | CASE NUMBER:<br>30-2020-01146632-CU-BC-CJC |
|---|---|---|

**Not for use in actions under the Fair Debt Buying Practices Act (Civ. Code, § 1788.50 et seq.)** *(see CIV-105)*

1. TO THE CLERK: On the complaint or cross-complaint filed  First Amended Complaint filed
   a. on *(date):* 07/16/2021
   b. by *(name):* Angela Danciu and George Danciu
   c. [x] Enter default of defendant *(names):*
      Lewis O'Reilly

   d. [ ] I request a court judgment under Code of Civil Procedure sections 585(b), 585(c), 989, etc., against defendant *(names):*

      *(Testimony required. Apply to the clerk for a hearing date, unless the court will enter a judgment on an affidavit under Code Civ. Proc., § 585(d).)*
   e. [ ] Enter clerk's judgment
      (1) [ ] for restitution of the premises only and issue a writ of execution on the judgment. Code of Civil Procedure section 1174(c) does not apply. (Code Civ. Proc., § 1169.)
           [ ] Include in the judgment all tenants, subtenants, named claimants, and other occupants of the premises. The *Prejudgment Claim of Right to Possession* was served in compliance with Code of Civil Procedure section 415.46.
      (2) [ ] under Code of Civil Procedure section 585(a). *(Complete the declaration under Code Civ. Proc., § 585.5 on the reverse (item 5).)*
      (3) [ ] for default previously entered on *(date):*

2. **Judgment to be entered.**

| | Amount | Credits acknowledged | Balance |
|---|---|---|---|
| a. Demand of complaint . . . . . . . . . . . . $ | | $ | $ |
| b. Statement of damages* | | | |
|    (1) Special . . . . . . . . . . . . . . . . . . $ | | $ | $ |
|    (2) General . . . . . . . . . . . . . . . . . . $ | | $ | $ |
| c. Interest . . . . . . . . . . . . . . . . . . . . . $ | | $ | $ |
| d. Costs *(see reverse)* . . . . . . . . . . . . $ | | $ | $ |
| e. Attorney fees . . . . . . . . . . . . . . . . . $ | | $ | $ |
| f. **TOTALS** . . . . . . . . . . . . . . . . . $ | | $ | $ |

   g. **Daily damages** were demanded in complaint at the rate of: $          per day beginning *(date):*
   *(* Personal injury or wrongful death actions; Code Civ. Proc., § 425.11.)*

3. [ ] *(Check if filed in an unlawful detainer case.)* **Legal document assistant or unlawful detainer assistant** information is on the reverse *(complete item 4).*

Date: September 9, 2021

Francis T. Donohue III, Esq
_____        ▶ _____
(TYPE OR PRINT NAME)                         (SIGNATURE OF PLAINTIFF OR ATTORNEY FOR PLAINTIFF)

| **FOR COURT USE ONLY** | (1) [X] Default entered as requested on *(date):* 09/09/2021 |
|---|---|
| | (2) [ ] Default NOT entered as requested *(state reason):* |

DAVID H. YAMASAKI, Clerk of the Court    Clerk, by _____ Dollie Campos , Deputy

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California CIV-100
[Rev. January 1, 2020]

**REQUEST FOR ENTRY OF DEFAULT**
(Application to Enter Default)

Code of Civil Procedure, §§ 585–587, 1169
www.courts.ca.gov

**EXHIBIT  4   pg. 1**

CIV-100

| | |
|---|---|
| Plaintiff/Petitioner: Angela Danciu and George Danciu<br>Defendant/Respondent: Kool Blast Gas, Inc, et al | CASE NUMBER:<br>30-2020-01146632-CU-BC-CJC |

4. **Legal document assistant or unlawful detainer assistant (Bus. & Prof. Code, § 6400 et seq.).** A legal document assistant or unlawful detainer assistant ☐ did ☒ did **not** or compensation give advice or assistance with this form. If declarant has received **any** help or advice for pay from a legal document assistant or unlawful detainer assistant, state:

  a. Assistant's name:
  b. Street address, city, and zip code:
  c. Telephone no.:
  d. County of registration:
  e. Registration no.:
  f. Expires on (date):

5. ☒ **Declaration under Code Civ. Proc., § 585.5** (for entry of default under Code Civ. Proc., § 585(a)). This action

  a. ☐ is ☒ is not on a contract or installment sale for goods or services subject to Civ. Code, § 1801 et seq. (Unruh Act).
  b. ☐ is ☒ is not on a conditional sales contract subject to Civ. Code, § 2981 et seq. (Rees-Levering Motor Vehicle Sales and Finance Act).
  c. ☐ is ☒ is not on an obligation for goods, services, loans, or extensions of credit subject to Code Civ. Proc., § 395(b).

6. **Declaration of mailing (Code Civ. Proc., § 587).** A copy of this *Request for Entry of Default* was

  a. ☐ **not mailed** to the following defendants, whose addresses are unknown to plaintiff or plaintiff's attorney (names):

  b. ☒ **mailed** first-class, postage prepaid, in a sealed envelope addressed to each defendant's attorney of record or, if none, to each defendant's last known address as follows:

    (1)  Mailed on (date): 09/09/2021
    (2)  To (specify names and addresses shown on the envelopes):
      Lewis R. O'Reilly, ▇▇▇▇▇▇▇▇▇ne, CA 92612
      For self (pro per) and as Registered Agent for Service of
      Process for Kool Blast Gas, Inc.

I declare under penalty of perjury under the laws of the State of California that the foregoing items 4, 5, and 6 are true and correct.

Date: 09/09/2021

Francis T. Donohue III, Esq.
(TYPE OR PRINT NAME)
                               ▶          (SIGNATURE OF DECLARANT)

7. **Memorandum of costs** (required if money judgment requested). Costs and disbursements are as follows (Code Civ. Proc., § 1033.5):

  a. Clerk's filing fees . . . . . . . . . . . . . . . . . . . $
  b. Process server's fees . . . . . . . . . . . . . . . . $
  c. Other (specify): $
  d. $
  e. **TOTAL** . . . . . . . . . . . . . . . . . . . . . . . . . . . $ _____
  f. ☐ Costs and disbursements are waived.
  g. I am the attorney, agent, or party who claims these costs. To the best of my knowledge and belief this memorandum of costs is correct and these costs were necessarily incurred in this case.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

_____
(TYPE OR PRINT NAME)
    ▶      (SIGNATURE OF DECLARANT)

8. **Declaration of nonmilitary status** (required for a judgment). No defendant named in item 1c of the application is in the military service as that term is defined by either the Servicemembers Civil Relief Act, 50 U.S.C. App. § 3911(2), or California Military and Veterans Code sections 400 and 402(f).

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 09/09/2021

Francis T. Donohue III, Esq.
(TYPE OR PRINT NAME)
                              ▶        (SIGNATURE OF DECLARANT)

**REQUEST FOR ENTRY OF DEFAULT**
**(Application to Enter Default)**

**EXHIBIT 4   pg. 2**

B1040 (FORM 1040) (12/15)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>Angela Danciu and George Danciu | DEFENDANTS<br>Lewis O'Reilly |
|---|---|

| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>Francis T. Donohue III, Esq. (CSB# 106801)<br>VOSS, COOK & THEL LLP, 2301 Dupont Drive, Suite 500<br>Irvine, California 92612-7504<br>Telephone  (949) 435-0225 | ATTORNEYS (If Known)<br>Charles W. Daff, Esq.<br>2107 N. Broadway, Suite 308<br>Santa Ana, CA   92706 |
|---|---|

| PARTY (Check One Box Only)<br>☐ Debtor        ☐ U.S. Trustee/Bankruptcy Admin<br>☑ Creditor     ☐ Other<br>☐ Trustee | PARTY (Check One Box Only)<br>☑ Debtor        ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor     ☐ Other<br>☐ Trustee |
|---|---|

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
Seeking a Determination That Defendant's Debts to Plaintiffs Are Not Dischargeable Because of Fraud Pursuant to 11 U.S.C. §523(a)(2) based on claim that Debtor fraudulently forged his wife's signature on a Lease and Lease Guaranty

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☑ 62-Dischargeability - §523(a)(2), false pretenses, false representation,
        actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation
        (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
☐ 02-Other (e.g. other actions that would have been brought in state court
        if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand  $ |

Other Relief Sought

**B1040 (FORM 1040) (12/15)**

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR        Lewis O'Reilly | BANKRUPTCY CASE NO.<br>8:21-bk-12426-MW | |
| DISTRICT IN WHICH CASE IS PENDING<br>Central District California | DIVISION OFFICE<br>Santa Ana | NAME OF JUDGE<br>Hon. Mark S. Wallace |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br>/s/   Francis T. Donohue III | | |
| DATE<br>January 10, 2022 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Francis T. Donohue III | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.